UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
OCALA DIVISION

LORAN COLE,

Plaintiff,

-vs-                                              Case No.  5:05-cv-222-Oc-10GRJ

JAMES V. CROSBY, JR, Secretary, Florida
Department of Corrections,

Defendant.
_____/


## <u>ORDER</u>

This case is before the Court for consideration of a Petition for Writ of Habeas Corpus (Doc. 1) brought pursuant to 28 USC § 2254 by a Florida inmate who has been sentenced to death.  The Respondent has filed a Response and a Motion to Dismiss (Doc. 13).[1]

The issues have been fully briefed and the case is ready for decision.  No evidentiary hearing is necessary because the record is fully developed and the claims of the Petition and the Motion to Dismiss raise issues of law, not issues of fact.  <u>See</u> <u>Breedlove v. Moore</u>, 279 F.3d 952, 959 (11th Cir. 2002).  The Court finds that the Petition is untimely and that, alternatively, all of Petitioner's claims lack merit.  The Petition will be denied in its entirety.

---

[1] The offenses of conviction and the trial in state court occurred in Marion County, Florida, within this district and this division.

## **Facts and Procedural History**[2]

On Friday, February 18, 1994, Pam Edwards, then 21 years of age and a senior at Eckerd College in St. Petersburg, Florida, met her brother, John Edwards, an 18 year-old freshman at Florida State University in Tallahassee, Florida, at Hopkins Prairie in the Ocala National Forrest  for a weekend camping trip.  That evening, Petitioner, then 27 years of age, aided and abetted by William Paul, then 20 years of age, encountered Pam and John Edwards and suggested they walk to a nearby pond.  During their walk, Petitioner and Paul attacked Pam and John.  Pam was hit on the back of her head and handcuffed.  John struggled with Paul, injuring Paul's hand and head, but was eventually subdued and restrained as well.

Petitioner took Pam and John Edwards' jewelry and wallets, and  informed them that he intended to take their cars and personal property.  Paul then took Pam further up a trail, leaving John with Petitioner.  Pam heard Petitioner asking John why he hurt Paul, and heard John grunting.  Petitioner then joined Pam and Paul for a period of time, later returning to the injured John to tie him up and move him off the trail.  While Petitioner was with John, Pam heard gagging noises.  Petitioner then returned to Pam and Paul and they walked back to the Edwards' campsite.  John died that evening from a slashed throat and three blows to the head, fracturing his skull.

---

[2]   The facts concerning this case are not in dispute.  A more detailed statement of the facts can be found at Cole v. State, 701 So. 2d 845 (Fla. 1997).

Petitioner forced Pam to stay with him and Paul that evening and all day Saturday. At some point on Saturday Petitioner raped Pam twice.  On Saturday evening, Petitioner and Paul gagged Pam and tied her to two trees.  They then took as much of the Edwards' camping materials as they could, and left in Pam's car.  The next day, Petitioner and Paul returned to the campsite, dropped off Pam's car and took John's car instead.[3]

Petitioner and Paul were arrested in Ocala, Florida on Monday, February 21, 1994. The indictment, returned on March 10, 1994, consisted of five counts charging both with murder in the first degree (of John Edwards), two counts of kidnaping while armed (John and Pam Edwards), and two counts of robbery with a deadly weapon (against both John and Pam Edwards).  The indictment also charged Petitioner with two counts of sexual battery while armed (of Pam Edwards).[4]

The case was tried on September 18 through September 29, 1995.  The Petitioner, who did not testify, was convicted of all counts, including the first degree murder count involving the killing of John Edwards.  After the penalty phase the jury recommended the death sentence for the Petitioner by a vote of 12 to 0.  The trial judge then imposed a sentence of death, finding four aggravating factors:  (1) that the Petitioner had been convicted of a prior felony; (2) that the murder had been committed in the course of a

---

[3]  Pam survived her ordeal and escaped from her bounds early Sunday morning.  She immediately contacted the police, and with their help, located John's body later that day.

[4]  The defendants' trials were severed on May 17, 1995.  Paul pleaded nolo contendere to all five counts against him and was sentenced to life in prison without possibility of parole for 25 years on the murder charge and concurrent terms on the remaining charges.

kidnaping - another violent felony; (3) that the offense was committed for pecuniary gain; and (4) that the murder was especially heinous, atrocious or cruel.

The conviction and death sentence were affirmed on direct appeal.[5] <u>Cole v. State</u>, 701 So.2d 845 (Fla. 1997).  A writ of certiorari was denied by the Supreme Court of the United States on March 30, 1998.  <u>Cole v. Florida</u>, 523 U.S. 1051, 118 S.Ct 1370 (1998). A timely motion for post-conviction relief was filed in the state trial court under Florida Rule of Criminal Procedure 3.850 on May 28, 1998.  An amended motion was filed on September 27,1999.  The trial court held an evidentiary hearing and ultimately denied both motions.  An appeal, in conjunction with an original petition for habeas corpus, was then filed in the Supreme Court of Florida.  The Court denied all relief on March 18, 2003.  <u>Cole v. State</u>, 841 So.2d 409 (Fla. 2003).  The mandate was issued on April 17, 2003.  No petition for certiorari was filed in the Supreme Court of the United States, and the time for filing such a petition expired on or about June 18, 2003.  <u>See</u> Supreme Court Rule 13.1.

On September 29, 2003, Petitioner filed a motion for post-conviction DNA testing, pursuant to Florida Statute § 925.11 and Florida Rule of Criminal Procedure 3.853.  The trial court denied the motion on November 3, 2003, and the Florida Supreme Court affirmed on November 24, 2004.  <u>Cole v. State</u>, 895 So.2d 398 (Fla. 2004).  The Court denied the

---

[5] Although the Florida Supreme Court affirmed each of the Petitioner's convictions and the death sentence, the Court concluded that the trial court erred in sentencing Petitioner to a 25 year minimum mandatory sentence for each of the other six felony convictions.  Upon remand, the trial court sentenced Petitioner to concurrent life sentences for each of the six convictions.

Petitioner's motion for rehearing on February 24, 2005, and the mandate was issued on March 14, 2005.

On May 6, 2005, Petitioner filed the instant petition under 28 U.S.C. § 2254. The petition presents twenty-five claims of constitutional violations, many of which contain numerous sub-parts. On July 5, 2005, the State filed its consolidated response to each of Petitioner's claims, as well as a Motion to Dismiss the petition based on its alleged untimeliness. The Court will address each of the Petitioner's claims, but first turns to the timeliness issue.

## MOTION TO DISMISS

It is undisputed that the provisions of the Anti-Terrorism and Effective Death Penalty Act of 1996 ("AEDPA") apply to this petition. That Act provides a one-year limitations period for a state petitioner to file a petition for a federal writ of habeas corpus. 28 U.S.C. § 2244(d)(1). For purposes of this petition, the one-year period begins to run from "the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review." 28 U.S.C. § 2244(d)(1)(A). The limitations period is tolled for any time "during which a properly filed application for State post-conviction or other collateral review with respect to the pertinent judgment or claim is pending." 28 U.S.C. § 2244(d)(2).

The State contends that the petition is untimely because Petitioner did not file it within one year of the date when his state conviction and sentence became final. Petitioner's conviction and sentence became final on March 30, 1998, when the United

5

States Supreme Court denied certiorari review of Petitioner's direct appeal. Cole v. Florida, 523 U.S. 1051, 118 S.Ct. 1370 (1998). Thus, the one-year limitations period under AEDPA began to run at that time. Petitioner tolled the limitations period approximately two months later on June 8, 1998, upon the proper filing of Petitioner's state application for post-conviction relief. The decision on that application became final on March 18, 2003, and the stay of AEDPA's one-year limitations period lifted at that time. According to the State, Petitioner had until approximately mid-January, 2004 to file a habeas petition with this Court. However, Petitioner did not file the instant petition until May 6, 2005. Therefore, the State argues that it is untimely and due to be dismissed with prejudice.

Petitioner asserts that his petition is in fact timely because the one-year limitations period was tolled until March 14, 2005, the date the Florida Supreme Court issued its mandate affirming the trial court's denial of Petitioner's motion for post-conviction DNA testing. According to Petitioner, his motion for DNA testing, which he filed on September 29, 2003, constitutes a "properly filed application for State post-conviction or other collateral review" for purposes of the tolling provisions of 28 U.S.C. § 2244(d)(2). Thus under Petitioner's theory, he had until approximately mid-September of 2005 to file the instant petition.

The impact of a post-conviction motion for DNA testing on the time limitations of AEDPA is an issue of first impression in this Circuit, and one not addressed by many other courts. There appears to be only three unpublished decisions concerning this point, each

6

reaching contrary results.  The two most recent decisions stated opposite conclusions without explanation.  Cf. Wolf v. Carroll, 2005 WL 2454889, * 4 (D. Del. Oct. 5, 2005) (noting, without explanation, that a petitioner's filing of motion for post-conviction relief and DNA testing tolled the one-year AEDPA limitation period), with Carrillo v. Dretke, 2004 WL 3008605 at *2 (N.D. Tex. Dec. 28, 2004) ("[a] motion for DNA testing is not an application for state post-conviction relief or other collateral review") (internal quotations omitted).

The only decision discussing the issue is one from the Eastern District of New York, holding that a motion for DNA testing under New York law is a motion for post-conviction relief that tolls AEDPA's one year limitations period.  McDonald v. Smith, 2003 WL 22284131 (E.D.N.Y. Aug. 21, 2003).  Judge Weinstein reached that conclusion because of the specific statutory relationship under New York law between a motion for post-conviction habeas corpus relief and a motion seeking DNA testing.  There is, however, a growing body of case law to the effect that motions not directly challenging the conviction do not trigger AEDPA's tolling provision.[6]

Stated another way, motions that seek to develop or acquire the means to mount a challenge to the conviction do not interrupt the running of AEDPA's period of limitations.

---

[6] See, e.g., Moore v. Cain, 298 F.3d 361 (5th Cir. 2002) (petition for writ of mandamus, which does not directly challenge conviction or sentence, does not toll AEDPA); Tinker v. Hanks, 255 F.3d 444 (7th Cir. 2001) (request to file second motion for post-conviction relief in state court merely procedural precondition for filing and does not toll AEDPA); Bridges v. Johnson, 284 F.3d 1201 (11th Cir. 2002) (application to state panel to review and modify sentence does not directly challenge conviction and does not toll AEDPA); Walkowiak v. Haines, 272 F.3d 234 (4th Cir. 2001) (motion for correction or reduction of sentence does not directly challenge conviction and does not toll AEDPA); Adeline v. Stinson, 206 F.3d 249 (2nd Cir. 2000) (motion to revive appeal does not toll AEDPA); Lookingbill v. Cockrell, 293 F.3d 256, 263 (5th Cir. 2002) (it is the filing of the habeas petition, not a motion for appointment of habeas counsel, that tolls AEDPA's limitations period).

An application for DNA testing falls squarely within that category of preliminary proceedings and cannot be distinguished on any principled or reasoned basis.  See, e.g., Zollman v. State, 820 So.2d 1059, 1062 (Fla. 2nd DCA 2002) (the purpose of Florida's post-conviction DNA testing procedures "is to provide defendants with a means by which to challenge convictions when there is a 'credible concern that an injustice may have occurred and DNA testing may resolve the issue.'") (emphasis added) (citing In re Amendment to Fla. Rules of Criminal Procedure Creating Rule 3.853 (DNA Testing), 807 So.2d 633, 636 (Fla. 2001) (Anstead, J., concurring)).

Furthermore, the result is not as harsh as it might seem.  If DNA testing is granted to a state inmate - and the test produces evidence of exoneration - the limitations period of the statute would run anew by virtue of the newly-discovered evidence provision of 28 U.S.C. § 2244(d)(1)(D), provided the petitioner can also demonstrate due diligence.[7]

A review of Petitioner's request for DNA testing demonstrates that it does not directly challenge his conviction or sentence.  In his motion, Petitioner seeks DNA testing on all hair, blood and other bodily fluid samples taken from Pam Edwards for the purpose of establishing who raped Pam.  According to Petitioner, if the DNA testing demonstrated that both Petitioner and William Paul raped Pam, it would contradict Pam's own testimony that only Petitioner raped her, and therefore call her credibility into question.  Obviously the

---

[7] See also 28 U.S.C. § 2244(b)(2)(B)(i)(ii), which provides the ability to file a petition for habeas corpus relief and seek to have it held in abeyance while a motion for DNA testing and/or other Fla. Rule of Crim. Procedure 3.850 proceedings are exhausted in state court; and Fla. Rule. Crim. Procedure 3.853(d)(2), which provides that a motion to vacate or motion for post-conviction relief based solely on DNA test results is treated as a motion based on newly discovered evidence, and receives an extended limitations period.

DNA test results would not, therefore, demonstrate Petitioner's guilt or innocence in the murder of John Edwards, and it would not challenge his conviction directly.  It would only be one step in a convoluted argument that could possibly be used to challenge his murder conviction.  Accordingly, the State's motion to dismiss (Doc.  13) is due to be GRANTED.[8]

## PETITION FOR WRIT OF HABEAS CORPUS

Although the Court may dismiss this Petition in its entirety based on its untimeliness, the Court will address each of the Petitioner's 25 substantive claims in accordance with Clisby v.  Jones, 960 F.2d 925 (11th Cir.  1992).  As discussed below, none of these claims have any merit.

## Standard of Review

Under 28 U.S.C. § 2254(d) and (e) as amended by AEDPA, this Court's review of the state court's factual findings must be highly deferential.  Such findings are presumed to be correct unless rebutted by clear and convincing evidence.  Fugate v.  Head, 261 F.3d 1206, 1215 (11th Cir.  2001).  Similarly, the state courts' resolutions of issues of law - - including constitutional issues - - must be accepted unless they are found to be "contrary to" clearly established precedent of the Supreme Court of the United States or involve an "unreasonable application" of such precedent.  Williams v. Taylor, 529 U.S. 362, 120 S.Ct. 1495 (2000).  Indeed, it is not enough "that the federal courts believe that the state court

_____

[8] Because the Court finds that Petitioner's Habeas Corpus Petition is untimely under AEDPA, it need not consider the State's argument that Petitioner's motion for post-conviction DNA testing was not "properly filed."  See Artuz v.  Bennett, 531 U.S. 4 (2000).

was wrong; it must be demonstrated that the state court decision was "objectively unreasonable." Id. See also Breedlove v. Moore, 279 F.3d 952 (11th Cir. 2002).

Moreover, in order for a court to consider claims brought in a federal habeas petition they must first be fully exhausted in state court. 28 U.S.C. § 2254(b)(1); Kelly v. Sec'y for Dept. Of Corrections, 377 F.3d 1317, 1343 (11th Cir. 2004). In order to be exhausted, a federal claim must be fairly presented to the state courts. Picard v. Connor, 404 U.S. 270, 275, 92 S.Ct. 509, 512 (1971). A federal question raised in a federal habeas petition is not fairly presented to the state courts if the issue is only raised as a state law claim before the state courts. Anderson v. Harless, 459 U.S. 4, 6-8, 103 S.Ct. 276 (1982). Thus federal claims that have not been fairly presented - that is, where the petitioner presents his claims to the state court "such that a reasonable reader would understand each claim's particular legal basis and specific factual foundation," Kelley, 377 F.3d at 1344-45 (citing Picard, 404 U.S. at 277, 92 S.Ct. at 513) - are procedurally barred and cannot be adjudicated at the habeas stage.

## PETITIONER'S CLAIMS OF ERROR IN THE GUILT PHASE OF TRIAL

Several of Petitioner's claims concern alleged violations of his constitutional rights resulting from various alleged errors during the guilt phase of his trial. These claims can all be disposed of summarily under the Supreme Court's seminal decision in Chapman v. California, 386 U.S. 18 (1967). In that decision, the Supreme Court held that the harmless error doctrine - where a reviewing court determines that the error is so small that it has little, if any, likelihood of having changed the result of the trial - can apply to federal

constitutional errors so long as the errors are found harmless beyond a reasonable doubt. 386 U.S. at 22-24.[9]

Applying this standard to Petitioner's habeas petition, it is clear that all of Petitioner's claims of error, assuming for the moment they are true, are harmless beyond a reasonable doubt.   The evidence presented at trial overwhelming and conclusively established Petitioner's guilt.    Numerous witnesses presented compelling and unimpeachable testimony as to Petitioner's actions, including the testimony of Pam Edwards herself, and Petitioner was never able to present sufficient evidence challenging the accuracy of this testimony.   Even if the few statements and pieces of evidence Petitioner now challenges were excluded, the outcome would not have changed.  No jury would have found Petitioner not guilty; rather any jury would have found Petitioner guilty of capital murder beyond a reasonable doubt.  As such, the constitutional errors Petitioner now raises in Claims II, V,

---

[9] While Chapman does not appear to have been applied in a capital case to summarily resolve challenges to the guilt phase of trial, several courts have applied a Chapman analysis to various individual claims of constitutional error at the guilt phase, and have uniformly denied the challenges where the evidence of guilt was otherwise overwhelming.  See, e.g., Hamilton v.  Mullin, 436 F.3d 1181, 1188-89 (10th Cir. 2006) (prosecutor's improper closing argument comments were harmless beyond a reasonable doubt due to overwhelming uncontradicted evidence of guilt); Sims v. Brown, 425 F.3d 560 (9th Cir. 2005) (admission of allegedly improperly obtained confessions harmless error beyond a reasonable doubt in light of overwhelming evidence of guilt and intent to commit murder); Ward v.  French, 165 F.3d 22 (4th Cir. 1998) (concluding in part that improper prosecutorial comments during closing argument were harmless beyond a reasonable doubt  where the evidence of defendant's guilt was overwhelming); Tucker v.  Kemp, 762 F.2d 1496, 1501-03 (11th Cir.  1985) (finding that improper jury instructions were harmless beyond a reasonable doubt where evidence of guilt and intent were overwhelming); Boggs v.  Bair, 695 F.  Supp. 864, 871 (E.D. Va.  1988) (denying petitioner's challenge to admission of irrelevant and inflammatory portions of murder confession where evidence of guilt was otherwise so overwhelming "as to render any prejudice in the guilt phase harmless"), aff'd in part, rev'd in part, 892 F.2d 1193 (4th Cir.  1989).

VI, VII, VIII, IX, X, XI, XIII, XVII, IXX, and XX with respect to the guilt phase of his trial are necessarily harmless beyond a reasonable doubt, and therefore denied.[10]

### CLAIM I

THE TRIAL COURT VIOLATED PETITIONER'S SIXTH AND FOURTEENTH AMENDMENT RIGHTS BY ALLOWING A PORTION OF THE TESTIMONY OF THE KEY STATE WITNESS TO BE READ BACK TO THE JURY WITHOUT READING THE PERTINENT CROSS-EXAMINATION

Petitioner argues in his first claim that the trial court abused its discretion by allowing a portion of Pam Edwards' testimony to be read back to the jury during the penalty phase - upon the jury's request - without reading any portions of her cross-examination testimony as well.   The testimony related to Pam's recollections regarding John Edwards' apology to her for having introduced her to Petitioner and Paul, her separation from John, and what she heard while Petitioner was alone with John.   Petitioner's trial attorney objected to this testimony, requesting that the jury either rely on their own recollections, or be read all of Pam's direct, cross, and redirect testimony regarding the entire chain of events.   The trial court overruled the objection, and allowed only the requested portions of Pam's testimony to be read to the jury.   At the conclusion of the reading, the trial court confirmed with the jury that the portion read back was precisely what they had requested.   See Exh.  A-17 at 1574-92.

---

[10] Even though the Court firmly believes that Petitioner's guilt phase claims can be disposed of under Chapman and its progeny, the Court will still address each claim on its own individual merits as yet another ground for denial.  Clisby v.  Jones, 960 F.2d 925 (11th Cir.  1992).

Petitioner raised this claim on direct appeal to the Florida Supreme Court.   In

denying this claim the Florida Supreme Court stated:

> Under Florida Rule of Criminal Procedure 3.410,
> upon request of the jury, a trial court has the
> discretion to order testimony to be read to them.
> See Haliburton v.  State, 561 So.2d 248, 250 (Fla.
> 1990).  We have found no abuse of discretion when
> a trial court rereads testimony specifically requested
> by the jury and that testimony is not misleading and
> does not place undue emphasis on any particular
> statements.  Garcia v.  State, 644 So.  2d 59, 62
> (Fla.  1991); Haliburton.  We have reviewed the
> record in this case and find no abuse of discretion
> by the trial court in allowing the rereading of
> portions of the testimony.  The portions reread to
> the jury were directly responsive to the jury's
> request, and the limited rereading was not
> misleading and did not place undue emphasis on
> portions prejudicial to Cole.  Accordingly, we find
> this issue meritless.

Cole v.  State, 701 So.2d at 850.

In this Circuit it has also been held that a response to a jury's request to review

witness testimony is entrusted to the trial court's sound discretion, and that the trial judge

has wide discretion in determining whether testimony should be read back to the jury upon

request.  United States v.  McDonald, 935 F.2d 1212, 1222 (11th Cir.  1991);  United States

v.  Braxton, 417 F.2d 878, 880 (5th Cir.  1969).  Petitioner's arguments do not demonstrate

an abuse of the trial court's discretion in this area.  His arguments mirror those raised in

his state court appeal, and Petitioner has not cited any Supreme Court or other federal

precedent that was unreasonably applied or is contrary to the Florida Supreme Court's

disposition of this claim.[11]  The Florida Supreme Court was not "objectively unreasonable" when it found that the trial court acted within its discretion in only permitting the requested portions of Pam Edwards' testimony to be read back to the jury.  Petitioner has failed to establish any grounds for federal habeas relief on this issue.  Claim One is without merit and is Denied.

### CLAIM II

THE TRIAL COURT CONDUCTED PORTIONS OF THE TRIAL WHEN PETITIONER WAS INVOLUNTARILY EXCLUDED, DENYING HIS RIGHTS TO DUE PROCESS UNDER THE SIXTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION

Petitioner's second claim is similarly without merit.  Petitioner contends that he was involuntarily absent from the following courtroom proceedings: (1) a hearing on the State's motion to sever Petitioner's trial from Paul; (2) a conference requested by Paul's attorney regarding threats made by Petitioner against Paul; (3) a June 9, 1995 hearing on his motion to continue the trial; (4) numerous unidentified status conferences; and (5) various bench conferences held during the trial.  According to Petitioner, these proceedings were

---

[11] The two decisions cited by Petitioner do not support his claim and are factually distinguishable. Both decisions simply reiterate that it is within a trial court's discretion to decide whether to allow testimony to be read back to the jury.  In United States v.  Holmes, 863 F.2d 4 (2nd Cir.  1988), the Second Circuit Court of Appeals held that there was no abuse of discretion even in situations where the trial court does not even allow defense counsel an opportunity to oppose the testimony before it was read back - a situation very different than the instant case, where Petitioner's trial counsel was heard in some detail on this issue. And, in United States v.  Rabb, 453 F.2d 1012 (3d Cir.  1971), the Third Circuit Court of Appeals actually reversed a trial court for denying a jury's request to have witness testimony read back to them.

"crucial stages of his trial," and his absence violated his Sixth and Fourteenth Amendment due process rights.

As the Supreme Court stated in <u>Kentucky v. Stincer</u>, 482 U.S. 730, 745 (1987), "a defendant is guaranteed the right to be present at any stage of the criminal proceeding that is critical to its outcome if his presence would contribute to the fairness of the procedure." <u>See also</u> <u>Diaz v.  Sec'y for Dept.  Of Corrections</u>, 402 F.3d 1141 (11th Cir.  2005).  Thus, in order to determine whether Petitioner's claim has any merit, the Court must determine both whether the proceedings listed above were "critical" to the outcome of the trial, and whether Petitioner was in fact absent.

Neither party disputes that a hearing on a motion to sever the trials of multiple defendants would be critical to the outcome of trial.  However, as the Florida Supreme Court held, Petitioner was in fact present at the hearing:  "[t]he record reflects that the trial court delayed hearing arguments on the motion until Cole was present.  The trial court ultimately granted the motion at a status conference at which Cole was present.  Thus we find this issue without merit."  <u>Cole v.  State</u>, 701 So.  2d at 850.  Petitioner has not presented any clear and convincing evidence to rebut these findings.  Thus, because Petitioner was present at the hearing on the motion to sever, and the record reflects that both the trial court and the State took great pains to ensure his presence and participation, the Court finds this claim untenable and without merit.  <u>See</u> Exh.  A-2 at 330-31, 350, 376; Exh.  A-2 at 15-18.

Similarly, Petitioner's claim that his constitutional rights were violated when he was not present at a conference concerning his threats against Paul is due to be denied.  As the Florida Supreme Court found: "the hearing had only to do with whether Paul's safety required that Paul be moved to another jail." Cole v. State, 701 So.2d at 850, n. 4. See also A-1 at 30-33.  The conference had nothing to do with Petitioner's trial; indeed, his trial had already been severed from Paul's, and the Petitioner had no right to be involved in the hearing to begin with.  Petitioner has not provided any clear and convincing evidence to refute this finding by the Florida Supreme Court, nor has he explained in any way how the Florida Supreme Court's determination is contrary to any clearly established law or an unreasonable application of such law.  Clearly, such a conference was not critical to the outcome of Petitioner's trial, and his absence did not violate his constitutional rights to due process and a fair trial.[12]

Petitioner also claims that his absence from the June 9, 1995 hearing on a motion to continue unconstitutionally prejudiced his right to a fair trial.  However, it is unclear from the record whether he was actually absent from the hearing, and there are no allegations that Petitioner requested to be present at the hearing.  Moreover, it was the Petitioner's motion to continue, which addressed scheduling issues faced by his trial counsel in completing expert witness discovery and witness depositions.  The motion did not involve

---

[12]  Petitioner argues in his Petition that this hearing also included discussion of Petitioner's previously filed pro se motion to disqualify his defense counsel.  Such an argument at this stage is simply ludicrous - Petitioner admitted in his direct appeal to the Florida Supreme Court that this "discussion" "was not of great import or significance," and that Mr. Paul's lawyer merely wished to clear up a joking reference made to Petitioner's trial counsel at a prior hearing. See Exh. B at 28, n. 23.

the facts or legal theories of Petitioner's case, and thus was not critical to the outcome of his trial.  Indeed, his motion to continue, though denied at that hearing, was effectively granted at a later time when the trial was postponed from June to September.  Petitioner has failed to provide clear and convincing evidence that his federal rights were violated by his apparent absence from this hearing.

Petitioner's claimed absence from various unidentified status conferences is similarly frivolous - Petitioner does not specify which status conferences he was allegedly prohibited from attending, the subject matter of these status conferences, whether Petitioner demanded to be present at these conferences, or how Petitioner's alleged absence prejudiced his right to a fair trial.  Thus, Petitioner has failed to provide any clear and convincing evidence that his federal rights were violated, or that the Florida Supreme Court's dismissal of this claim was contrary to any established federal law.

Lastly, Petitioner's claim that he was denied access to various bench conferences held throughout the trial is both procedurally barred, and without merit.  These bench conferences were held in the hallway outside the courtroom, due to the poor acoustics in the courtroom proper.  More importantly, the conferences were moved outside <u>at the request of Petitioner's trial counsel</u>.  Trial counsel did not object at any point during the trial to Petitioner's absence from these conferences, and the Florida Supreme Court held that any such objections were procedurally barred for that reason.  <u>Cole v.  State</u>, 701 So.2d at 850.  As such, to the extent Petitioner's claim is based on his absence from these bench conferences, this claim is procedurally barred.  <u>Coleman v.  Thompson</u>, 501 U.S. 722, 750

17

(1991) (issues found procedurally barred at the state court level cannot be raised in a habeas proceeding in federal court); Harris v. Reed, 489 U.S. 255, 109 S.Ct. 1038 (1989) (same).[13]

Even if this claim was not procedurally barred, it is without substantive merit. The Florida Supreme Court found that "these conferences involved purely legal issues for which Cole's presence would not have aided counsel."[14] Cole v. State, 701 So.2d at 850. It is settled Florida law that a defendant does not have a constitutional right to be present at bench conferences which involve purely legal matters. Coney v. State, 653 So.2d 1009, 1013 (Fla.), cert. denied, 516 U.S. 921, 116 S.Ct. 315 (1995); Hardwick v. Dugger, 648 So.2d 100 (Fla. 1994); see also Florida Criminal Rule of Procedure 3.180(a) (listing instances where presence of Defendant is required - presence at bench conferences where legal issues are discussed is not included).

Florida law mirrors the Supreme Court's decision in Stincer. See 482 U.S. at 745 (defendant has right to attend any critical proceedings where his presence would contribute

---

[13] The only way Petitioner could successfully bring this claim before this Court would be to argue that he is "actually innocent," or show "cause and prejudice" for this procedural default. Sims v. Singletary, 155 F.3d 1297, 1311 (11th Cir. 1998); Johnson v. Singletary, 938 F.2d 1166, 1174-75 (11th Cir. 1991). Petitioner has made no such argument or showing.

[14] For example, one of the conferences involved a motion in limine where a witness was instructed not to reveal the contents of a letter written to her by Petitioner. Another conference involved Petitioner's motion for a mistrial and/or request for a curative jury instruction, and another conference involved deciding how best to answer a juror's question. The conference Petitioner relies most heavily on involved the trial court's hallway questioning of Petitioner's trial counsel as to his tactical decision to call a specific witness out of order and forfeit his right to the first and last closing arguments. Exh. A-14 at 1064-65. Petitioner argues that his absence from this last conference prejudiced him in that he was unable to question his trial counsel's tactical decision. However, this, as with the other bench conferences, are all legal disputes. Any "missed opportunity" would not have affected the trial or helped to resolve the issue, but at best could be used to later assert an ineffective assistance of counsel claim.

to the fairness of the procedure).  Petitioner's presence at any of the bench conferences identified in his petition would not have been useful in ensuring a more reliable determination of any of the matters at issue in his trial.  See id. at 747, 107 S.Ct. 2658 (the respondent gave no indication that his presence at the hearing would have been useful in ensuring a more reliable determination). These various bench conferences involved essentially legal argument, and there is no constitutional right to be present at such proceedings.  Cf. In re Shriner, 735 F.2d 1236, 1241 (11th Cir.1984) (the petitioner had no constitutional right to be present at the bench during conferences that involved purely legal matters).

Petitioner has not attempted to refute that these bench conferences involved purely legal matters, nor has he demonstrated that he was in any manner prejudiced by his absence from these proceedings.  It is also apparent that he "would have added nothing nor gained anything by attending" these proceedings.  See United States v. Gagnon, 470 U.S. 522, 527 (1985) (the respondents "could have done nothing had they been at the conference, nor would they have gained anything by attending.").  The Florida Supreme Court's resolution of this question was not "objectively unreasonable" - there is no constitutional infirmity with regard to this matter and Claim II is Denied.[15]

### CLAIM III

THE JURY'S RECOMMENDATION AT THE
PENALTY PHASE WAS TAINTED BY HIGHLY

---

[15] This analysis would also apply to Petitioner's claim to the extent it focuses on the June 9, 1995 motion to continue hearing, and various unidentified status conferences.

19

INFLAMMATORY AND IMPROPER VICTIM
IMPACT EVIDENCE

In his third claim for relief, Petitioner contends that the trial court erred by permitting "highly emotional and inflammatory" victim-impact testimony during the penalty phase of the trial.  Specifically, Petitioner takes issue with the trial court's decision to allow Brock T. Fallon, John Edwards' former high school teacher, to testify.  Mr. Fallon testified "that John was a good student who was respected for his scholastic abilities as well as hs personality."  Cole v. State, 701 So.2d at 851.  Petitioner takes issue with Mr. Fallon's additional testimony that he felt "like that the Stars and Stripes lost something" with John's death.  See Exh. A-15 at 1345.  On direct appeal, the Florida Supreme Court found that "this testimony was limited to that which was relevant under [Florida Statute] section 921.141(7), and therefore we find no reversible error."[16]  Cole v. State, 701 So.2d at 851.

The Florida Supreme Court's analysis was not contrary to, or an unreasonable application of, any federal constitutional law.   In fact, Petitioner's argument on this issue is simply a recitation of the applicable federal standards, upon which the Florida victim-impact testimonial scheme is based.  Cf. Florida Statute § 921.141(7) (victim impact evidence  "shall be designed to demonstrate the victim's uniqueness as an individual human being and the resultant loss to the community's members by the victim's death.  Characterizations and opinions about the crime, the defendant, and the appropriate

---

[16] Fla. Stat. § 921.141(7) provides for the introduction of victim-impact evidence to the jury in the penalty phase of a capital case, once the prosecution has provided evidence of one or more statutory aggravating factors.

sentence shall not be permitted as a part of victim impact evidence") with <u>Payne v. Tennessee</u>, 501 U.S. 808, 827, 830, n.2., 111 S.Ct. 2597, 2609, 2611, n.2 (1991) (permitting admission of victim-impact evidence concerning the victim and the impact of the victim's death on the family, but characterizations and opinions of the crime, the defendant/petitioner, and the appropriate sentence violate the Eighth Amendment). There is not a shred of evidence indicating that Mr. Fallon provided any opinion as to the nature of Petitioner's crime, the Petitioner himself, or an appropriate sentence. His testimony was clearly within the bounds of both § 921.141(7), and federal law. This claim is denied.

## CLAIM IV

THE IMPOSITION OF THE DEATH PENALTY IS DISPROPORTIONATE IN THIS CASE WHERE THE TRIAL COURT RELIED UPON INAPPROPRIATE AGGRAVATING CIRCUMSTANCES, FAILED TO FIND VALID MITIGATING CIRCUMSTANCES, AND ERRED IN WEIGHING BOTH. THIS VIOLATES PETITIONER'S RIGHTS UNDER THE EIGHTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION

In claim four, Petitioner argues that the trial court made several errors with respect to its consideration of various aggravating and mitigating factors during the penalty phase. This claim is not properly before the Court because it was not fully exhausted in the state courts below. While Petitioner raised this claim in state court, he raised it solely as an issue of state law. The Court has thoroughly reviewed Petitioner's appellate briefs to the Florida Supreme Court and finds no reference to any <u>federal</u> precedents or legal theories.

As such, Petitioner's attempts to reclassify this claim as a deprivation of a federal right cannot go forward.  See Kelly v. Sec'y for Dept.  Of Corrections, 377 F.3d 1317, 1343-45 (11th Cir.  2004).  Moreover, to the extent Petitioner requests this Court conduct a proportionality review of his sentence, the Court cannot do so.  See Mills v. Singletary, 161 F.3d 1273, 1281-82 (11th Cir.  1998) ("We have instructed district courts to refuse such requests when deciding habeas corpus petitions.").

Even if Petitioner could somehow show that he had raised federal issues before the Florida Supreme Court, his claim would still fail.  First, Petitioner asserts that the trial court erred in finding that the murder of John Edwards was especially heinous, atrocious, or cruel - one of the aggravating factors required for a sentence of death under Florida Statute § 921.141(5)(h) - and that the trial court should not have instructed the jury on this issue.  On direct appeal, the Florida Supreme Court rejected this argument, affirming the trial court's lengthy findings of fact with respect to this aggravator.

According to the Florida Supreme Court, a murder may fit within the heinous, atrocious and cruel aggravator "if it exhibits a desire to inflict a high degree of pain, or an utter indifference to or enjoyment of the suffering of another. . . .  When evaluating the evidence, the trial court may consider the victim's fear and emotional strain as contributing to the heinous nature of the murder. . . ." Cole v. State, 701 So.2d at 851.  In applying this standard, the trial court found that John Edwards expressed "concern and understanding of the developing events [as] evidenced by his statement of regret for getting them into the situation.  Although faced with personal danger and physical harm, John's only comment

was 'I'm sorry Pam.'"  Id.   The trial court also found that the evidence and testimony - including that of the Medical Examiner - demonstrated that John Edwards was still alive at the time Petitioner beat him over the head, and that he was alive and conscious at the time Petitioner slit his throat.  Id.  Finally, the trial court found that John Edwards lived for several minutes after Petitioner slit his throat, while suffering from the inability to breath and making gagging noises, and that Petitioner joked to Pam Edwards that John was simply "having trouble with his dinner."  Id.  Based on these facts, the trial court found - and the Florida Supreme Court affirmed - that:

> the State has proved beyond a reasonable [doubt] that the Defendant subjected John Edwards to a slow, tortu[r]ous death.  John was conscious for several minutes while he gasped [for] air from a severed windpipe slow[ly] filling with blood.  Death finally resulted from the head wounds and loss of blood from the severed throat.  The beatings and the manner in which the Defendant killed John Edwards evidences a total indifference on the part of the Defendant to the victim's suffering.  The Defendant knew the victim died a slow, choking death and reacted with a joke.  The Court finds that the testimony and evidence establishes that the Defendant committed the murder of John Edwards in a manner that was especially heinous, atrocious or cruel.

Cole v.  State, 701 So.2d at 852.

Petitioner claims that the State did not prove beyond a reasonable doubt that:  (a) John Edwards was conscious at the time of his death; (b) John Edwards was aware he was

about to die; and (c) Petitioner intended for John Edwards to suffer.[17]  However, Petitioner

has not submitted any clear and convincing evidence to refute any of the trial court's

detailed findings on each of these issues.   Nor has Petitioner explained how the Florida

Supreme Court's affirmance of the trial court's factual findings is contrary to any federal or

constitutional law or an unreasonable application of any such law.   Rather, Petitioner

merely cites to Justice Marshall's concurrence in Godfrey v.  Georgia, 466 U.S. 420, 437

(1980) for the proposition that actions taken after a victim dies cannot be relied upon to

support a sentence of death.   Clearly that is not what happened in this case.   Accordingly,

this portion of Petitioner's claim is denied.

Next, Petitioner argues that the trial court afforded too much weight to the prior-

violent-felony aggravator because it was based on Petitioner's contemporaneous

convictions for violent felonies against both Pam and John Edwards.   The Supreme Court

found that this aggravator was established beyond a reasonable doubt.   Cole v. State 701

---

[17] The decisions cited by Petitioner with respect to this claim are factually distinguishable from the present case, and therefore do not support Petitioner's argument that his crime was not especially heinous, atrocious or cruel.  For example, in Elam v. State, 636 So.2d 1312 (Fla.  1994), the Florida Supreme Court rejected a death penalty sentence where the victim was beaten to death in less than a minute, and never regained consciousness.  And in Rhodes v.  State, 547 So.2d 1201 (Fla.  1989), the court rejected the heinous, atrocious or cruel aggravator where there were conflicting stories as to whether the victim was drunk and/or conscious at the time of her death.  Similarly, in Robinson v.  State, 574 So.2d 108 (Fla. 1991), the victim died almost instantaneously from a gunshot wound to the head, and had been previously assured that she would not be harmed.  However, in Petitioner's case, there was ample evidence - which Petitioner has not refuted - demonstrating both that John Edwards was alive at the time he was beaten and his throat was slashed, that he was conscious at least at the time of his beating and most likely at the time his throat was slashed, that he was aware of the dangerous situation he and Pam were in (any assurances of safety were made to Pam, not to John), and that he suffered for several minutes - literally suffocating on his own blood - prior to his death.  The decisions Petitioner cites in support of his argument that he did not intend for John Edwards to suffer are equally distinguishable - they each dealt with situations where the killings were committed during an emotional rage, or a "crime of passion," or where the jury suggested a life sentence based on the defendant's use of drugs and alcohol at the time of the murder.  Clearly none of these situations existed in the present case.

So.2d at 852.  The Florida Supreme Court also rejected Petitioner's reliance upon <u>Terry v. State</u>, 668 So.2d 954 (Fla.  1996).[18]  Petitioner does not provide any clear and convincing evidence to refute this aggravator, and has failed to explain how the Florida Supreme Court's rejection of Petitioner's argument and distinguishing of <u>Terry</u> was either contrary to established federal law, or an unreasonable application of such law.  Therefore, this portion of Petitioner's claim is denied.

Petitioner next contends that the trial court erred in finding two additional aggravating factors: (1) that the murder of John Edwards was committed during the course of a kidnapping; and (2) that the murder of John Edwards was for pecuniary gain.  The Florida Supreme Court found that each aggravating circumstance was established beyond a reasonable doubt:  "[t]he record contains competent, substantial evidence to support the trial court's findings regarding these aggravators, and we find no error in the trial court's ruling that each aggravator be considered separately."  <u>Cole v.  State</u>, 701 So.2d at 852.  The Florida Supreme Court was particularly persuaded by the fact that the jury returned a guilty verdict as to the charges against Petitioner for the kidnapping and robbery of John Edwards - verdicts which Petitioner has never challenged.  <u>Id.</u>

Petitioner does not even attempt to refute these factual findings; rather he claims that beating John Edwards to the ground, binding his hands and legs, taking his jewelry, money, camping equipment and car, and moving him down the forest trail does not

---

[18] In <u>Terry</u>, the court improperly relied on this aggravator where the defendant was a principal in an aggravated assault committed by a <u>co-defendant</u>.  The Florida Supreme Court distinguished the present case from <u>Terry</u> based on Petitioner's own actions against Pam Edwards - her kidnaping, repeated rape, and robbery.  <u>Cole v State</u>, 701 So.2d at 852.

constitute kidnapping and robbery.  Apparently, Petitioner believes that a victim must be moved a great distance in order to be "kidnapped," and that Petitioner murdered John Edwards in retaliation for John's struggle with Cole.  This argument defies logic and the facts as set forth in the trial record.  Moreover, Petitioner has not come close to meeting his burden under AEDPA with respect to this claim - he has not provided any clear and convincing evidence that the trial court's findings were incorrect, nor has he pointed to any federal or constitutional precedents which the Florida Supreme Court applied unreasonably or acted contrary to.  This portion of Petitioner's claim therefore is denied.

Finally, Petitioner asserts that the trial court did not afford appropriate weight to the mitigating evidence presented by Petitioner's trial counsel.  During the penalty phase of the trial, Petitioner's trial counsel presented evidence in three categories of nonstatutory mitigation:[19] (1) the fact that Cole received a lighter sentence; (2) Petitioner's mental incapacity; and (3) Petitioner's abused and deprived childhood.

In Florida, the disparate treatment of a codefendant - in this case Paul's receipt of a life sentence - can constitute a nonstatutory mitigating circumstance when the defendants are equally culpable.  See Pentecost v. State, 545 So.2d 861, 863 (Fla. 1989).  However, it is clear from the facts of this case - which Petitioner has been unable to refute - that Petitioner and Paul were not equally culpable.  Indeed, the Florida Supreme Court agreed

---

[19] Florida Statute § 921.141(6) lists seven mitigating circumstances which the jury and trial court must consider in deciding whether the death penalty is appropriate.  The trial court in this case determined that none of these statutory mitigating factors existed with respect to Petitioner.  See Exh.  A-6 at 917-18.  The trial court did find, however, several instances of mitigating conditions which were not listed in the statute - the "nonstatutory" mitigators discussed above.

with the trial court's conclusion "that since Cole was the dominant actor and the one who committed the actual murder, the codefendant's life sentence was not a mitigating factor. See Hays v. State, 581 So.2d 121, 127 (Fla. 1991) (disparate treatment of codefendant is justified when defendant is more culpable participant in crime.)." Cole v. State, 701 So.2d at 852. Petitioner has made no argument at all to support his challenge of the Florida Supreme Court's resolution of this issue, and the Court finds no unreasonable application of federal law. See Mills v. Singletary, 161 F.3d 1273, 1283 (11th Cir. 1998).

With respect to the remaining nonstatutory mitigating factors, Petitioner claims that the trial court erred when it did not give more weight to his difficult childhood, use of drugs and alcohol, and mental condition. The Florida Supreme Court rejected this claim on direct appeal, holding that:

> Deciding the weight to be given a mitigating circumstance is within the trial court's discretion, and a trial court's decision is subject to the abuse-of-discretion standard. . . . In the sentencing order, the trial court detailed the evidence presented regarding each circumstance proposed, found each of these nonstatutory mitigators to exist, and afforded them the weight which the court found was appropriate. . . . We thus find no error.

Cole v. State, 701 So.2d at 853.

Once again, Petitioner has not come forward with clear and convincing evidence to demonstrate that the trial court's findings with respect to these nonstatutory mitigating factors was in error. Nor has Petitioner pointed to any federal precedents which the Florida

Supreme Court unreasonably applied or acted contrary to, and the Court is unaware of

any.  As such, Petitioner's Claim IV is denied.

### CLAIM V

A STATE WITNESS REFERRED TO
PETITIONER'S PRIOR CRIMINAL RECORD,
VIOLATING HIS FIFTH, SIXTH, EIGHTH, AND
FOURTEENTH AMENDMENT RIGHTS TO A FAIR
TRIAL

Petitioner's fifth claim strains credulity and is due to be denied.  In essence,

Petitioner contends that the trial court erred by not granting a mistrial when a prosecution

witness, Mary Gamble, (an acquaintance of the Petitioner), stated on direct examination

that she "knew some history on K.C. [the Petitioner], so I decided to go outside and look

at the tag on the [Petitioner's] car."  Exh.  A-12 at 889.  According to Petitioner, this lone

and indefinite statement clearly referred to Petitioner's prior criminal record, an area which

the trial court had previously directed the witness to avoid.  In response to Petitioner's trial

counsel's motion for a mistrial, the State asserted that Ms.  Gamble's statement would not

be interpreted by an ordinary person to refer to criminal history, but rather referred to

Petitioner's general dishonest and deceitful nature, and that the statement had not been

intentionally elicited during the witness' examination.  The trial court denied the motion and

agreed to give a curative instruction to the jury - which trial counsel for Petitioner declined.

Id.  at 889-92.

On direct appeal, the Florida Supreme Court rejected Petitioner's claim of error,

stating that:

28

> [a] ruling on a motion for mistrial is within the sound
> discretion of the trial court.  See Power v.  State,
> 605 So.2d 856, 861 (Fla.  1992).  A motion for
> mistrial should be granted only when it is necessary
> to ensure that the defendant receives a fair trial.  Id.
> Based upon our review of the record, we agree that
> the reference was isolated and inadvertent and was
> not focused upon.  See Merck v.  State, 664 So.2d
> 939, 941 (Fla.  1995).  Since this remark was not so
> prejudicial as to require reversal, we hold that the
> trial court did not abuse its discretion.   See
> generally, Ferguson v.  State, 417 So.2d 639, 642
> (Fla.  1982).

Cole v.  State, 701 So.2d at 853.

As an initial matter, Petitioner is barred from raising any constitutional or federal law violations on this issue, because he never raised any such claims before the Florida Supreme Court.  In fact, Petitioner made no reference in his appeal to any constitutional or federal rights that were allegedly violated as a result of Ms.  Gamble's testimony.  His arguments rested solely on state law interpretations, and it is clear that the Florida Supreme Court decided this claim solely under state law principles.  Cole v.  State, 701 So.2d at 853.  As such, this claim is procedurally defaulted.  McNair v.  Campbell, 416 F.3d 1291, 1302-04 (11th Cir.  2005), Kelley, 377 F.3d at 1343-45; see also Duncan v.  Henry, 513 U.S. 364, 366, 115 S.Ct.  887, 888 (1995).

Even if Petitioner had not defaulted on this claim, it would be denied.  Petitioner has carried his failure to reference federal precedent into his federal habeas petition - he has made absolutely no showing that the Florida Supreme Court's analysis of this claim was

"contrary to" clearly established federal law or involved an "unreasonable application" of such precedent.   This failure alone dooms his claim.

Moreover, federal review of a state trial court's decision on the admissibility of evidence is highly constricted - habeas corpus relief will be granted only when the evidentiary ruling "affects the fundamental fairness of the trial."   Mills v.  Singletary, 161 F.3d 1273, 1289 (11th Cir.  1998); Baxter v.  Thomas, 45 F.3d 1501, 1509 (11th Cir.), cert. denied, 516 U.S. 946, 116 S.Ct.  385 (1995).  Petitioner has not demonstrated how Ms. Gamble's statement adversely affected his trial or impacted its fundamental fairness.  This claim is denied.

## CLAIM VI

> THE TRIAL COURT'S DENIAL OF A CHANGE OF VENUE PRECLUDED THE SELECTION OF A FAIR AND IMPARTIAL JURY AND VIOLATED THE PETITIONER'S RIGHTS UNDER THE FIFTH, SIXTH, EIGHTH, AND FOURTEENTH AMENDMENTS.

Petitioner argues in his sixth claim that his constitutional rights were violated when the state trial court denied his motion for a change of venue.  On September 14, 1995, Petitioner filed a motion for change of venue based on pretrial publicity.  Exh.  A-4 at 692-706.   As grounds for the motion, Petitioner's trial counsel referred to five newspaper articles and various television coverage.  After hearing argument from counsel, the trial court took the motion under advisement with the explanation that the trial court would first attempt to select a fair and impartial jury. Exh.  A-7 at 7-10.  Petitioner renewed his motion following selection of a jury, and the trial court denied it.  Exh.  A-9 at 409-11.

Petitioner raised the issue on direct appeal to the Florida Supreme Court.   In rejecting this claim, the Florida Supreme Court stated:

> Cole argues that the trial court erred in denying his motion for change of venue.  Cole filed this motion before the trial began, arguing that the pretrial publicity was so pervasive that Cole could not receive a fair trial.  The trial court deferred ruling on the motion until after voir dire.  The parties then agreed upon a procedure through which the court would first read the venire the indictment and ask general questions.  Thereafter, the venire would be placed in the jury room, and each juror would be brought into the courtroom individually to be questioned about his or her exposure to publicity about the case.  The jurors who were not struck for cause were brought in collectively and asked further questions by the attorneys.   After the jury was selected, the trial court denied Cole's renewed motion for change of venue.
>
> The test for determining whether to grant a motion for change of venue is:
>
>> whether the general state of mind of the inhabitants of a community is so infected by knowledge of the incident and accompanying prejudice, bias, and preconceived opinions that jurors could not possibly put these matters out of their minds and try the case solely upon the evidence presented in the courtroom.
>
> Manning v. State, 378 So.2d 274, 276 (Fla. 1979). A motion for change of venue is addressed to the trial court's discretion and will not be overturned on appeal absent a palpable abuse of discretion.  See Davis v. State, 461 So.2d 67, 69 (Fla. 1984).  We find no such abuse of discretion in this case. Rolling v. State, 695 So.2d 278 (Fla. 1997).  The

> record shows that throughout the voir dire, the trial court readily excused jurors who stated that they had formed an opinion as to the defendant's guilt or would not be able to base a decision solely on the evidence presented at trial.   The record demonstrates that the members of Cole's venire did not possess such prejudice or extensive knowledge of the case as to require a change of venue. Moreover, the record shows that Cole was not prejudiced from striking any undesirable juror or by any knowledge the jurors may have possessed. Accordingly, we find this claim without merit.

Cole v.  State, 701 So.2d at 853-54.

The standard governing change of venue issues is derived from the Fourteenth Amendment's due process clause which safeguards a defendant's Sixth Amendment right to be tried by "a panel of impartial, 'indifferent' jurors."  Coleman v. Kemp, 778 F.2d 1487, 1489 (11th Cir. 1985) (quoting Irvin v. Dowd, 366 U.S. 717, 722, 81 S.Ct. 1639  (1961)), cert. denied, 476 U.S. 1164 (1986).  The trial court may be unable to seat an impartial jury because of prejudicial pretrial publicity or an inflamed community atmosphere.  In such a case, due process requires the trial court to grant a defendant's motion for a change of venue, Rideau v. Louisiana, 373 U.S. 723, 726, 83 S.Ct. 1417 (1963), or a continuance, Sheppard v. Maxwell, 384 U.S. 333, 362-63, 86 S.Ct. 1507 (1966).  At issue is the fundamental fairness of the defendant's trial, Murphy v. Florida, 421 U.S. 794, 799, 95 S.Ct. 2031 (1975).  However, "this does not mean that a defendant is entitled to a change of venue whenever potential jurors have been exposed to the facts of the case."  Meeks v.  Moore, 216 F.3d 951 (11th Cir.  2000).

There are two standards that guide analysis of this question, the "actual prejudice" standard and the "presumed prejudice" standard. Actual prejudice occurs when the "prejudice actually enters the jury box and affects the jurors." Heath v. Jones, 941 F.2d 1126, 1134 (11th Cir. 1991). Petitioner does not rely upon a showing of actual prejudice because his argument centers around the trial court's order denying his request for a change of venue prior to trial and renewed at the conclusion of jury selection; and Petitioner has not identified any specific instances of "actual prejudice." Rather, his argument involves alleged prejudice that is "presumed" from pretrial publicity.

In order to establish "presumed prejudice," a defendant must show "first that pretrial publicity was sufficiently prejudicial and inflammatory and second that the prejudicial pretrial publicity saturated the community where the trial was being held." Spivey v. Head, 207 F.3d 1263, 1270 (11th Cir. 2000). Presumed prejudice is rarely applicable, and is reserved for an extreme situation. Coleman, 778 F.2d at 1490. In fact, the Eleventh Circuit has noted that only a very few decisions have granted relief under this standard. Id.

Petitioner argued in state court, and reargues here, that the state trial court erred in denying his request for a change of venue due to the prejudicial nature of the pretrial publicity which allegedly saturated the community. The voir dire proceedings in this case consumed approximately 363 pages of transcript and included an extensive individual voir dire about the pretrial publicity. See Exhs. A-7 at 28-159; A-8 at 167-295; and A-9 at 304-408. The jurors who were selected to serve all agreed that any pretrial publicity would not bias them or interfere with their ability to follow the trial court's instructions. While many

of the seated jurors had read something about the case, there is nothing in the trial record to suggest that the case was decided based on anything other than the evidence introduced by the State, which was, to say the least, overwhelming.

The state trial court found no legal reason to grant the Petitioner's motion for a change of venue and the Florida Supreme Court was not objectively unreasonable when it found that the trial court acted within its discretion in denying the motion.  After reviewing the direct appeal record, the Florida Supreme Court made factual findings that each prospective juror was questioned extensively about the pretrial publicity and, that any juror "who stated that they had formed an opinion as to the defendant's guilt or would not be able to base a decision solely on the evidence presented at trial" was "readily excused." Cole v. State, 701 So.2d at 854.  Moreover, even Petitioner admits that each juror stated that "they could disregard any prior knowledge of the case and decide the case fairly on the evidence," and that a jury was seated "without great difficulty."  Petitioner's Mem. of Law (Doc. 3) at 20-21.  Other than asking the Court to assume that each juror was lying, Petitioner has failed to proffer any evidence to rebut this factual finding.[20]  Thus, absent evidence to the contrary, the Court must presume that the jurors were fair and impartial "as indeed they swore to be."  United States v. Khoury, 901 F.2d 948, 955 (11th Cir. 1990) (footnote omitted).

---

[20] Petitioner cites numerous decisions for the proposition that a trial court should not rely solely on a prospective juror's assurances of impartiality.  Petitioner's Mem. of Law at 21.  Aside from the fact that each of these decisions is factually distinguishable from the instant case on many levels,  the record is clear that the trial court did far more than simply rely on prospective jurors' statements of impartiality.  The trial court's efforts were thorough and more than enough to satisfy all of Petitioner's constitutional rights.

Furthermore, in denying Petitioner's claim on direct appeal, the Florida Supreme Court correctly utilized the applicable law as established by the United States Supreme Court in Murphy v. Florida, 421 U.S. 794, 95 S.Ct. 2031 (1975).  In Murphy, the Court noted that the constitutional standard of fairness requires that a defendant have a panel of impartial, indifferent jurors, but qualified jurors need not be totally ignorant of the facts and issues involved.  421 U.S. at 799-800, 95 S.Ct. at 2036.  And, in this instance, although the jurors had read something about the case, the trial court and the Florida Supreme Court found that they were each impartial and qualified.[21]

The state court's legal ruling on Petitioner's claim was not "contrary to" clearly established federal law as determined by the United States Supreme Court, nor did it involve an "unreasonable application" of such law.  Petitioner has failed to establish any grounds for federal habeas relief on this issue.  Claim VI is without merit and is Denied.[22]

## CLAIM VII

THE TRIAL COURT ALLOWED GRUESOME PHOTOGRAPHS INTO EVIDENCE WHERE THE PREJUDICE OUTWEIGHED THE SLIGHT PROBATIVE VALUE, VIOLATING PETITIONER'S

---

[21] For example, the Eleventh Circuit has held that there is no presumption of prejudice where, although "virtually every venireperson and actual juror had heard or read accounts of the case," only a few of the venirepersons indicated a preconceived opinion about the defendant's guilt or innocence, the venirepersons with preconceived opinions who did not believe that they could set their opinions aside were excused for cause, and the extensive publicity was neither inflammatory or pervasive.  Ross v. Harper, 716 F.2d 1528 1541 (11th Cir.  1983).  The present case is quite similar.

[22] Respondent argues that this claim should be procedurally defaulted because Petitioner did not raise any constitutional deprivation on direct appeal.  A cursory reading of Petitioner's state appellate brief, however belies this argument - Petitioner referred at length to Supreme Court and other federal authorities, as well as to various constitutional provisions.  See Ex.  B at 53-56.

FIFTH, SIXTH, EIGHTH, AND FOURTEENTH
AMENDMENT RIGHTS TO A FAIR TRIAL.

In his seventh claim, Petitioner alleges that the trial court should not have allowed various photographs of John Edwards' body to be submitted to the jury.  Specifically, Petitioner objected to three photographs which show John's body as found at the crime scene: a photograph of how his body was covered when first found; a close-up photograph of the back of John's head; and a photograph of John's upper torso from a different angle. These three photographs were introduced at trial through the testimony of one of the investigating police officers.  See Exh.  A-11 at 615-17.  Petitioner also objected to six photographs introduced into evidence during the testimony of the state medical examiner: two companion photographs of John's torso when the examiner first received the body; a photograph of the body after it had been cleaned which demonstrated a neck wound and injury to the right ear; a close-up photograph of the neck wound also showing a superficial cut to the left side of the neck; a close-up photograph of the neck wound showing the depth of the cut; and a photograph showing the undersurface of John's scalp and the extent of the bruising to the scalp not visible from the surface.  See Exh.  A-12 at 725-34.  Petitioner claims that the State relied on four of these photographs during closing argument, and that the jury requested three of the photographs during their deliberations.

Prior to admitting these photographs into evidence, the trial court reviewed each picture, heard argument from both sides, as well as from the state medical examiner, and determined that each of the photographs was relevant and not duplicative.  See Exhs. A-11 at 616-17; A-12 at 728-34.  Petitioner asserts that the probative value of these photographs

was slight, if any, given their allegedly duplicative nature and the fact that the medical

examiner stated that while the pictures would aid her testimony, they were not absolutely

necessary.  The Florida Supreme Court rejected this argument on appeal, stating:

> A trial court's decision on the introduction of
> photographic evidence will not be overturned on
> appeal unless there is a clear showing of an abuse
> of discretion.  Pangburn v. State, 661 So.2d 1182,
> 1187-88 (Fla. 1995).  We approve the procedures
> which the trial court followed in determining the
> admissibility of the photographs.  Based on our
> review of the record concerning this issue, we find
> no abuse of discretion.

Cole v. State, 701 So.2d at 854.

The question of whether a trial court should or should not admit into evidence

materials which may be prejudicial to a defendant is governed by the Fifth and Fourteenth

Amendments' due process clause.  Generally, a federal court deciding a habeas petition

will not review a trial court's actions in the admission of evidence, unless the admission

creates a "fundamental unfairness" in the trial.  Osborne v. Wainwright, 720 F.2d 1237

(11th Cir. 1983); see also Futch v. Dugger, 874 F.2d 1483, 1487 (11th Cir. 1989).[23]  The

evidence must be inflammatory or gruesome, and so critical that its introduction denied

petitioner a fundamentally fair trial.  Osborne, 720 F.2d at 1239; see also Dickson v.

Wainwright, 683 F.2d 348, 350 (11th Cir.1982) ("An evidentiary error does not justify

habeas relief unless the violation results in a denial of fundamental fairness.").  In other

---

[23] The State argues that Petitioner did not raise any federal constitutional question in his state court appeal, and therefore he cannot raise any federal habeas challenge on this ground.  However, the mere fact that Petitioner argued in his state court appeal that the photographs were gruesome and unduly prejudicial is sufficient to preserve a due process challenge in this Court.  Osborne, 720 F.2d at 1238.

words, the admission of prejudicial evidence justifies habeas relief only if the evidence "is material in the sense of a crucial, critical, highly significant factor." Hills v. Henderson, 529 F.2d 397, 401 (5th Cir.1976) (quoting Corpus v. Beto, 469 F.2d 953, 956 (5th Cir. 1972)). For example, in Osborne, the defendant contended that the evidence of guilt was extremely close and did not otherwise clearly identify the defendant as the culprit, and that the gruesome and highly prejudicial photographs of the victim inflamed the jury.

This is clearly not the situation in the present case. As both the trial court and the Florida Supreme Court held, the photographs of John Edwards were not unduly prejudical, inflammatory or gruesome. Rather, they were relevant to the case, and a useful tool for both the police officer and medical examiner - they had clear probative value. For example, Dr. Pillow, the state medical examiner, testified that the photographs would help her demonstrate to the jury the manner of death, the nature, extent, and location of injuries sustained, the identify of John Edwards, and whether he was alive at the time he was injured. Exh. A-12 at 725-732. These were all crucial issues relating to the establishment of Petitioner's guilt. Dr. Pillow also explained the differences between the photographs, belying Petitioner's claim that they were unnecessarily duplicative.[24]  Moreover, the evidence at trial was overwhelming in otherwise establishing Petitioner's guilt. This is not a case where the photographs tipped the balance against Petitioner. Thus, the Court finds that Petitioner's right to a "fundamentally fair" trial was not violated. See Futch, 874 F.2d

---

[24] In addition, Petitioner's claim that the prosecutor relied on these photographs during his closing argument in the penalty phase is wrong. The transcript clearly shows that the prosecutor did not argue from, or otherwise utilize these photographs in any manner. See Exh. A-17 at 1546-60.

at 1487-88 (because there was overwhelming evidence of guilt, the photograph was not a "crucial, critical, highly significant factor" in petitioner's conviction).  Further, Petitioner has failed to demonstrate that the state court's rejection of this claim relied on erroneous facts, or applied established federal law in a manner that was contrary to or objectively unreasonable in light of United States Supreme Court precedent.  As such, Petitioner is not entitled to habeas relief on this claim.

## CLAIM VIII

> THE TRIAL COURT ERRED IN DENYING PETITIONER'S MOTION TO SUPPRESS EVIDENCE OBTAINED FOLLOWING HIS ILLEGAL ARREST WHERE POLICE HAD NO PROBABLE CAUSE, VIOLATING THE FOURTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION

Petitioner argues that the trial court erred in denying his motion to suppress evidence seized following his warrantless arrest.[25]  In particular, Petitioner contends that at the time he was arrested, the police did not have probable cause to detain him.  Petitioner's trial counsel filed a motion to suppress this evidence, and the trial court held an evidentiary hearing.  At the hearing, the trial court heard testimony from Detective Sowder, one of the investigating officers.  Detective Sowder testified that he interviewed Pam Edwards the same day that she escaped from Ocala National Forest, and that Pam provided a very detailed description of the attack, a detailed description of both her and John's cars, and,

---

[25] The evidence in question included jewelry, a checkbook, a driver's license, and other items belong to both John and Pam Edwards.

most importantly, a detailed description of both Petitioner and Paul.  She described Petitioner as a 36-year old male, between 5'6" and 5'7" tall, weighing approximately 200 pounds with thinning strawberry blonde hair curly around the collar.  Petitioner wore a beard, a military utility cap, and a black and blue flannel shirt with a black t-shirt underneath with gold writing on it.  Pam also described Petitioner's belt, which had the initials K.C. on the buckle.  Exh. A-10 at 437-52.  Pam stated that Petitioner had several tattoos, including a few on his right forearm, wore black jeans, and had a muscular, stocky build.  Id.  at 445. Pam also described Paul as a thin man with shoulder-length brown hair and a goatee, who weighed approximately 155 pounds, was about 5'8" tall, and was in his late teens or early twenties.  She stated he was wearing a black t-shirt with lettering on it, work/hiking boots, and had a severe injury to his left hand.  In an interview later that evening, Pam told Detective Thomas Bibb that she also remembered Paul wore an earring, had a chipped tooth, and wore shoes with protective leggings.  Id.  at 456-57.  Apparently, Pam's descriptions were sufficiently detailed to create forensic sketches of both the Petitioner and Paul.  Id.  at 443-44.

The trial court also heard testimony from Detective Bibb, who stated that the day after his interview with Pam Edwards he received a phone call stating that Petitioner and Paul had been spotted behind a NAPA auto parts store in Ocala.  Approximately three to four blocks from the store location, Detective Bibb noticed both Petitioner and Paul standing by a railroad crossing, waiting for a train to pass.  In particular, he noticed Petitioner's and Paul's clothing, hair, and the protective leggings worn by Paul, however

Detective Bibb could not, at that time, see their faces.    According to Detective Bibb,

"everything matched" Pam Edwards' description of the pair, "[i]t matched perfectly."  Exh.

A-10 at 462.  Detective Bibb and his partner got out of their squad car, drew their guns, and

yelled "Police" in the direction of Petitioner and Paul.  Id.  When they turned around,

Detective Bibb realized that Petitioner's and Paul's facial hair and facial descriptions also

matched Pam Edwards' description.  The officers immediately ordered them to the ground

and detained them.  Id.  Afterward, Detective Bibb noticed a knife being carried in the small

of Petitioner's back and the initials K.C. on his belt buckle, and that Paul wore an earring.

Id.

After hearing this evidence, the trial court entertained argument and denied

Petitioner's motion to suppress.  Id.  at 494.

Petitioner asserts that the arrest took place at the time Detective Bibb and his partner

got out of their squad car and approached Petitioner and Paul from behind and yelled

"Police."  At this second in time, neither Detective had yet observed Petitioner's or Paul's

faces - therefore Petitioner claims they did not have probable cause to arrest.  Petitioner

further argues that the Detectives could not base their arrest on Pam Edwards' description

as it was merely a "generalized description that could have fit most males in Ocala,

Florida."  Petition at 32.

The Florida Supreme Court rejected this argument, holding that:

> On appeal, Cole contends that when he was
> arrested, the police did not have probable cause or
> a reasonable suspicion to detain him.  While Cole
> concedes that a witness's detailed description

coupled with proximity to time and place of a crime can furnish probable cause to make an arrest, such was lacking here because when officers first encountered Cole, his back was to the officers. Consequently, he argues, the officers could not have known that Cole was the person for whom they were looking.  We disagree.

The standard for determining whether a law enforcement officer has probable cause to make a legal arrest is whether the officer has reasonable grounds to believe that the person has committed a felony.  Blanco v. State, 452 So.2d 520, 523 (Fla. 1984).  When reviewing a trial court's determination of a motion to suppress, an appellate court will look to all of the surrounding facts and circumstances in the light most favorable to sustaining the lower court's ruling.  Terry v. State, 668 So.2d 954, 958 (Fla. 1996).  In this case, officers had a detailed physical description of Cole and Paul, their clothing, and the crime. . . . [W]hen the police were informed that the two were in the area near where the stolen car was found, they located the two and personally observed that the two fit Pam's physical description. Based on these circumstances, we affirm the trial court's order denying the motion to suppress. . . .

Cole v. State, 701 So.2d at 855.

The Court agrees with the Florida Supreme Court's analysis and finds Petitioner's current argument to be strained at best.  Pam Edwards provided an extremely detailed description - so detailed in fact that a forensic sketch of both Petitioner and Paul was created.  This is far more than a "generalized description that could have fit most males in Ocala, Florida."  Petition at 32.  And, as Petitioner himself admits,  a detailed description such as that provided by Pam Edwards, coupled with proximity in time and place to the scene of the crime - they were only four blocks away from where they abandoned John

Edwards' car - can furnish probable cause sufficient for an arrest.  That is exactly what happened in this case.

Moreover, Petitioner's recitation of the facts surrounding his arrest is simply wrong. It is clear from the record that Petitioner and Paul were not detained or arrested until **after** they turned around and were ordered to fall to the ground.   Exh.  A-10 at 462-63.  In fact, at the time the Detectives yelled "Police" Petitioner and Paul immediately turned around, giving the Detectives a full view of their faces.  At that time, both Detectives had closely observed both Petitioner's and Paul's height, weight, clothes, and facial characteristics, noticed that they matched almost perfectly to Pam Edwards' descriptions, and therefore clearly had sufficient probable cause to arrest them both.  Thus, by the time Petitioner and Paul kneeled to the ground, and were detained, Detective Bibb had observed their entire persons, and verified that they matched almost perfectly Pam Edwards' descriptions.

Even if Petitioner's argument that his arrest took place during the split-second before he turned around, it is clear to the Court, as it was to the Florida Supreme Court, that the Detectives had sufficient probable cause to arrest them based on Pam's detailed description of their height, weight, and clothing, and their proximity to John's abandoned car, as well as the description from another witness of what they looked like and the direction in which they were traveling.

Finally, Petitioner has not pointed to any facts which the trial court or Florida Supreme Court ignored in their analysis of this claim, nor has Petitioner explained how the state courts' analysis is contrary to, or an unreasonable application of federal law.  Rather,

all Petitioner has done is recite the general principles for warrantless arrests under the Fourth and Fourteenth Amendment to the Constitution.  Under these bedrock principles, a warrantless arrest may be effected where the arresting officer has information that, if provided to a disinterested judicial officer, would be sufficient to support an independent judgment that probable cause exists for an arrest warrant.  See Whiteley v. Warden, 401 U.S. 560, 564-68.  It is clear that Detective Bibb had such information, and even if the Florida Supreme Court's analysis was incorrect, it clearly does not reach the level of unreasonableness necessary to prevail at the habeas stage.   As such, Petitioner's ninth claim is Denied.[26]

### CLAIM IX

> THE INTRODUCTION OF IRRELEVANT AND PREJUDICIAL EVIDENCE WHICH THE STATE COULD NOT TIE TO THE CRIME DENIED PETITIONER HIS FIFTH, SIXTH, EIGHTH, AND FOURTEENTH AMENDMENT RIGHTS TO A FAIR TRIAL.

Petitioner's ninth claim centers on his challenge to the trial court's admission of a forty-seven inch length of oak, which the State claimed was the object used by Petitioner to beat John Edwards in the head, fracturing his skull.  According to Petitioner, the State never established that this particular length of oak was the precise walking stick used by Petitioner in his attack on John Edwards.   The trial court overruled Petitioner's trial counsel's objections on this basis and allowed the State to rely on this piece of evidence.

---

[26] The Court rejects the State's argument that the Petitioner did not raise this constitutional claim during his direct appeal and that it is therefore barred at the habeas stage.  It is clear from even a cursory review of the Petitioner's state appellate briefs that he raised both state and federal constitutional issues.

Exh. A-15 at 1203. Petitioner now claims that the "substantial prejudice" of this piece of wood far outweighed any probative value it may have had, thereby preventing Petitioner from receiving a fair trial.

On direct appeal, the Florida Supreme Court rejected this argument:

> We similarly find no impropriety in the trial court's ruling on the introduction of an oak walking stick which was purportedly the one Paul carried prior to the attack. The stick was found in the area of the assault and near to where John Edwards' body was found. Pam Edwards testified that it matched the characteristics of the one which Paul carried. The trial court found that the lack of blood or hair found on the stick related to its weight [as evidence] rather than its admissibility. We agree with the trial court that this evidence was relevant and admissible to explain the entirety of the criminal episode. See Fla. Stat. § 90.402 (1993).

Cole v. State, 701 So.2d at 855.

Upon review of Petitioner's state appellate briefs, it is clear that he did not raise any federal or constitutional arguments with respect to this claim before the Florida Supreme Court. Rather, he limited his argument solely to an analysis of the admissibility standards under Florida law. As such, Petitioner is not entitled to federal habeas review of this claim. See 28 U.S.C. § 2254(b)(1); Anderson, 459 U.S. at 6-8; Kelly, 377 at 1343 (11th Cir. 2004).

Even if this claim was properly before the Court, it would fail on its merits. As with Petitioner's objections to the admissibility of the photographs of John Edwards' body, this claim hinges on whether Petitioner can show that the admission of this oak walking stick

violated his right to a "fundamentally fair" trial.  It is clear that this right was not violated.

As the trial court and the Florida Supreme Court found, the walking stick was relevant to

aid in the State's explanation of how the crimes were committed.  The fact that the walking

stick was not proved to be the precise instrument used in the crimes did not destroy that

relevancy.   There was also more than enough other evidence demonstrating Petitioner's

guilt - including eyewitness testimony.  The walking stick did not, by itself, produce a finding

of Petitioner's guilt.  See Futch, 874 F.2d at 1487-88.  Petitioner has failed to either point

to any evidence presented at trial which the trial court ignored in allowing the walking stick

into evidence, nor has Petitioner explained how the state courts' decisions on this issue are

contrary to, or an unreasonable application of, any federal law.  Perhaps tellingly, Petitioner

does not make any legal argument other than a cursory reference to Rule 402 of the

Federal Rules of Evidence. As such, this claim is Denied.

### CLAIM X

> THE JURY WAS NOT INSTRUCTED ON THE
> APPLICABLE LAW AT BOTH THE GUILT AND
> PENALTY PHASES, VIOLATING PETITIONER'S
> RIGHTS TO A FAIR TRIAL UNDER THE FIFTH,
> SIXTH, EIGHTH AND FOURTEENTH
> AMENDMENTS TO THE UNITED STATES
> CONSTITUTION.

Petitioner challenges the trial court's denial of several requested jury instructions at

both the guilt and penalty phase of his trial, and argues that the trial court's actions denied

him his constitutional right to a fair trial.  With respect to the guilt phase of the trial, the court

rejected Petitioner's requested instruction regarding independent acts:  if the jury found that

the State failed to prove beyond a reasonable doubt that Petitioner killed John Edwards, and that it was Paul who independently killed John Edwards, the jury should find Petitioner not guilty of first degree murder. The trial court permitted Petitioner's trial counsel to argue at closing that Petitioner did not kill John Edwards, and that the true murderer was Paul, but found it inappropriate to give such a jury instruction. Exh. A-14 at 1214-20. The trial court also rejected Petitioner's requested instruction on felony murder: that if the jury found that Petitioner took John Edwards' property after he was killed, then the taking was an afterthought which may constitute theft, but does not constitute robbery such that the felony murder statute would not apply. Id. A-14 at 1221-23. See also, Fla. Stat. § 782.04(1)(a)(2)(d).[27]

On direct appeal, the Florida Supreme Court summarily rejected this claim in its entirety. Cole v. State, 701 So.2d at 855. Throughout his direct appeal on this issue, Petitioner relied entirely on state law authorities and did not raise any challenges to his federal and/or constitutional rights. As such, Petitioner failed to exhaust any federal or constitutional claims he may have as to this portion of Claim X. See Duncan v. Henry, 513 U.S. 364, 366 (1995).[28]

---

[27] The requested special instruction also stated that if the jury found that the kidnaping and robbery of Pam Edwards took place as an afterthought following John Edwards' death, that the jury should not find Petitioner guilty of felony murder. Petitioner makes no argument in his habeas petition concerning this portion of the claim, and did not raise this portion of the instruction in his direct appeal below.

[28] The Petitioner's mention of one United States Supreme Court decision in his state court appellate brief, which does not relate to any of the arguments made in that brief, does not equate to exhaustion of a federal or constitutional claim before the Florida Supreme Court. Kelley, 377 F.3d at 1344-45

Even if Petitioner had exhausted this portion of his claim, the Court finds it to have no substantive merit.   With respect to the requested jury instruction concerning independent acts, it is clear from the record that the instruction was not supported by the evidence and did not accurately state the law at the time in a clear and unconfusing manner.  See generally, Exh.  A-14 at 1214-20.  In addition, Petitioner raises no federal or constitutional arguments in his habeas petition as to this instruction.  He merely rehashes his arguments before the Florida Supreme Court and has failed to demonstrate that the trial court's denial of the instruction was contrary to or an unreasonable application of clearly established federal law.

Petitioner has also failed to demonstrate an entitlement to an instruction concerning theft as a mere afterthought.  He appears to argue that it is implicit in the elements of the crime of robbery in Florida that the taking of a victim's property is not a mere afterthought to other crimes.  In support of this argument, Petitioner cites two Florida Supreme Court decisions which say no such thing.  See Jones v. State, 569 So.2d 1234 (Fla.  1990) and Taylor v.  State, 190 So. 262 (1939).  Rather, the elements of the crime of robbery are set forth in Florida Statute § 812.13 (1992), and the elements of the lesser offense of theft (which does not trigger the application of Florida's felony-murder rule), are set forth in Florida Statute § 812.014 (2004).  The trial court instructed the jury as to each element for each of these crimes, and further instructed that the State must prove each element beyond a reasonable doubt.  Exh.  A-15 at 1282-1285.

Perhaps recognizing that the trial court did not act improperly in giving such instructions, Petitioner has attempted to use the United States Supreme Court's decision in Jackson v. Virginia, 443 U.S. 307 (1979) to argue that the trial court did not properly instruct the jury.   Apparently, Petitioner believes that Jackson, which stands for the proposition that, after viewing the evidence in the light most favorable to the prosecution, a rational trier of fact must find the essential elements of a crime beyond a reasonable doubt, creates a "sufficiency test" which the State must satisfy. See Petitioner's Mem. of Law at 27.  Petitioner also appears to argue that the trial court erred when it did not provide a jury instruction setting forth this "sufficiency test" and that the Florida Supreme Court erred when it did not review the jury's decision under this standard as well.

This nonsensical argument is due to be denied for several reasons.  First, it is clear that the trial court did, in fact, direct the jury to determine whether the State proved each element of every offense beyond a reasonable doubt, thereby satisfying the requirements of Jackson.   More importantly however, this "sufficiency test" as Petitioner calls it, was never raised at any point during any state court proceedings, and therefore cannot be raised before this Court.  Duncan, 513 U.S. at 366; Kelly, 377 F.3d at 1344-45.[29]

---

[29] Upon the Court's own independent review of the record, it is also clear that there was sufficient evidence before the jury such that a rational trier of fact could find all of the elements of the crime of robbery.  As stated by the Florida Supreme Court, Petitioner attacked both Pam and John Edwards, restrained them, told them he was going to take their cars, and took their personal property, including their jewelry. Cole v. State, 701 So.2d at 848.   The Court agrees with these findings – intent to take the Edwards' possessions through force or threat of violence could not be more clearly shown.  Therefore, even if Petitioner had properly raised this portion of this claim below, it would fail on its merits.

Turning to the penalty phase, Petitioner alleges that the trial court's rejection of six requested jury instructions violated his constitutional rights.   Petitioner's trial counsel requested instructions to the effect that: (1) if Petitioner received a life sentence, he would most likely never be released from prison; (2) the burden of proof rests with the State to demonstrate that mitigating circumstances proffered by a defendant are not sufficient to avoid the death penalty; (3) the jury must be unanimous in determining that the State has proved any aggravating circumstances beyond a reasonable doubt; (4) the finding of a single aggravating circumstance is not sufficient to recommend imposition of the death penalty; (5) once a mitigating circumstance is established, the jury must give it appropriate weight and cannot ignore it completely; and (6) the death penalty is "reserved for only the most aggravated of first degree murders."   Again, the Florida Supreme Court summarily denied this claim on direct appeal.   Cole v. State, 701 So.2d at 855.

In his habeas petition, Petitioner attempts to argue that the rejection of these instructions by both the trial court and Florida Supreme Court violated United States Supreme Court precedent and his constitutional rights.   However, these federal arguments were never raised at the state court level, have not been exhausted, and cannot be considered at the habeas stage. Kelley, 377 F.3d at 1344-45.[30]

Petitioner's arguments with respect to the penalty phase jury instructions also fail on their merits.   The Supreme Court of the United States has previously held that state courts

---

[30]  The Court further notes that, yet again, Petitioner has misrepresented the record in this case. At least with respect to the requested instruction concerning parole, the trial court did, in fact, instruct the jury that if Petitioner received a life sentence instead of the death penalty, he would not be eligible for consideration for parole for at least 25 years.  See Exh.  A-17 at 1567-68.

"must channel the [capital] sentencer's discretion by 'clear and objective standards' that provide 'specific and detailed guidance' and that 'make rationally reviewable the process for imposing a sentence of death.'"  Godfrey v. Georgia, 446 U.S. 420, 428, 100 S.Ct. 1759, 1764-1765, 64 L.Ed.2d 398 (1980) (plurality opinion) (footnotes omitted).  In other words, "sentencers may not be given unbridled discretion in determining the fates of those charged with capital offenses." California v. Brown, 479 U.S. 538, 541, 107 S.Ct. 837, 839, 93 L.Ed.2d 934 (1987).  Upon a review of the trial record in this case, it is clear that the trial court followed this precedent.

At the two charge conferences prior to the guilt and penalty phases of trial, the court gave careful consideration to both the applicable standard Florida jury instructions and the requested special instructions submitted by both sides.  The trial court chose to follow the standard jury instructions wherever possible, in accordance with Florida law.  See State v. Bryan, 290 So.2d 482 (Fla.  1974) (standard jury instructions are presumed to be correct and are preferred over special instructions).   The failure to give special jury instructions does not constitute legal error where the instructions given adequately address the applicable legal standards.  Stephens v.  State, 787 So.2d 747, 755 (Fla.  2001).  The instructions given by the trial court adequately addressed the applicable legal standards presented in Petitioner's trial and penalty phase.  Thus, the trial court provided the jury with "clear and objective standards" with "specific and detailed guidance" concerning each issue, and Petitioner did not and cannot establish that the trial court abused its discretion.

Petitioner also cannot establish that he is entitled to any of the requested

instructions.  Under Florida, law, in order to receive special jury instructions, the Petitioner must demonstrate: (1) that "the [requested] special instruction was supported by the evidence, " (2) that "the standard instruction did not adequately cover the theory of defense; " and (3) that "the special instruction was a correct statement of the law and not misleading or confusing."  <u>Stephens</u>, 787 So.2d at 756; <u>Alvarez v.  State</u>, 890 So.2d 389 (Fla. 2004).  Such a standard obviously comports with the United States Supreme Court's requirement that jury instructions during the penalty phase "must channel the [capital] sentencer's discretion by 'clear and objective standards' that provide 'specific and detailed guidance.'"  <u>Godfrey</u>, 446 U.S. at 428.   Unfortunately for Petitioner, his requested instructions did not even come close to meeting this standard.  The record in this case reveals that Petitioner's trial counsel repeatedly acknowledged that the disputed special instructions were either not supported by the evidence or did not reflect the state of the law at that time, and he had no legal authority to support his requests.  <u>See generally</u> Exh.  A-16 at 1519-28, 1532-42.  Thus, if the trial court were to have instructed the jury as requested by Petitioner, it would have both violated Florida law and compromised the requirement that sentencing juries in capital cases be given "clear and objective standards" which are readily reviewable.  Accordingly, even if Petitioner had appropriately exhausted this claim below, the Court finds that the decision of the trial court to deny the requested special penalty phase instructions, as well as the Florida Supreme Court's affirmance of that decision, was not contrary to or an unreasonable application of clearly established federal law.  This claim is due to be Denied.

CLAIM XI

THE TRIAL COURT ALLOWED THE STATE TO
PROCEED UNDER BOTH A PREMEDITATION
AND A FELONY MURDER THEORY AND THE
JURY RETURNED A GENERAL VERDICT,
VIOLATING MR. COLE'S FIFTH, SIXTH, EIGHT,
AND FOURTEENTH AMENDMENT RIGHTS TO A
FAIR TRIAL

Petitioner's next claim focuses on the trial court's decision to permit the State to go

forward with both a premeditated murder and felony-murder theory while using a general

verdict form.  Petitioner's indictment charged him with premeditated first-degree murder

against John Edwards pursuant to Florida Statute § 782.04(1)(a)(1), and did not mention

felony-murder.  Exh.  A-1 at 104.  Trial counsel for Petitioner attempted to prevent the State

from proceeding under both theories.  Exh.  A-3 at 470-75; Exh.  A-8 at 18-20.  The trial

court denied these requests.  Exh.  A-8 at 20; Exh.  A-10 at 527-28.  At the conclusion of

all the evidence, the trial judge gave detailed instructions on both premeditated murder and

felony-murder, as separate and distinct theories, (Exh.  A-15 at 1275-77), and the jury

returned a unanimous general verdict of first-degree murder.  Exh.  A-5 at 763.

On appeal, Petitioner argued that allowing the State to go forward under both

theories of murder, without alleging both with particularity in the indictment and separating

them in the verdict form, violated his Fifth, Sixth, Eighth and Fourteenth Amendments.  The

Florida Supreme Court summarily denied this claim:

> [W]e find no merit to Cole's issue eleven that the trial court erred
> in allowing the State to proceed on both a premeditated and
> felony-murder theory since the jury returned a general verdict of

first-degree murder.  Lovette v.  State, 636 So.2d 1304, 1307
(Fla.  1994).

The Court finds that the Florida Supreme Court did not act contrary to clearly established federal law, or apply such law unreasonably.  The United States Supreme Court has long held that an indictment "need not specify which overt act, among several named, was the means by which a crime was committed."  Schad v.  Arizona, 501 U.S. 624, 631 (1991).  Under this doctrine, the Supreme Court has further held that a general guilty verdict which fails to differentiate between premeditated and felony murder is not constitutionally inadequate and does not violate a defendant's due process rights.  Id. at 644-45.  See also Sims v.  Singletary, 155 F.3d 1297 (11th Cir.  1998) (finding that jury need not agree on the precise theory of first degree murder, only the offense itself).  It is only where a conviction on a general verdict could have been based on two separate grounds and one of those grounds is constitutionally impermissible that due process is violated. Zant v.  Stephens, 462 U.S. 862 (1983); Stromberg v.  California, 283 U.S. 359 (1931).

The Florida Supreme Court follows the United States Supreme Court's analysis, see Woodel v.  State, 804 So.2d 316 (Fla.  2001); Lovette v.  State, 636 So.2d 1304, 1307 (Fla. 1994); ;  Lightbourne v.  State, 438 So.2d 380 (Fla.  1983), cert.  denied, 465 U.S. 1051 (1984), and did so in this case as well.  Petitioner does not dispute this precedent; rather, he claims that the evidence presented at trial does not support a conviction for premeditated murder, and therefore a conviction on that ground would be constitutionally impermissible under Stephens and Stromberg.  The Court disagrees.

54

When a federal habeas petition challenges the sufficiency of the evidence supporting his conviction, a court must conduct a "review of the record in the light most favorable to the prosecution [to determine whether] a rational factfinder could readily have found the petitioner guilty beyond a reasonable doubt. . . ." Jackson v. Virginia, 443 U.S. 307, 319 (1979).   The Florida Supreme Court's factual findings demonstrate ample evidence of premeditation beyond a reasonable doubt:   Petitioner lured both Pam and John Edwards away from their campsite under false pretenses and attacked and restrained them; he stole their personal property and expressed his intention to steal their cars; he beat John Edwards on at least one additional occasion while expressing anger towards John for defending himself against Paul; and some time later Petitioner returned to where John lay bound and helpless, beat him again and slit his throat.   See Cole v. State, 701 So.2d at 848-49.   These factual determinations must be accorded great deference, and Petitioner has not provided clear and convincing evidence to dispute them.   Moreover, following this Court's own independent review of the record, the Court concludes that the jury could have found beyond any reasonable doubt based on the evidence at trial that Petitioner committed premeditated murder.   The record thus supports both felony murder and premeditated murder jury instructions, and the jury's general verdict under either theory. Petitioner has also failed to demonstrate how the trial court and Florida Supreme Court's

use of general verdicts in this case was contrary to or an unreasonable application of federal or constitutional law.  Accordingly, this claim is Denied.[31]

CLAIM XII

FLORIDA'S CAPITAL SENTENCING SCHEME VIOLATED MR.    COLE'S EIGHTH AND FOURTEENTH AMENDMENT RIGHTS

Petitioner asserts a laundry list of alleged deficiencies in Florida's capital sentencing scheme, all of which lead to Petitioner's argument that the death penalty as applied in Florida is unconstitutional.  The Florida Supreme Court summarily rejected this argument in its entirety.  Cole v. State, 701 So.2d at 855-56.  The Court will address each alleged deficiency in turn.

A.    The "Heinous, Atrocious or Cruel" Jury Instruction.

Petitioner first argues that the jury instruction given during the sentencing phase did not limit and define the circumstances under which the "heinous atrocious or cruel" ("HAC") statutory aggravator applies, thereby rendering it an arbitrary application in violation of the Eighth and Fourteenth Amendments, as well as unconstitutionally vague and overbroad. Petitioner also claims that this jury instruction violated his due process rights because it relieved the state of its burden of proving the elements of the HAC aggravator as set forth under Florida law in order for the aggravator to apply.  Trial counsel for Petitioner filed a

---

[31] Given that the use of general verdicts for first-degree murder charges is accepted practice under both state and federal precedent, and based on the record in this case, the Court further finds no merit to Petitioner's claim that the State switched theories mid-case, unconstitutionally broadened the charges in the indictment, or that the trial court impermissibly amended the indictment by instructing the jury on both theories of first-degree murder.

pretrial motion seeking to have this instruction as well as the portion of the Florida Statute which creates the HAC aggravator declared unconstitutional.  Exh.  4 at 629-42.  The trial court denied the motion immediately prior to the start of trial.  Exh.  A-10 at 427-28.

In Espinosa v. Florida, 505 U.S. 1079, 112 S.Ct. 2926 (1992), following its earlier decisions in Godfrey v. Georgia, 446 U.S. 420, 100 S.Ct. 1759 (1980), Maynard v. Cartwright, 486 U.S. 356, 108 S.Ct. 1853 (1988), and Shell v. Mississippi, 498 U.S. 1, 111 S.Ct. 313 (1990), the Supreme Court held that the Florida jury instruction as given in Espinosa's case concerning the HAC aggravator was unconstitutionally vague.  However, the  Espinosa instruction did not elaborate upon the terms of the statute; the key words were not defined or limited in scope.  See Hall v. State, 614 So.2d 473, 478 n.5 (Fla. 1993).

As early as 1973, the Supreme Court of Florida was called upon in State v. Dixon, 283 So.2d 1 (Fla. 1973), to respond to numerous questions certified to the court by the state's trial courts concerning the construction and constitutionality of Florida's death penalty act that had been adopted in the wake of Furman v. Georgia, 408 U.S. 238, 92 S.Ct. 2726 (1972).  Among the issues decided in Dixon was the meaning to be given to the "heinous, atrocious or cruel" aggravator.  The court supplied a definition of those terms and limited the scope of the HAC aggravator to "those capital crimes where the actual commission of the capital felony was accompanied by such additional acts as to set the crime apart from the norm of capital felonies - - the conscienceless or pitiless crime which is unnecessarily tortuous to the victim."  Dixon, supra, 283 So.2d at 9.  As so construed and limited, the Florida HAC aggravator was specifically upheld against constitutional attack in

Proffitt v. Florida, 428 U.S. 242, 255-256, 96 S.Ct. 2960, 2968 (1976).  Also, the addition of the last sentence of the instruction in Dixon served to cure the flaw found to be unconstitutional in Godfrey, Maynard and Shell.

Notwithstanding the decisions in Dixon and Proffitt, the state's standard jury instructions were not amended to incorporate the Dixon limitation on the HAC aggravator until 1990.  See In re Standard Jury Instructions Criminal Cases No. 90-1, 579 So.2d 75 (Fla. 1990).  As a result, in some capital cases tried in Florida before 1990, like Espinosa, the jury instruction concerning the HAC aggravator consisted of nothing more than a reading of the statute itself.  See Hall v. State, supra.  By contrast, in this case (tried in 1995), the trial judge gave the full Dixon-Proffitt jury instruction.

> The crime for which the defendant is to be sentenced was especially heinous, atrocious or cruel.  Heinous means extremely wicked or shockingly evil.  Atrocious means outrageously wicked and vile.  Cruel means designed to inflict a high degree of pain with utter indifference to, or even enjoyment of, the suffering of others.
>
> The kind of crime intended to be included as heinous, atrocious or cruel is one accompanied by additional acts that show that the crime was conscienceless, pitiless or was unnecessarily tortuous to the victim.
>
> The aggravating circumstances that the capital felony was especially heinous, atrocious or cruel applies only where the actual commission of the capital felony was accomplished by such additional acts as to set the crime apart from the norm of capital felonies.  It's a conscienceless or pitiless crime which is unnecessarily tortuous to the victim.

Exh.  A-17 at 1569-70.

Petitioner has thus failed to demonstrate that the Florida Supreme Court disposed of this claim in a manner that was "contrary to" or involved an "unreasonable application" of Supreme Court precedent.  This portion of Claim Twelve is without merit and is Denied.[32]

## B.   Florida's Felony Murder Statute and Jury Instruction.

Petitioner next argues that the statutory aggravating factor of felony murder and the standard jury instruction fail to narrow the discretion of the sentencer and therefore violates the Eighth and Fourteenth Amendments.  Trial counsel attacked this portion of Florida's aggravating factors statute and jury instruction in a pre-trial motion (Exh.  A-4 at 664-69), which the court denied.  Exh.  A-10 at 428-30.  Both the United States Supreme Court and the Florida Supreme Court have previously rejected this precise argument.  See Lowenfield v.  Phelps, 484 U.S. 231, 241-44 (1988) (rejecting similar challenge to felony murder instruction in Louisiana capital sentencing scheme), and Hunter v.  State, 660 So.2d 244, 252-53, n.  11 (Fla. 1995) (same).  As such, Petitioner cannot demonstrate that the Florida Supreme Court acted contrary to, or unreasonably applied Supreme Court precedent in denying this claim, and this portion of Claim Twelve is Denied.

## C.   Majority Verdicts.

Petitioner next argues that Florida's sentencing scheme "places great weight on margins for death as slim as a bare majority," thereby violating the Due Process and the Cruel and Unusual Punishment Clauses of the United States Constitution.  In support of

---

[32] The Court also rejects Petitioner's argument that this instruction violates due process.  There is no requirement that the State prove tortuous intent before the HAC aggravator can apply, and Petitioner has provided no authority - state or federal - to support this claim.

this argument, Petitioner cites to United States Supreme Court precedent which he claims requires a guilty verdict by a "substantial majority."  See Johnson v. Louisiana, 406 U.S. 356 (1972).  Petitioner reads more into the Johnson decision than is justified by what the Supreme Court said.  Johnson does not create a rule that guilty verdicts must be by a "substantial majority;" rather it only states that, in the facts before the Supreme Court at that time, a guilty verdict rendered by nine out of twelve jurors is not automatically unconstitutional.  Johnson, 406 U.S. at 363.

Petitioner also fails to note that Johnson and its progeny only apply to the guilt phase of a criminal trial.  Petitioner has not provided any authority - state or federal - for the proposition that a "substantial majority" must approve a penalty of death particularly where, as in Florida, the jury's recommendation in a capital case is merely advisory.  To the contrary, the Florida Supreme Court has previously held that a jury in a capital case can recommend an advisory sentence by a simple majority vote.  Alvord v. State, 322 So.2d 533 (Fla. 1975); see also James v. State, 453 So.2d 786 (1984).  It also appears that the Eleventh Circuit Court of Appeals has previously recognized this aspect of Florida's sentencing scheme.  See Bush v. Singletary, 988 F.2d 1082, 1089 (11th Cir. 1993) (noting that under Florida's capital sentencing scheme, if a simple majority does not vote for death, the jury's recommendation is life).  Accordingly, Petitioner has failed to demonstrate under the standards of AEDPA that the Florida Supreme Court's rejection of this portion of his claim is either contrary to, or an unreasonable application of clearly

established Supreme Court or other federal precedent.  This portion of Claim Twelve is Denied.

**D.      Florida Allows an Element of the Crime to be Found by a Majority of the Jury.**

Petitioner next argues that his constitutional rights have been violated because Florida's sentencing scheme makes the aggravating circumstances necessary to render a death sentence tantamount to elements of the crime which should not be decided by a simple majority jury vote.  Petitioner makes this argument despite recognizing in his brief that the United States Supreme Court has previously rejected this precise argument. Hildwin v.  Florida, 490 U.S. 638, 640-41 (1989) ("the existence of an aggravating factor here is not an element of the offense but instead is 'a sentencing factor that comes into play only after the defendant has been found guilty.' ") (quoting McMillan v.  Pennsylvania, 477 U.S. 79,  86 (1986)).  Because it is binding precedent that aggravating circumstances are not elements of the crime and therefore not part of the guilt phase of a capital trial, Petitioner's challenge to Florida's simple majority sentencing scheme is without merit.

**E.      Advisory Role.**

Petitioner next claims that Florida's standard jury instructions do not inform the jury of the great importance of its advisory decision at the penalty phase in violation of Caldwell v.  Mississippi, 472 U.S. 320 (1985).  This claim is without merit.

In Caldwell, the Supreme Court stated that "it is constitutionally impermissible for a death sentence to rest on a determination made by a sentencer who has been led to believe that the responsibility for determining the appropriateness of the defendant's death

lies elsewhere." 472 U.S. at 328-29. With respect to sentencing schemes such as Florida's where the jury acts in an advisory capacity and the trial judge renders the ultimate decision, the Supreme Court has held that "[t]o establish a Caldwell violation, a defendant necessarily must show that the remarks to the jury improperly described the role assigned to the jury by local law." Romano v. Oklahoma, 512 U.S. 1, 8 (1994). The Eleventh Circuit has further expanded on Caldwell and held that

> [I]t is clear that the references to and descriptions of the jury's sentencing verdict in this case as an advisory one, as a recommendation to the judge, and of the judge as the final sentencing authority are not error under Caldwell – because they accurately characterize the jury's and judge's sentencing roles under Florida law.

Davis v. Singletary, 119 F.3d 1471, 1482 (11th Cir.1997); see also Johnston v. Singletary,162 F.3d 630, 643 (11th Cir.1998) (rejecting Caldwell claim and related ineffective assistance claim because remarks to the jury "accurately described the jury's advisory role during a capital trial under Florida law").

In Petitioner's case, the trial judge instructed the jury that:

> As you have been told, the final decision as to what punishment shall be imposed is the responsibility of the Judge. However, it's your duty to follow the law that will now be given to you by the Court and render to the Court an advisory sentence based upon your determination as to whether sufficient aggravating circumstances exist to justify the imposition of the death penalty, and whether sufficient mitigating circumstances exist to outweigh any aggravating circumstances found to exist.

Exh. A-17 at 1568.

As in <u>Davis</u> and <u>Johnston</u>, the jury instructions provided to the jury at the penalty phase of Petitioner's trial accurately explained the jury's role under Florida law as it existed at that time.[33]   Accordingly, the trial court's use of the standard Florida jury instructions on the jury's role at the sentencing phase, as well as the Florida' Supreme Court's rejection of this claim on appeal, was not contrary to or an unreasonable application of clearly established United States Supreme Court or other federal precedent.  This portion of Claim Twelve is Denied.

**F.    The Trial Judge.**

Petitioner also challenges the trial court's "ambiguous role" in Florida's capital punishment system.  According to Petitioner, while the trial judge is "largely bound" by the jury's advisory decision, the trial judge is also the "ultimate sentencer" so that any constitutional errors committed by the jury can be ignored.  The United States Supreme Court has previously held that Florida's sentencing scheme, whereby the jury provides an advisory decision as to the appropriate sentence, and the trial judge renders the ultimate decision - including the finding of aggravating and mitigating circumstances and their respective weight - is constitutional.  <u>See, e.g.</u>, <u>Espinosa v. Florida</u>, 505 U.S. 1079 (1992); <u>Hildwin v. Florida</u>, 490 U.S. 638 (1989); <u>Proffit v. Florida</u>, 428 U.S. 242 (1976).  Petitioner has not provided any legal support for this argument, thus he has not demonstrated that

---

[33] The United States Supreme Court's decision in <u>Ring v. Arizona</u>, 536 U.S. 584 (2002), which may call into question the validity of Florida's allocation of roles between judge and jury with respect to the weighing of aggravating and mitigating factors, offers Petitioner no basis for relief.  The Supreme Court has expressly held that <u>Ring</u> cannot be applied retroactively in habeas actions.  <u>Schriro v. Summerlin</u>, 542 U.S. 348 (2004), <u>see also</u>, <u>Turner v. Crosby</u>, 339 F.3d 1247, 1285 (11th Cir.  2003).

the trial judge's role in Florida's capital sentencing scheme, or the Florida Supreme Court's rejection of this argument, is contrary to or an unreasonable application of clearly established federal precedent.  This portion of Claim Twelve is Denied.

## G.  The Florida Judicial System.

Petitioner's next argument is that his sentence must be vacated because he was sentenced under "a system designed to exclude African-Americans from participation as circuit judges" in violation of the Fifth, Sixth, Eighth, Thirteenth, Fourteenth, and Fifteenth Amendments to the United States Constitution.  According to Petitioner, Florida's system for selecting circuit judges - *i.e.* the sentencers - is racially discriminatory and "leads to condemning men and women to die on racial factors."   The Florida Supreme Court has routinely rejected such claims without discussion, see, e.g., Hunter v.  State, 660 So.2d 244, 253 (Fla.  1995); Fotopoulos v.  State, 608 So.2d 784, 794 n.  7 (Fla.  1992).  The Court will discuss each aspect of this argument in turn.[34]

In order to successfully challenge on equal protection grounds a conviction and/or sentence on the basis of race discrimination, a defendant must prove "the existence of purposeful discrimination," which "had a discriminatory effect" on him.  McCleskey v. Kemp, 481 U.S. 279, 292 (1987) (internal quotations omitted).  In other words, to prevail under the United States Constitution's Equal Protection Clause, Petitioner must prove that the decisionmakers in his case acted with discriminatory purpose.  Id.  Petitioner makes

---

[34] While it is not entirely clear, it appears that Petitioner is focusing this portion of his claim on alleged violations of his equal protection and due process rights and his right to be free from cruel and unusual punishment.

no such showing in this case.  He offers no evidence specific to his own case that would support an inference that racial considerations played a part in his sentence.  Instead, he relies solely on various articles and studies discussing the history of judge selection in Florida, and two law review articles discussing the disparate impact of death sentences on African-American defendants.[35]   This information is clearly insufficient to support an inference that any of the decisionmakers in Petitioner's case acted with discriminatory purpose.  McCleskey, 481 U.S. at 297-98.

To the extent Petitioner suggests that the State of Florida as a whole acted with a discriminatory purpose by adopting a procedure for selecting circuit judges and allowing it to remain in force despite its allegedly discriminatory application, he again has failed to make such a showing.   For such a claim to prevail, Petitioner "would have to prove that the [Florida] Legislature enacted or maintained [its procedure for selecting circuit judges] because of an anticipated racially discriminatory effect."   McCleskey, 481 U.S. at 298. Petitioner has not referred to any evidence that the election of circuit judges in Florida furthers a racially discriminatory purpose, other than a snap-shot statistic that in 1990, only 2.8% of the circuit judges in Florida were African American, whereas Florida's entire population at that time was 14.95% African American.  This single statistic, without more, does not establish an equal protection violation.  Moreover, the Eleventh Circuit Court of Appeals has previously validated Florida's system for the selection of circuit judges and

---

[35] The Court has serious doubts as to the validity of this argument for another more basic reason - Petitioner is Caucasian, his trial judge is Causcasian, and his victims were Caucasian.  There were no racial overtones in this case at any time.

found that it is not racially discriminatory.  See Davis v.  Chiles, 139 F.3d 1414 (11th Cir. 1998); Nipper v.  Smith, 39 F.3d 1494 (11th Cir.  1994); see also Al-Hakim v.  Florida, 892 F.Supp.  1464 (M.D Fla.  1995).

A similar analysis applies to Petitioner's challenges under due process and Eighth Amendment grounds, and Petitioner's failure to demonstrate any racial prejudice in his specific case, or provide any statistical or other evidence demonstrating a discriminatory motive and intent.  See, e.g., McCleskey, 481 U.S. at 312-13 (rejecting Eighth Amendment challenge to Georgia's death penalty scheme where statistical information at most indicated a discrepancy that appears to correlate with race); Adams v.  Wainwright, 709 F.2d 1443, 1449 (11th Cir. 1983) (Fourteenth Amendment claim based on statistical evidence may prevail only where "a showing of an intent to discriminate" or "evidence of disparate impact . . . [is] so strong that the only permissible inference is one of intentional discrimination").  Because Petitioner has failed to meet these well-established standards, and because Florida's selection of circuit judges has withstood legal challenge, this portion of Petitioner's claim is Denied.

## H.    Florida's Appellate Review of Capital Sentences.

Petitioner next claims that Florida's capital punishment scheme has prevented the evenhanded application of appellate review and the independent reweighing process envisioned in Proffitt v.  Florida, 428 U.S. 242 (1976).  Petitioner has presented no support for this argument, however, other than a blanket statement that "[h]istory shows that intractable ambiguities" in Florida's sentencing scheme over the years now render the

scheme unconstitutional under <u>Proffitt</u>.  Moreover, the United States Supreme Court has repeatedly held Florida's capital punishment scheme constitutional since <u>Proffitt</u>.  <u>See</u> <u>Hildwin v. Florida</u>, 490 U.S. 638 (1989); <u>Spaziano v. Florida</u>, 468 U.S. 447 (1984).  Thus, without more, Petitioner cannot meet the standards required under AEDPA and cannot demonstrate that Florida's capital punishment procedures, as well as the Florida Supreme Court's rejection of this claim are contrary to, or constitute an unreasonable application of clearly established federal law.  This portion of Claim Twelve is Denied.

**I.      Aggravating Circumstances.**

Petitioner also has challenged Florida's death penalty scheme by arguing that the aggravating circumstances analyzed during the sentencing phase are not applied consistently at the appellate review  level.    Petitioner points to three aggravating factors: the "cold calculated and premeditated" factor ("CCP"); the "heinous atrocious or cruel" factor ("HAC"); and the felony murder factor.  He argues that these three aggravating factors have not been applied consistently over time, and therefore do not rationally narrow the class of death-eligible persons, or properly channel discretion as required by <u>Lowenfield v. Phelps</u>, 484 U.S. 231 (1988).

To pass constitutional muster, a capital sentencing scheme must "genuinely narrow the class of persons eligible for the death penalty and must reasonably justify the imposition of a more severe sentence on the defendant compared to others found guilty of murder." <u>Zant v. Stephens</u>, 462 U.S. 862, 877 (1983).    The United States Supreme Court has previously held constitutional Florida's capital sentencing procedure, including its weighing

of aggravating and mitigating circumstances.  <u>Proffitt v. Florida</u>, 428 U.S. at 258.  And each of the aggravating circumstances listed by Petitioner have previously been found constitutional as well.  <u>See</u>, <u>e.g.</u>, <u>Harich v. Dugger</u>, 844 F.2d 1464, 1468-69 (11th Cir. 1988) (en banc) (holding CCP aggravating circumstance constitutional); <u>Scott v. Dugger</u>, 891 F.2d 800, 806 (11th Cir. 1989) (holding HAC aggravating circumstance constitutional); <u>Lowenfield v. Phelps</u>, 484 U.S. 231 (1988) (holding aggravating circumstance [such as felony murder] may duplicate an element of the capital offense if the class of death-eligible defendants is sufficiently narrowed by the definition of the offense itself).  Petitioner, however, focuses on how the courts have applied these aggravating factors.

Examination of the state decisions cited by Petitioner reveals that the Florida Supreme Court's review of death sentences involving these three aggravating circumstances is not arbitrary, capricious or in disaccord with constitutional principles relating to sentencing in capital cases.  With respect to the CCP factor, Petitioner asks the Court to compare <u>Herring v. State</u>, 446 So.2d 1049 (Fla. 1984) and <u>Rogers v. State</u>, 511 So.2d 526 (Fla. 1987) with <u>Swafford v. State</u>, 533 So.2d 270 (Fla. 1988) and <u>Schafer v. State</u>, 537 So.2d 988 (Fla. 1989).  These cases are clearly factually distinguishable.  In <u>Herring</u>, the defendant shot the victim twice during an armed robbery - the first shot was in response to what the defendant believed was threatening movement by the victim - the second shot was after the clerk had fallen to the floor.  The Florida Supreme Court found that this second shot was sufficient to establish the CCP factor.  446 So.2d at 1057.  In contrast, the murder in <u>Rogers</u> took place while the defendant was fleeing the scene, and

68

was not done in a calculated fashion.  511 So.2d at 533.  In <u>Swafford</u>, the Florida Supreme Court found sufficient evidence to support the CCP factor where the defendant abducted and raped his victim, then shot the victim nine times, including two shots to the head at close range, only to stop and reload his weapon to finish carrying out the crime.  533 So.2d at 277.  And in <u>Schafer</u>, the Florida Supreme Court rejected the CCP factor where the defendant had no intent to kill anyone; he simply panicked during a burglary and tied up his victim who later suffocated as a result of her bounds.  537 So.2d at 991.  Thus, it is clear that the application of the CCP factor in the cases cited by Petitioner does not demonstrate an inconsistent standard of review, but rather a detailed and fact specific analysis of each individual crime.  Petitioner has not shown how the Florida Supreme Court failed to follow the standards set forth in <u>Zant v.  Stephens</u>.

In addition, this same argument has been rejected by the Eleventh Circuit Court of Appeals in <u>Harich v. Dugger</u>, 844 F.2d 1464, 1468-69 (11th Cir.1988) (<u>en banc</u>).  The Court finds Petitioner's arguments in this respect similarly unpersuasive.  "[W]hile the line between 'ordinary' premedication and the 'heightened' cold, calculated premedication is a thin one, petitioner has not shown that the state has applied this factor in an unconstitutionally arbitrary manner." <u>Harich v.  Wainright</u>, 813 F.2d 1082, 1103 (11th Cir. 1987), <u>aff'd</u> <u>en banc</u> <u>Harich v. Dugger</u>, 844 F.2d 1464.

The cases cited by Petitioner which allegedly demonstrate inconsistencies with the application of the HAC aggravator are equally unpersuasive.  Both cases involve the same defendant, and are decisions by the Florida Supreme Court at different stages in the

appellate review process.  See Raulerson v. State, 358 So.2d 826 (Fla. 1978) with

Raulerson v. State, 420 So.2d 567 (Fla. 1982).  The fact that the Florida Supreme Court

realized on subsequent review that it's earlier finding that the HAC aggravator existed was

incorrect merely emphasizes that the Florida Supreme Court does, in fact, engage in careful

weighing and reweighing of the aggravating factors at each stage of the appeal process,

and will not affirm the application of the HAC aggravator absent reasonable justification.

The Supreme Court of the United States has also recognized that the qualitative

differences that will make some murders "especially heinous atrocious and cruel" can be

considered in imposing the death penalty as long as there are guidelines for their

application by the sentencing court and jury.  See Proffitt, 428 U.S. at 252-56.  Such

guidelines exist in Florida's capital sentencing scheme.  In sum, Petitioner's attempts to

compare cases which share some, but not other relevant characteristics, is unpersuasive.

Finally, the Court fails to see the logic in Petitioner's argument that the felony murder

aggravator has been applied so "liberally" as to justify the death penalty for murders that are

not even premeditated.  See Fla. Stat. § 921.141(5)(d) (defining felony murder aggravator);

Fla. Stat. § 782.04(1)(a)2 (defining the crime of felony murder).  He provides no support for

this argument, and given that this aggravator has been found constitutional, as well as the

fact that there is no evidence that the aggravator was applied inappropriately in Petitioner's

case, this argument is unpersuasive and is rejected.

**J.    Appellate Reweighing**.

According to Petitioner, Florida's death penalty scheme is also unconstitutional because it does not allow for the appellate court to independently reweigh aggravating and mitigating factors as required by <u>Proffitt v.  Florida</u>.  However, the Supreme Court of the United States does not require such a procedure in order to validate a state's death penalty scheme.  Rather, when reviewing aggravating and mitigating circumstances on appeal, the appellate court must reach its decision "<u>either</u> by reweighing of the aggravating and mitigating evidence or by harmless error review." <u>Clemons v.  Mississippi</u>, 494 U.S. 738, 741 (1990) (emphasis added); <u>Brown v.  Sanders</u>, ___ U.S. ___, 126 S.Ct.  884 (2006) (same).  <u>See also</u> <u>Sochor v.  Florida</u>, 504 U.S. 527 (1992) (recognizing that the Florida Supreme Court does not generally independently reweigh evidence, and holding that the appellate court's consideration of a death sentence was not sufficient where the court did not conduct an appropriate harmless error analysis).

Petitioner does not allege the absence of harmless error review by the Florida Supreme Court, and it appears that such reviews are routinely performed.  The Florida Supreme Court also conducts a proportionality review of the sentence, which "involves comparing the balance between aggravating and mitigating circumstances in the case at hand with the balance in other cases (not considered by the jury in recommending, or the trial judge in fashioning, the sentence to be given) in which the death penalty has been imposed." <u>Bolender v.  Singletary</u>, 16 F.3d 1547, 1568 (11th Cir.  1994) (quoting <u>Booker v.  Dugger</u>, 922 F.2d 633, 643 (11th Cir.  1991) (Tjoflat, C.J. specially concurring)).  It appears that the United States Supreme Court, as well as the Eleventh Circuit Court of

Appeals, considers this proportionality review "exactly the type of 'reweighing' referred to in Clemons." Bolender, 16 F.3d at 1568; see also Wainwright v. Goode, 464 U.S. 78 (1983) (per curiam).   Thus, rather than conduct an independent reweighing of the aggravating and mitigating factors, the Florida Supreme Court "need only reconsider the balance of aggravating and mitigating circumstances to determine whether the evidence still justifies the death penalty." Bolender, 16 F.3d at 1568.

Because the Florida Supreme Court conducts harmless error reviews as well as proportionality reviews which appear to satisfy the requirements of Clemons, the Court finds that Petitioner has failed to demonstrate the unconstitutionality of Florida's death penalty scheme with respect to appellate review.  This portion of Petitioner's claim is Denied.

**K.    Procedural Technicalities.**

Next, Petitioner claims that the use of the contemporaneous objection rule results in disparate application of the law in capital sentencing.  Florida's contemporaneous objection rule requires that an objection be raised at the proper stage before or during trial.  Any objections which are raised for the first time on appeal are deemed untimely and procedurally barred.  See McKinon v. Wainwright, 705 F.2d 419 (11th Cir. 1983).  The United States Supreme Court has held that absent a showing of cause or actual prejudice, habeas relief is barred where a state prisoner failed to comply with a state's contemporaneous objection rule.  Wainwright v. Sykes, 433 U.S. 72, 89 (1977).  See also McKinon, 705 F.2d at 421; Moran v. Estelle, 607 F.2d 1141, 1141 (5th Cir. 1979) (both holding same).

72

Florida's contemporaneous objection rule is well-established, and has been consistently upheld when applied in capital cases and subsequent habeas petitions.  See, e.g., Bertoletti v. Dugger, 883 F.2d 1503 (11th Cir. 1989) (affirming lower court's holding that where trial counsel made no objection to general verdict form, that claim is procedurally barred under Florida law on appeal); Dobbert v. Strickland, 718 F.2d 1518, 1524-25 (11th Cir. 1983) (challenge to prosecutor's use of peremptory challenges to exclude anti-death penalty jurors from jury panel is barred under Florida's  contemporaneous objection rule); Ford v. Strickland, 696 F.2d 804, (11th Cir. 1983) (failure to raise motion to suppress confession on direct appeal waived consideration on habeas corpus petition).  Petitioner has presented no argument explaining how the continued use of this long-existing rule violates the United States Constitution or Supreme Court precedent.[36]

The decisions relied upon by Petitioner in his attack on Florida's allegedly capricious use of the rule of retroactivity are similarly unpersuasive.  The first decision, Gilliam v. State, 582 So.2d 610 (Fla. 1991), correctly holds that the Florida Supreme Court's decision in Campbell v. State, 571 So.2d 415 (Fla. 1990) should not apply retroactivity as it is

---

[36] The state decisions cited by the Petitioner do not demonstrate any unconstitutional application of the contemporaneous objection rule.  In each case the Florida Supreme Court complied with the United States Supreme Court's direction in Sykes and determined whether cause or actual prejudice would result from application of the contemporaneous objection rule.  See, e.g., Smalley v. State, 546 So.2d 720, (Fla. 1989) (finding defendant waived objection to HAC jury instruction, but Florida Supreme Court nevertheless considered his objection and determined instruction was constitutional); Grossman v. State, 525 So.2d 833 (Fla. 1988) (affirming trial court's allowance of improper victim impact testimony both under contemporaneous objection rule and harmless error analysis); Elledge v. State, 346 So.2d 998, 1002 (Fla. 1977) (determining that admission of certain testimony was not harmless error, despite lack of objection by trial counsel).  See also Rutherford v. State, 545 So.2d 853, 857 (Fla. 1989) (refusing to consider argument on admissibility of certain witness testimony where defense counsel not only did not object at trial, but also elicited the comments on cross-examination).

simply a refinement of existing law.  The other decisions cited by the Petitioner, <u>Nibert v. State</u>, 574 So.2d 1059 (Fla.  1990) and <u>Maxwell v.  State</u>, 603 So.2d 490 (Fla.  1992),  do not apply <u>Campbell</u> retroactively, but merely cite the case for another proposition that has long been established in Florida law.  Moreover, whether or not <u>Campbell</u> was applied in any of those decisions had no impact on the Florida Supreme Court's final rulings. Petitioner has thus failed to demonstrate how the Florida Supreme Court's application of its retroactivity principle is arbitrary and capricious, results in a disparate impact on death penalty sentences, or is  contrary to or an unreasonable application of any federal law.  This portion of Claim Twelve is Denied.

**L.    Tedder v.  State.**

Petitioner further argues that the failure of Florida's appellate review process is demonstrated by the Florida Supreme Court's alleged inability to consistently apply <u>Tedder v.  State</u>, 322 So.2d 908 (Fla.  1975).[37]  According to Petitioner, the fact that the Florida Supreme Court cannot apply <u>Tedder</u> consistently "strongly suggests that other legal doctrines are arbitrarily and inconsistently applied in capital cases."  Petitioner's Mem.  of Law at 39-40.  Petitioner does not explain what these "other legal doctrines" are, provides no legal authority for the bold proposition that <u>Tedder</u> is inconsistently applied, and does not explain how a failure to properly apply <u>Tedder</u> violates the United States Constitution or other federal law.

---

[37] The Florida Supreme Court held in <u>Tedder</u> that "[i]n order to sustain a sentence of death following a jury recommendation of life, the facts suggesting a sentence of death should be so clear and convincing that virtually no reasonable person could differ."  322 So.2d at 910.

Petitioner's reliance on Cochran v. State, 547 So.2d 928 (Fla. 1989) is misplaced. Contrary to Petitioner's belief, Cochran clearly demonstrates that the Florida Supreme Court does endeavor to apply the Tedder doctrine in a consistent manner:

> Clearly, since 1985 the Court has determined that Tedder means precisely what it says, that the judge must concur with the jury's life recommendation unless "the facts suggesting a sentence of death [are] so clear and convincing that virtually no reasonable person could differ."

Cochran, 547 So.2d at 933 (quoting Tedder, 322 So.2d at 910). In addition, the United States Supreme Court has previously held that the Tedder standard is a "significant safeguard" for capital defendants, and that the "Florida Supreme Court takes that standard seriously and has not hesitated to reverse a trial court if it derogates the jury's role." Spaziano v. Florida, 468 U.S. 447, 465 (1984). Thus, it is clear that the Florida Supreme Court appropriately applies Tedder in capital cases, and this portion of Claim Twelve is Denied.

## M.   Lack of Special Verdicts

Petitioner next claims that his Fifth, Sixth, Eighth, and Fourteenth Amendment rights have been violated because Florida does not use a special verdict form for the jury to specify aggravating and mitigating circumstances. Petitioner argues that the use of a general verdict form leads to double jeopardy and collateral estoppel problems where a jury may reject an aggravating factor, but the trial court nevertheless finds it to exist.

"Any argument that the Constitution requires that a jury impose the sentence of death or make the findings prerequisite to imposition of such a sentence has been soundly

rejected by prior decisions of this Court."  Clemons v. Mississippi, 494 U.S. at 745.  The United States Supreme Court has also repeatedly rejected constitutional challenges to Florida's death sentencing scheme, which provides for sentencing by the judge, not the jury.  Hildwin, 490 U.S. 638; Spaziano, 468 U.S. 447; Proffitt, 428 U.S. 242.  Moreover, the precise argument raised by Petitioner was rejected in Hildwin, 490 U.S. at 638 (holding that a jury is not required to specify the aggravating factors that permit the imposition of the death penalty), a fact that Petitioner appears to recognize, yet blatantly ignores.  Accordingly, this portion of the Petitioner's claim is Denied.[38]

**N.     No Power to Mitigate.**

        Petitioner next claims that Florida's prohibition against mitigation of a death sentence under Florida Rule of Criminal Procedure 3.800 violates the constitutional presumption against capital punishment and violates the Equal Protection Clause as an irrational distinction entrenching on the fundamental right to live.  Petitioner mis-reads this rule.  Rule 3.800(b) does not state that a capital defendant is precluded from seeking mitigation from the trial judge.  Rather, the defendant instead must proceed directly to the Florida Supreme Court for his automatic appeal where he may challenge his verdict and sentence.  Fla.R.Crim.P. 3.800(b); see also Lynch v.  State, 841 So.2d 362 (Fla.  2003) (recognizing that an inmate sentenced to death may properly present mitigation arguments before the

---

        [38] The Petitioner's argument that Florida makes the aggravating circumstances into elements of the crime is repetitive of part four of this claim, which the Court previously denied.  See ____, supra.  See also Hildwin, 490 U.S. at 640-41.  Petitioner's attempts to recast the argument as an attack on Florida's statutory scheme is equally unavailing.  In addition, the Supreme Court's decision in Ring v.  Arizona does not provide any relief, as the Supreme Court has held that it does not apply retroactively to habeas petitions.  See Schiro v.  Summerlin, 542 U.S. 348 (2004).

Florida Supreme Court during direct appeal).  Petitioner also has not provided any legal authority to support this claim.  Thus, he has failed to demonstrate how this rule, or the Florida Supreme Court's rejection of Petitioner's challenge to it, is contrary to or an unreasonable application of federal law.  This portion of Claim Twelve is Denied.

**O.     Florida Creates a Presumption of Death.**

Petitioner's penultimate challenge to Florida's death penalty scheme is a claim that Florida creates a presumption of death by allowing a death sentence to be entered when there is but one aggravating factor in existence (such as felony murder or premeditation), and that this presumption can only be overcome by mitigating evidence so strong as to outweigh the aggravating factor.  Petitioner has failed to identify any United States Supreme Court decision that is contrary to the Florida Supreme Court's rejection of this argument, or demonstrates that established federal law was unreasonably applied by the state courts. The United States Supreme Court has repeatedly upheld Florida's death penalty scheme, including its weighing of aggravating and mitigating factors.  See Proffitt, 428 U.S. 242.  See also Grossman v.  Crosby, 359 F.  Supp.2d 1233, 12749 (M.D. Fla.  2005) (rejecting identical argument); and Bertolotti v.  Dugger, 883 F.2d 1503, 1528 n.22 (11th Cir.  1989) (jury verdict of felony-murder did not make the death penalty automatic under Florida law, so as to render death penalty unconstitutional, although sentencer found in aggravation the circumstance that defendant murdered in the course of robbery).  Because no state or federal court has ever invalidated Florida's death penalty scheme based on this particular argument, Petitioner is not entitled to relief here.

**P.      Florida Unconstitutionally Instructs Juries Not to Consider Sympathy.**

Petitioner's last attack on Florida's death penalty scheme is a claim that Florida law unconstitutionally instructs juries not to consider sympathy to the defendant.   Such an argument has been directly rejected by the United States Supreme Court.  <u>See</u>, <u>Saffle v. Parks</u>, 494 U.S. 484 (1990) (jury instructions that emphasize that sympathy should play no role do not violate the Constitution); <u>California v.  Brown</u>, 479 U.S. 538 (1987) (finding instruction that jurors must not be swayed by "mere sentiment, conjecture, sympathy, passion, prejudice, public opinion or public feeling" did not violate the Eighth or Fourteenth Amendments).   Petitioner's reliance on a Tenth Circuit Court of Appeals decision that was reversed by the Supreme Court in <u>Saffle</u> is obviously of no avail.   This portion of Claim Twelve is Denied.[39]

In sum, each of Petitioner's 16 challenges to Florida's capital punishment scheme are without merit, and Petitioner has not met the standards under AEDPA that the Florida Supreme Court's rejection of these challenges is contrary to or an unreasonable application of federal law.   Claim Twelve is Denied in its entirety.

CLAIM XIII

MR.    COLE  DID  NOT  HAVE  EFFECTIVE
ASSISTANCE  OF  COUNSEL,  VIOLATING  HIS
FOURTH,   FIFTH,   SIXTH,   AND   EIGHTH
AMENDMENT RIGHTS

---

[39] The Court further notes that no such instruction was provided to the jury during Petitioner's penalty phase.  There was simply no mention of sympathy at all, therefore, the Court finds this claim without merit on factual as well as legal grounds.

Petitioner contends that he was denied effective assistance of counsel during the guilt and penalty phases of his trial, in violation of the Fourth, Fifth, Sixth, and Eighth Amendments.  In support of this claim, Petitioner sets forth seven instances where he asserts that his counsel was ineffective.  These contentions were raised in Petitioner's post-conviction motion for collateral relief pursuant to Rule 3.850 of the Florida Rules of Criminal Procedure.  Exhs.  G-1 and G-2.  The trial court conducted an evidentiary hearing (Exhs. H-11 and H-12), and entered an order stating findings and conclusions denying the claim as a whole.  Exhs.  G-4 and G-5.  On appeal, the Supreme Court of Florida issued an opinion stating its findings and conclusions, and following the two-part test set forth in Strickland v.  Washington, 466 U.S. 668 (1984), affirmed the denial of any relief.  Cole v. State, 841 So.2d at 418, 425-28.  The Court will address each argument in turn.

## A.    Standard for Ineffective Assistance of Counsel

The Sixth Amendment guarantees the right to effective assistance of counsel. McMann v. Richardson, 397 U.S. 759, 771 (1970).  The two-part test to determine whether counsel provided effective assistance was stated in the seminal case Strickland v. Washington, 466 U.S. 668, 690 (1984).  First, a defendant must show that counsel's representation "fell below an objective standard of reasonableness . . . considering all the circumstances."  Id.  at 688.  Counsel's errors must be "so serious that counsel was not functioning as the 'counsel' guaranteed by the Sixth Amendment."  Id.  at 687.  Judicial scrutiny of counsel's performance must be highly deferential, and every effort should be made to evaluate the conduct from counsel's perspective at the time.  Id.  at 688.  In order

to prevail on this prong of the Strickland test, a defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy.  Id.  See also Devier v. Zant, 3 F.3d 1445, 1450 (11th Cir.  1993) ("a court should be highly deferential to those choices . . . that are arguably dictated by a reasonable trial strategy.").

Second, once a defendant demonstrates that counsel's behavior was objectively unreasonable, he must still prove that counsel's particular errors "had an actual effect on the defense," not merely that the errors had "some conceivable effect on the outcome of the proceeding."  Strickland, 466 U.S. at 693.  Stated differently, the defendant must show actual prejudice; that there "is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Id. at 694.  In determining this prejudice prong, the court must "consider the totality of the evidence before the judge or jury."  Id. at 695.  In addition, failure to raise non-meritorious issues is not considered ineffective assistance of counsel.  Card v. Dugger, 911 F.2d 1494, 1520 (11th Cir.  1990).

The burden of establishing whether counsel was ineffective rests with Petitioner, and it is a heavy one.  As such, "the cases in which habeas petitioners can properly prevail on the ground of ineffective assistance of counsel are few and far between."  Rogers v. Zant, 13 F.3d 384, 386 (11th Cir.  1994).

## B.    Ineffective Assistance of Counsel Claims at the Penalty Phase

An examination of the petition discloses that Petitioner has six specific complaints about the performance of his trial counsel during the penalty phase of his trial:  (1) his

counsel failed to investigate and present evidence of Petitioner's extensive history of drug and alcohol abuse; (2) his counsel should have presented testimony about Petitioner's abusive and "bizarre" upbringing, as well as his family's history of mental illness; (3) his counsel failed to object to the state prosecutor's misconduct during closing argument; (4) his counsel failed to request a heinous, atrocious, or cruel limiting jury instruction; (5) his counsel should have introduced the co-defendant's life sentence to the jury as mitigation; and (6) his counsel should have requested co-counsel.

Before discussing each of these contentions about what Petitioner's trial counsel did not do at the penalty phase, it is appropriate to briefly review what counsel did present at that stage of the trial.

The defense called five witnesses during the penalty phase of Petitioner's trial.  The first witness, Andrea Jane Headlee, Petitioner's half-sister, testified as to the nature of Petitioner's childhood until he was 12 years of age.  She provided testimony that Petitioner's mother, Ann Cole, and father, Don Cole, fought regularly, including physical altercations, that Don Cole was an alcoholic, that their mother was in prison at least once during this time, that their mother frequently abandoned them, and that both she and Petitioner moved between several foster homes and lived with their older half-sister Ann Marie Powers, at certain points in time.  Exh.  A-16 at 1364-71.

Trial counsel next called Ann Marie Powers to testify.  She also provided testimony concerning Petitioner's upbringing, including his multiple stays in foster care, and their mother's frequent incarcerations and absences from the home.   During these absences,

and to avoid additional foster care, Petitioner stayed with Ms. Powers for a period of time. She also testified that their mother drank often, went out with numerous men, and acted "crazy." With respect to Don Cole, Ms. Powers testified that he was a "mean drunk" who would engage in violent physical fights with their mother. Ms. Powers also testified that Petitioner began using marijuana when he was approximately 12 years old, and that all of the children, including Petitioner, were subject to emotional abuse from their mother. Exh. A-16 at 1376 - 83, 1388-89.

The third witness for the defense was Don DuWayne Cole, Petitioner's father. Mr. Cole testified that both he and Ann Cole were alcoholics, and that Ann Cole drank while she was pregnant with Petitioner. He described the Cole household as "miserable" and testified that Ann Cole was emotionally and physically abusive to all of the children, including Petitioner. Mr. Cole also admitted that he would often fight with Ann Cole, that these fights were often physical, and that he believed Ann Cole was mentally disturbed. Mr. Cole left Petitioner with his mother when he was only three or four years old, and only had very sporadic contact with him from that point forward. Exh. A-16 at 1390-96.

The defense next called Beverly Jean Helm. Ms. Helm was Petitioner's foster mother when he was approximately 16 years of age. Ms. Helm testified that Petitioner stayed with her for approximately four months after he was released from an Ohio juvenile correctional facility. According to Ms. Helm, Petitioner was generally a "good kid" who usually followed the rules. He attended school for a time, but was removed after getting into a fight with a student who learned of his background. Ms. Helm testified that Petitioner

used marijuana and drank beer while he lived with her, and that after Petitioner left her home, he stayed with his mother in Florida for a time, but eventually returned to Ms. Helm approximately one year later.  When he returned he continued to use marijuana and drink beer, and Ms. Helm testified that she believed Petitioner had a long-term problem with drugs.  Exh. A-16 at 1401-10.

The final witness called by trial counsel was Dr. Robert M. Berland, a forensic psychologist counsel had retained to examine Petitioner.  In making his evaluation, Dr. Berland interviewed Petitioner, conducted two psychological tests, interviewed several family members, and reviewed Petitioner's Ohio prison records.  Exh. A-16 at 1423-27, 1460-61, 1484.  Dr. Berland testified that based on his examination, Petitioner suffers from some sort of mental disturbance, most likely a psychosis of some sort, but that he could not ascertain the severity of his disorder because Petitioner deliberately gave false and exaggerated responses to several of the test questions.  Id. at 1451-56, 1474.  Dr. Berland further testified that based on an intelligence test administered to Petitioner, he had an above average IQ, but it appeared that Petitioner's mental disturbance could be the product of a brain injury, and that the consumption of drugs and alcohol would only exacerbate the symptoms of Petitioner's mental disturbance.  Id. at 1471-72, 1475, 1499.  Dr. Berland also testified, however, that he could not say with any certainty the degree to which, if any, Petitioner's mental disturbance caused him to commit the crimes.  Id. at 1498.

Following the conclusion of this testimony, the trial court spoke with both the prosecutor, trial counsel, and Petitioner himself outside the presence of the jury concerning

whether Petitioner wished to admit into evidence the fact that his co-defendant received a

lesser sentence of life imprisonment.  Petitioner expressly and unequivocally stated that he

had no wish to submit that evidence to the jury, and acknowledged that his counsel advised

him on this issue.  Petitioner further stated that his counsel made him aware that if he did

submit the co-defendant's sentence to the jury, that the state would be able to submit

rebuttal evidence, including witness testimony, to explain exactly why his co-defendant

received a lighter sentence.  Petitioner agreed that this was his decision alone, and that by

omitting his co-defendant's sentence, he was receiving a "fair trade-off" by also omitting any

additional testimony from the state.  Exh.  A-16 at 1505-07.

## 1.    Counsel failed to present evidence of Mr.  Cole's 17-year history of drug and alcohol abuse.

Petitioner's first ineffective assistance claim focuses on his trial counsel's failure to

present evidence of his drug and alcohol abuse.  Petitioner claims that if his counsel has

conducted an adequate investigation into his background, he would have discovered that

Petitioner began using alcohol when he was only 10 years old, and that he used both

alcohol and drugs on a regular, almost daily, basis.  Trial counsel also allegedly failed to

investigate and present evidence of Petitioner's drug and alcohol abuse while in prison in

both Ohio and Florida.  According to Petitioner, this information should have been submitted

to the jury as mitigating evidence, which may have resulted in his receiving a life sentence.

On appeal, the Florida Supreme Court adopted the trial court's findings and affirmed

its rejection of this claim on the basis that the evidence Petitioner sought to have admitted

was merely cumulative of that actually presented.  Cole v.  State, 841 So.2d at 425.  In

particular, the Florida Supreme Court found that "trial counsel presented extensive evidence of Defendant's history of alcohol and drug use during the penalty phase." Id.

The Court agrees and finds Petitioner's renewed argument here to be frivolous.  It is clear that Petitioner's trial counsel conducted a thorough investigation of Petitioner's alcohol and drug abuse, and presented ample evidence of both during the guilt and penalty phases of the trial, including testimony from one of his half sisters and foster parents.  Other witnesses at trial - including Pamela Edwards herself - testified that Petitioner had used alcohol and drugs both before and after the crimes.   Finally, Petitioner's forensic psychologist testified that drugs and alcohol would have exacerbated Petitioner's mental abnormality.  Dr. Berland also testified that he reviewed the Petitioner's Ohio prison records - thereby negating Petitioner's claim that his counsel failed to investigate and review his prior prison records.  All of this evidence was presented to the jury, and the trial court expressly instructed the jury to consider any and all mitigating evidence it may find.  Exh. A-17 at 1571.   In addition, the trial court's findings in support of the death sentence demonstrate that the trial court considered evidence of Petitioner's alcohol and drug abuse, including his use of these substances both before and after the crimes.  Exh.  A-6 at 917-21.

The evidence Petitioner now claims should have been submitted to the jury would not shed any new light on this issue - his trial counsel had already established Petitioner's extensive problems with alcohol and drugs.   Applying Strickland, Petitioner cannot demonstrate either that his trial counsel's performance was deficient, or that he suffered any prejudice.  See Turner v.  Crosby, 339 F.3d 1247, 1277 (11th Cir.  2003) (finding trial

counsel's performance was not deficient for failing to submit cumulative testimony to the jury during the penalty phase of trial); Glock v. Moore, 195 F.3d 625, 636 (11th Cir.1999) (finding that, "where much of the new evidence that [petitioner] presents is merely repetitive and cumulative to that which was presented at trial," petitioner could not show prejudice). Petitioner has failed to demonstrate that the state court disposition of this part of his claim was "contrary to" or constituted an "unreasonable application of" governing Supreme Court precedent.   This portion of Claim XIII is Denied.

## 2.   Counsel failed to present evidence of nonstatutory mitigating circumstances of childhood abuse

Petitioner's next argument also asserts that his trial counsel was ineffective for failing to submit cumulative testimony to the jury concerning the alleged emotional, physical and sexual abuse Petitioner suffered as a child, as well other circumstances surrounding his "bizarre" childhood and family history of mental illness.   In particular, Petitioner claims that trial counsel should have called his mother and his closest sister to testify at the penalty phase.   The trial court rejected this claim on the grounds that the evidence would have been cumulative of the wealth of evidence actually presented at trial, and because Petitioner himself refused to have his mother testify.

The Florida Supreme Court affirmed on appeal:

> We find no error in the trial court's determination that Cole's claim is refuted by the trial record and that the evidence which Cole now asserts should have been presented would have been cumulative. . . .   As to Cole's specific claim about his mother, the record establishes that the trial court offered to send a deputy to pick up Cole's mother, who was under

86

> subpoena, but Cole on the record unequivocally declined the trial court's offer after conferring with trial counsel.

Cole v. State, 841 So.2d at 426.

Once again the Florida Supreme Court is correct.  The trial court's findings of fact, to which the Court must give great deference, demonstrate that Petitioner's trial counsel presented substantial testimony concerning Petitioner's allegedly abusive upbringing, including testimony from two of his half-sisters, and his father, all of whom also testified as to the mental state of Petitioner's mother.  An independent review of the record supports the trial court's findings.  Thus the Court agrees that any further investigation and/or submission of evidence on these points would have been cumulative.  There was no deficient performance or prejudice as required by Strickland.  See Turner, 339 F.3d at 1277; Glock, 195 F.3d at 636.  See also Collier v. Turpin, 177 F.3d 1184, 1199-1200 (11th Cir.  1999) (failure to interview additional potential witnesses in preparation for sentencing phase was not deficient performance where decision was essentially tactical, and cousnel selected several witnesses to testify about defendant's past and character).   In addition, Petitioner himself expressly refused to allow his mother to testify, despite the trial court's offer to have her brought to the courthouse.  See Exh.  A-15 at 1357-58.  Petitioner cannot now complain that his trial counsel was ineffective for simply following his client's instructions.  See Stano v.  Dugger, 921 F.2d 1125, 154 (11th Cir. 1991) (acceding to the wishes of a competent client cannot be construed as ineffective assistance of counsel); Mitchell v. Kemp, 762 F.2d

886, 889 (11th Cir. 1985) (a defendant cannot claim ineffective assistance of counsel after he preempts his counsel's strategy).  This portion of Claim XIII is Denied.

> ### 3.   Counsel performed deficiently by failing to object to the prosecutor's misconduct during closing argument.

Petitioner next faults his trial counsel for failing to object during the state prosecutor's closing argument when he asserted that the co-defendant could not possibly have murdered John Edwards because the co-defendant's hand was broken.  In fact, his co-defendant's hand was not broken, but he did suffer an injury to his hand during his earlier struggle with John Edwards.  Petitioner claims that this incorrect statement misled the jury, resulting in a conviction based on false evidence.

While the trial court and the Florida Supreme Court agreed that the prosecutor's statement was "technically incorrect," they also determined that this error "was not prejudicial to the outcome," and denied the Petitioner's request for relief. Cole v. State, 841 So.2d at 426-27.  The Court agrees with the state court's analysis and findings of fact.  Petitioner has presented no evidence to refute these findings.  In fact he quotes from the co-defendant's medical records which describe a fairly severe hand injury.  Whether or not the co-defendant's hand was broken or badly injured in some other manner would not have changed the essence of the prosecutor's argument that the co-defendant was physically unable to murder John Edwards; would not have altered the finding of four separate aggravating factors in support of the death penalty; and would not to a reasonable probability change the outcome of the penalty phase.  Thus, Petitioner has not demonstrated prejudice under the standard of Strickland, which the Florida Supreme Court and trial court followed,

and has not demonstrated that the state court's decisions were contrary to or an unreasonable application of federal precedent.[40]  This portion of Claim XIII is Denied.

### 4.    Counsel failed to request the heinous, atrocious, or cruel limiting construction to which Mr.  Cole was constitutionally entitled.

Petitioner next challenges his trial counsel's performance for failing to request a limiting instruction that actions taken after the victim is unconscious cannot be considered when assessing the heinous, atrocious, or cruel (HAC) statutory aggravator.  This claim is nothing more than another attempt by the Petitioner to challenge the trial court's finding of the existence of the HAC aggravator.  The Court previously rejected this argument in Claim Four above, and agreed with the Florida Supreme Court that "sufficient acts . . . occurred while the victim was conscious for the HAC aggravator to be established beyond a reasonable doubt." Cole v.  State, 841 So.2d at 427.  See also Cole v.  State, 701 So.2d at 852.  The state courts found that John Edwards was conscious when his throat was slit and that he lived for several minutes before suffocating on his own blood.  These factual findings must be given great deference, and Petitioner has not been able to rebut them.

The Court also finds that any such instruction would have been duplicative of instructions and argument already presented to the jury.  The record reflects that trial counsel raised the issue during the penalty phase that John Edwards could very well have been unconscious when his throat was slit.  He also requested that the trial court instruct the jury that events occurring after the victim's death are not relevant for the HAC aggravator.

---

[40] A court may decline to reach the deficient performance prong of the Strickland standard if it is convinced that the prejudice prong cannot be satisfied.  See Strickland, 466 U.S. at 487; Waters v. Thomas, 46 F.3d 1506, 1510 (11th Cir.1995).

Exh. A-16 at 1522.  The trial court agreed and gave such an instruction.  Id.  Thus, this claim focuses solely on trial counsel's alleged failure to request an additional limiting instruction that events occurring after the victim loses consciousness are also not relevant.  Because this issue was sufficiently raised before the jury, and because the trial court and Florida Supreme Court found that the HAC aggravator existed beyond a reasonable doubt (including what transpired while John Edwards was conscious), Petitioner has not demonstrated any prejudice under the Strickland test.  This portion of Claim XIII is Denied.

### 5.    Failure to introduce the co-defendant's life sentence to the jury as mitigation.

Petitioner also challenges his trial counsel's failure to present to the jury as mitigating evidence the fact that his co-defendant only received a life sentence for the same crimes.  This argument merits almost no discussion as it is belied by the fact that Petitioner himself clearly and unequivocally decided not to submit this evidence to the jury.  Exh. A-16 at 1505-07.  It is also clear that Petitioner made this tactical decision in order to avoid giving the prosecutor an opportunity to present evidence (including witnesses) as to why the co-defendant received a lesser sentence, which would most likely negate any mitigating effects.  Id.  For this reason alone, this claim is due to be denied.  See Strickland, 466 U.S. at 691 ("The reasonableness of counsel's actions may be determined or substantially influenced by the defendant's own statements or actions.").

Petitioner now argues that he suffers from mental illness and brain damage, which his counsel was aware of, and therefore his counsel should not have allowed him to make such decision on his own.  However, there is no evidence (and Petitioner has not argued) that he

was incompetent to stand trial or to assist in his own defense, including making such tactical

decisions.  While Petitioner's forensic psychologist testified that Petitioner suffers from some

mental issues, he did not testify that Petitioner was incompetent.[41]

The Court finds that Petitioner has not demonstrated that the Florida Supreme Court's

rejection of this argument is contrary to or an unreasonable application of federal precedent.

This portion of Claim XIII is Denied.

### 6.     Failure to request assistance of co-counsel.

The last penalty phase argument raised by Petitioner involves his trial counsel's failure

to request co-counsel.  At the time of Petitioner's trial, his counsel had never prepared for

or tried a capital penalty phase proceeding.   Petitioner contends that had he requested

counsel with death penalty experience, he could have completed additional legal research

on statutory mitigators and investigated Petitioner's background more thoroughly.

The Florida Supreme Court rejected this argument on appeal:

> We find that this subclaim is legally insufficient
> because Cole has alleged neither deficient
> performance nor resulting prejudice for the trial
> court's failure to secure co-counsel. . . .
>
> The only prejudice alleged by Cole with any
> specificity concerns the presentation of Paul's life

---

[41] Petitioner also contends that the decision concerning his co-defendant's sentence is a legal issue and therefore can only be made by counsel.  In support, Petitioner cites to a footnote in an Eleventh Circuit decision, In re McDonald, 819 F.2d 1020 (11th Cir.  1987).  That decision does not support Petitioner's argument; in that case the attorney engaged in a cross-examination of a witness that was not permitted under the Federal Rules of Evidence and was in direct contravention of the trial court's express order.  The attorney sought to excuse his behavior during criminal contempt proceedings by stating that his client asked him to conduct the inappropriate cross-examination.  Id.  at 1022-23.  In the present case, trial counsel merely complied with Petitioner's tactical decision to omit any reference to his co-defendant's life sentence - a decision that did not contravene any rules or orders by the trial court.

> sentence.  However, as noted above, Cole is not entitled to relief on that claim.  The general allegation that mitigating evidence could have been better presented is an insufficient allegation of prejudice relating to this subclaim, Cole has failed to demonstrate that his counsel was ineffective for failing to request co-counsel.

Cole v.  State, 841 So.2d at 428.

The Court agrees.  In his habeas petition, Petitioner has apparently abandoned his reference to the co-defendant's life sentence, and has not made any specific allegations of deficient performance or prejudice.  Rather, he simply speculates in general that co-counsel would have done a better job of researching and investigating mitigating evidence.  There is no discussion of what that evidence might be.  Such a generic allegation cannot form a successful claim of ineffective assistance of counsel.  See United States v.  Cronic, 466 U.S. 648, 665 (1984) (fact that counsel was young and inexperienced in criminal matters did not provide basis for finding ineffective assistance of counsel in the absence of showing of actual ineffectiveness); Chandler v.  United States, 218 F.3d 1305, 1316 n.  18 (11th Cir. 2000) (en banc) (Counsel that is merely inexperienced is not automatically ineffective).   See also Waters v.  Thomas, 46 F.3d 1506, 1512 (11th Cir.  1995) (en banc) ("The test has nothing to do with what the best lawyers would have done.  Nor is the test even what most good lawyers would have done.  We ask only whether some reasonable lawyer at the trial could have acted, in the circumstances, as defense counsel acted at trial.").

Moreover, the Court has previously found that his trial counsel conducted a more than adequate investigation and presented extensive evidence of Petitioner's life prior to the

crimes, from which the jury could have found mitigating factors.  This portion of Claim XIII is Denied.

## D.   Counsel Was Ineffective During the Guilt Portion of Mr. Cole's Trial Because He Did Not Object to Improper Hearsay Statements.

Petitioner also raises one ineffective assistance of counsel argument with respect to the guilt phase of his trial:  that trial counsel failed to object to portions of the testimony of two state witnesses on the grounds that the testimony was improper hearsay and bolstered Pam Edwards' testimony.  The first witness, Dan Jackson, was the person who drove Pam out of the forest after she escaped and helped her to contact the police.  He testified that while he was driving with Pam, "she said that she had been tied up and raped."  Exh. A-11 at 559.  Trial counsel did not object to this statement.  The second witness was Lake County Sheriff's Deputy Tammy Jicha, who responded to Pam's call.  During her testimony Deputy Jicha stated that she continued a dialogue with Pam in order to ascertain whether or not she was making a true and accurate police report.  The allegedly objectionable testimony consists of Deputy Jicha's statement that "I felt like she was telling the truth, because everything just added up, right down the line."  Exh. A-11 at 575.  Trial counsel also did not object to this statement.

Both the trial court and the Florida Supreme Court rejected this argument:

> Cole contended in his rule 3.850 motion that the failure to object to these statements allowed the State to improperly bolster Ms. Edwards' credibility and that the prejudice was the extra weight the jury likely gave her testimony.  The trial court ruled that the rule 3.850 motion contained insufficient allegations as to prejudice and that the allegations made were entirely

speculative. On the basis of the evidence in the trial record, we find no error in the trial court's denial of this claim for lack of prejudice. See Strickland, 466 U.S. at 687, 104 S.Ct. 2052. The trial record contains substantial other evidence corroborating Pam's testimony that she had been tied up and raped. Mary Gamble testified that Cole confessed to raping Pam. Nails removed from the trees where Pam was tied up were introduced into evidence, and twine was still attached to one nail. Accordingly, Cole is not entitled to Strickland relief on this claim. See Arbelaez v. State, 775 So.2d 909, 914 (Fla. 2000); see also Gudinas v. State, 816 So.2d 1095, 1011 n. 6 (Fla. 2002) (finding no error in trial court's summarily denying legally sufficient claims where claims were conclusively refuted by trial record).

Cole v. State, 841 So.2d at 418.

The Court agrees. Although the Florida Supreme Court's findings of fact are given great deference, and Petitioner has done nothing to refute them, the Court conducted its own independent review of the record, and finds that substantial, conclusive evidence exists to establish that Pam Edwards was attacked by Petitioner and his co-defendant, that both she and her brother were beaten, that her brother was left behind while she was taken by Petitioner and his co-defendant, that she was raped at least twice, and that she was left tied to two trees in the forest. Thus, the admission of these two statements, while they may be hearsay and/or bolstering statements, did not prejudice Petitioner in anyway - i.e. neither of the statements related to the identification of Petitioner as the perpetrator of the crimes and the absence of the statements would not have altered the outcome of the trial. See e.g. Roberts v. Singletary, 794 F. Supp. 1106 (S.D. Fla. 1992) (finding that it was harmless error and therefore not prejudicial under Strickland to admit hearsay statements where the

same testimony was produced through other valid evidence).  Because Petitioner cannot establish the prejudice prong of the <u>Strickland</u> test, this portion of Claim XIII is Denied.

In sum, Petitioner has not established any instances of ineffective assistance of counsel under established federal precedent.  Claim XIII is therefore Denied.

CLAIM XIV

> COUNSEL'S FAILURE TO ASK FOR AND ARGUE THE INSTRUCTIONS REGARDING THE MENTAL HEALTH STATUTORY MITIGATORS WAS INEFFECTIVE ASSISTANCE OF COUNSEL WHICH VIOLATED LORAN COLE'S FIFTH, SIXTH, EIGHTH, AND FOURTEENTH AMENDMENT RIGHTS UNDER THE UNITED STATES CONSTITUTION

Petitioner's next claim challenges his counsel's failure to request jury instructions concerning two statutory mitigating circumstances at the penalty phase: (1) that the capital felony was committed while Petitioner was under the influence of extreme mental or emotional disturbance; and (2) that Petitioner's capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law was substantially impaired. <u>See</u> Fla.  Stat. § 921.141(6)(b), (f).  Petitioner points to the charge conference prior to the conclusion of the penalty phase, during which the prosecutor stated that Petitioner's trial counsel had not proven any of the statutory mitigators permitted under Fla. Stat. § 921.141(6), and therefore was not entitled to any jury instructions on these factors.  Trial counsel did not object to this statement, (Exh.  A-16 at 1511-12), despite the fact that his forensic psychologist, Dr.  Berland, testified that Petitioner had "some kind of biologically determined mental illness that involves original paranoid thinking," and some sort of

"psychotic mood disturbance." Petitioner also complains that his counsel did not argue these factors to the jury during closing arguments.

Petitioner first raised this argument in his Rule 3.850 motion seeking post-conviction relief.    The trial court held an evidentiary hearing during which Petitioner's trial counsel conceded that although Dr.  Berland presented some evidence of a mental disturbance, he did not request the statutory mental mitigators.  Exh.  H-11 at 1446-48.  Trial counsel also testified, however, that he would not ask for jury instructions on statutory mitigators where the evidence would not support the instructions.  Exh.  H-11 at 1514-15.

Following the conclusion of the evidentiary hearing, and after a review of the trial record, the trial court issued its findings of fact and conclusions of law and denied Petitioner's requested relief.  The trial court recognized that under existing Florida law Petitioner may have been entitled to an instruction on the statutory mental mitigators, and that his trial counsel was arguably deficient in this regard.  However, the trial court further found that the jury was instructed to consider all aspects of Petitioner's character or record as mitigating evidence and unanimously recommended the death penalty despite receiving evidence of non-statutory mitigating factors.  Further, in its written order in support of the death sentence, the trial court had considered and determined that none of the statutory mitigating circumstances - including the two mental mitigators - existed, and had found that slight to moderate weight should be given to the non-statutory mitigating factor of mental incapacity. Exh.  G-5 at 7-9.  Based on these findings, the trial court determined that Petitioner's mental

status was considered during the penalty phase, and that the outcome of the trial would not have differed if jury instructions on the mental mitigators had been given.  Id.

On appeal, the Florida Supreme Court affirmed:

> The trial record reveals that Dr.  Robert Berland, a board certified forensic psychologist, performed a mental health examination of Cole.  Dr.  Berland performed clinical interviews of Cole; talked with family members, although some would not talk to him; reviewed a Minnesota Multiphasic Personality Inventory (MMPI) administered in November of 1988; and reviewed voluminous material from Ohio State Prison regarding Cole.  Dr.  Berland also conducted extensive psychological testing of Cole.  As part of this psychological testing, Berland administered to Cole two additional MMPIs and a Wechsler Adult Intelligence Scale test (WAIS).  The WAIS result was that Cole's full scale IQ was scored at 98.  From Dr.  Berland's first MMPI administration, Dr.  Berland concluded that some mental disturbance existed but that he could not diagnose the extent of the problem because Cole was not truthful in his answers.  Dr.  Berland thereafter administered a second MMPI to Cole.  From administration of the second MMPI, Dr.  Berland concluded that Cole had a biologically caused manic type disturbance with an indication of delusional paranoid thinking.  Dr.  Berland testified that he could not be more specific as Cole attempted in the second MMPI to understate the severity of his problems.  However, a careful reading of Dr.  Berland's testimony shows that Dr.  Berland did not testify as to his opinion of whether the two statutory mitigators applied to Cole's murder of John Edwards.
>
> The trial court in its sentencing order specifically rejected the existence of either statutory mental mitigator.

2.    The murder of John Edwards was not committed while the Defendant was under the influence of extreme mental or emotional disturbance.  The defense expert, Dr. Robert Berland, a forensic psychologist, testified that the Defendant exhibits symptoms of some form of organic brain damage and mental illness. However, the doctor was unable to establish that such significantly influenced the acts of the Defendant.  Though the evidence indicates that the Defendant may have consumed some alcoholic beverages and smoked marijuana on or about the date of the commission of the offense, that evidence is insufficient to establish that such influenced the Defendant's actions in a mitigating manner.

. . . .

6.    The Defendant's capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law was not substantially impaired.  As stated above, Dr. Berland testified that the Defendant exhibited signs of organic brain damane and mental illness; however, such did not affect the Defendant's ability to control the circumstances or understand the consequences of his actions.

State v. Cole, No. 94-498-CF-A-X, order at 5-6 (Fla. 5th Cir.  Ct. Order filed Dec. 20, 1995).  Thus, the trial court when sentencing Cole concluded that these two statutory mental mitigators did not exist.  The trial court in the same sentencing order then evaluated this evidence as nonstatutory mental mitigation.

2.    The Defendant presented expert testimony through Dr.  Robert Berland, a forensic psychologist, as to Defendant's organic brain damage and mental disabilities.  Dr. Berland testified that the test scores and test taking attitude indicated that the Defendant lied and

exaggerated his responses in an attempt to manipulate the results. However, based on additional indicators which are more difficult to skew, the doctor found some indication of mental illness and psychosis, but could not determine the severity of either due to the untruthfulness and exaggeration of the Defendant's responses. Interviews with family members and lay witnesses did not confirm any prior history of mental illness, nor was there independent evidence of brain injury or fetal alcohol syndrome.

Dr. Berland testified that mental illness may cloud a person's perception of the world and judgments, but that the Defendant was not delusional or controlled by hallucinations. Further, alcohol and marijuana may intensify the symptoms of psychosis. Although there was evidence that the Defendant had been drinking prior to the murder, there was no evidence that such affected the Defendant's ability to understand the consequences of his actions and control of the circumstances. Also, Dr. Berland testified that the Defendant was of average intelligence. Any brain damage affecting the Defendant's intelligence quotient would only decrease the score down to a normal finding.

Upon evaluating the testimony, the Court finds that the Defendant has established the mitigating factors of organic brain damage and mental illness by the greater weight of the evidence. However, the testimony has failed to establish that such affected the Defendant's judgment in any significant manner. Dr. Berland was unable to definitively connect any psychotic influence on the Defendant's criminal acts. Therefore, the Court can only attach slight to moderate weight to this mitigating factor.

> Id. at 7-8.
>
> At the evidentiary hearing no expert evidence was presented that counsel was deficient on the basis of the trial record for not requesting jury instructions on these two statutory mental mitigators.  Based upon Dr. Berland's testimony, the trial court's sentencing order, and the rule 3.850 evidentiary hearing record, we find no error in the trial court not granting relief on this claim.

Cole v. State, 841 So.2d at 420-21.

Upon an independent review of the trial record, including the trial court's evidentiary hearing on this claim, the Court agrees completely with the Florida Supreme Court's analysis.  Any deficiency in trial counsel's performance on this issue - and it is arguable at best that counsel was deficient - did not impact the outcome of the penalty phase.  There was simply no evidence supporting either statutory mitigating factor.  Dr. Berland was not able to provide a more detailed diagnosis or explain exactly what sort of mental disturbance the Petitioner suffered.  He was also not able to testify that Petitioner's crimes were the direct result of his mental disturbance, or that his mental condition contributed in any meaningful manner to his murder of John Edwards.   There was also a complete absence of any testimony, during either the guilt or penalty phase of the trial, demonstrating that  Petitioner was unable to appreciate the criminality of his conduct, due either to a mental disturbance or the use of alcohol or drugs.  Moreover, Petitioner's trial counsel did, in fact, argue extensively during his closing argument that Petitioner's mental illness was a contributing factor to his crimes, and that the jury should consider this mitigating evidence while reaching its advisory opinion. Exh. A-17 at 1562-65.  Finally, the fact that the trial court specifically

considered and rejected the existence of either statutory mental mitigator, and attributed

minimal weight to the non-statutory mitigator of mental incapacity, further demonstrates that

Petitioner did not suffer any prejudice.  The state court's determination that Petitioner did not

meet his burden with respect to this claim is not an unreasonable application of clearly

established law and is not based on an unreasonable determination of the facts.  Claim XIV

is Denied.

CLAIM XV

COUNSEL WAS INEFFECTIVE FOR FAILING TO
HAVE A COMPETENT NEUROPSYCHOLOGICAL
EVALUATION PERFORMED ON LORAN COLE, IN
VIOLATION OF THE FIFTH, SIXTH, EIGHTH AND
FOURTEENTH AMENDMENTS TO THE UNITED
STATES CONSTITUTION

Petitioner next alleges that his trial counsel was ineffective during the penalty phase

for failing to subject Petitioner to a competent mental health examination.   Specifically,

Petitioner contends that: (1) Dr.  Berland, the forensic psychologist for the defense, was only

able to provide a "muddled" diagnosis of Petitioner which resulted in a determination that he

suffered from "some" brain damage and mental disorder; (2) trial counsel should have hired

a trained neuropsychologist to conduct an examination and determine the precise extent of

the Petitioner's brain damage and mental disorder; (3) trial counsel knew that he should have

hired a neuropsychologist almost three months prior to trial, but waited until one week before

trial to retain Dr.  Bortnik; (4) as a result, Dr.  Bortnik did not have sufficient time to conduct

a complete examination, and his determination that the Petitioner was "psychologically

sound" was incorrect and in conflict with Dr. Berland's diagnosis; and (5) trial counsel did not

question Dr.  Bortnik on this diagnosis, or seek a third opinion to resolve the conflict between these two doctors.  Based on these alleged deficiencies, Petitioner contends that he was prejudiced because another trained neuropsychologist with sufficient time to examine him would have been able to testify that he suffered from an extreme mental disturbance at the time of the crime and that his ability to confirm his actions to the requirements of the law was substantially impaired.

While Petitioner makes much of what his trial counsel allegedly did not do, it is clear that he did engage in extensive investigations concerning his client's mental state.  First, he hired Dr.  Berland, who conducted several examinations of Petitioner, and reviewed approximately 44 pounds of documents provided by trial counsel, including prior psychological exams Petitioner took while in Ohio State Prison.  Dr.  Berland testified extensively at the penalty phase about the nature of his examination and how he concluded that Petitioner suffered from some indeterminate brain damage and mental illness.  Trial counsel also hired a neuropsychologist, Dr.  Bortnik, as a confidential defense expert.  Dr.  Bortnik examined Petitioner for one hour, reviewed numerous records provided by trial counsel, including test results and other psychological examination records, and was instructed to contact Dr.  Berland for any further information.  Exh.  H-11 at 1474-75.  Dr.  Bortnik concluded that Petitioner was "neuropsychologically sound."  Exh.  H-11 at 1478.  Given this diagnosis, trial counsel chose not to obtain a written opinion from Dr.  Bortnik, or to call him as a witness, as neither would help Petitioner's case.

Given what trial counsel did do, Petitioner's argument on this issue must necessarily focus on the very narrow issue that his counsel should have given Dr. Bortnik more time to examine him, in the vain hope that Dr. Bortnik would change his diagnosis. And, if Dr. Bortnik did not change his opinion, Petitioner would have his counsel "inform himself about the nature of neuropsychological examinations" so he could shop around for another neuropsychologist who would diagnose Petitioner as mentally ill. Indeed, it is almost a certainty that this claim would not be before the Court if Dr. Bortnik, after his brief examination of Petitioner, had concluded that he was in fact brain damaged and mentally ill.

Petitioner first raised the issue of a neuropsychologist during his Rule 3.850 proceedings. However, the narrow claim made in this Court was not part of that initial motion and was not presented to the trial court below. Rather, Petitioner's claim below focused solely on an allegation that trial counsel did not hire a neuropsychologist <u>at all</u>. <u>See</u> Exh. G-2 at 12-13. It was only on appeal to the Florida Supreme Court that Petitioner changed his tactic and began to argue that his trial counsel did not hire a neuropsychologist <u>early enough</u> and/or did not hire a second or third neuropsychologist to say what he wanted him to say. Because Petitioner did not raise this more narrow claim until his appeal, the Florida Supreme Court ignored it and focused on his original claim that trial counsel never hired a neuorpsychologist:

> The record reveals that Dr. Berland, a board certified forensic psychologist, was Cole's main mental health expert. Trial counsel hired Dr. Bortnick, a neuropsychologist, to evaluate Cole for possible brain damage after Dr. Berland advised that he could not determine the extent of Cole's brain damage on

account of Cole's lack of candor and evasiveness during Dr. Berland's interviews of Cole. Dr. Berland also performed those tests, clinical interviews, and reviews previously detailed. Dr. Berland explored various issues such as head injuries, fetal alcohol syndrome, and other events which could have caused brain damage. Documentation provided at the evidentiary hearing established that trial counsel provided Dr. Berland with 44.52 pounds of documentary materials.

With respect to Cole's claim in the rule 3.850 motion alleging a failure to hire a neuropsychologist, we find that there is competent, substantial evidence supporting the trial court's finding that trial counsel did indeed hire Dr. Bortnick, a neuropsychologist. It is correct that trial counsel thereafter made a tactical decision not to call Dr. Bortnick. But we find no error in the denial of relief as to this claim in view of the claim presented to the trial court and the record.

Cole v. State, 841 So.2d at 422-23.

Because the narrow claim Petitioner now posits was not presented to the trial court and not considered by the Florida Supreme Court, it is not properly before this Court. See Kelly v. Sec'y for Dept. Of Corrections, 377 F.3d 1317, 1343 (11th Cir. 2004). For this reason alone, Petitioner's claim must fail. However, upon a review of the trial record, it is also clear that this claim fails on its merits.

Counsel is not necessarily required to seek multiple mental evaluations in order to render effective assistance. Rather, the choice is a tactical decision which "must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgment." Holladay v. Haley, 209 F.3d 1243, 1250 (11th Cir. 2000) (quoting Strickland, 466 U.S. at 691). In this case it is clear that trial counsel's conduct was

reasonable.  He worked extensively with Dr. Berland do assess Petitioner's mental status.

After Dr.  Berland provided his indefinite diagnosis that Petitioner suffered from a psychosis

and brain damage to some degree, trial counsel sought out and retained Dr.  Bortnik, a

licensed neuropsychologist, to conduct further examinations.  Once Dr.  Bortnik provided a

diagnosis that was not favorable to Petitioner's defense, trial counsel made the clear tactical

decision not to call him as a witness or to pursue the matter further with other possible

experts who might well be expected to make matters even worse given Dr.  Bortnik's

unfavorable opinion.

        To demand that trial counsel continue searching for other neuropsychologists who

might present a more favorable diagnosis is not reasonable.  The Eleventh Circuit has

previously held that  "counsel is not required to 'shop' for a psychiatrist who will testify in a

particular way."  Elledge v.  Dugger, 823 F.2d 1439, 1447 n.  17 (11th Cir.  1987).  In

addition, attorneys "do not enjoy the benefit of endless time, energy, or financial resources."

 Williams v. Head, 185 F.3d 1223, 1237 (11th Cir.1999) (quoting Rogers v. Zant, 13 F.3d

384, 387 (11th Cir.1994)).  Trial counsel did the best he could with the resources he had

available - he already had a forensic psychologist willing to testify at length to Petitioner's

mental health.

        The fact that Petitioner proffered the testimony of another neuropsychologist[42] at the

evidentiary hearing (almost five years after Petitioner's conviction and sentence) who

_____

        [42] At the evidentiary hearing, Petitioner's appellate counsel proffered the testimony of Dr.  Dee, a
clinical psychologist and clinical neuropsychologist who examined Petitioner in 1999, almost four years
after Petitioner's trial.  (Exh.  H-11 at 1527-28).

testified that Dr. Bortnick's evaluation of Petitioner was inadequate and that Petitioner did indeed suffer from several mental defects, does not make his trial counsel's performance deficient under <u>Strickland</u>.  "A psychologist's assessment in hindsight that another expert's testing methods and conclusions were inadequate does not, standing alone, demonstrate that counsel's performance at the penalty phase of trial was unreasonable within the meaning of <u>Strickland</u>."  <u>Card v. Dugger</u>, 911 F.2d 1494, 1513 (11th Cir. 1990).  <u>See also</u> <u>Daugherty v. Dugger</u>, 839 F.2d at 1432 (mere fact that an expert who would give favorable testimony for Daugherty was discovered five years after sentencing proceedings is not sufficient to prove that a reasonable investigation at the time of sentencing would have produced the same expert or another expert willing to give the same testimony).[43]

Dr. Berland's testimony that Petitioner has some sort of mental disturbance and some degree of organic brain damage, and that drugs and alcohol would only exacerbate his mental condition, was based on his professional assessment of Petitioner's mental health. The fact that his assessment was not sufficient to cause the jury to recommend a life sentence or to cause the judge to find the presence of mitigating factors does not mean that counsel was ineffective.  Accordingly, even if this claim was not procedurally barred in this

---

[43] Petitioner also mischaracterizes Dr. Dee's testimony at the evidentiary hearing.  Dr. Dee did <u>not</u> testify that Petitioner was under an extreme mental disturbance at the time of the crime, or that Petitioner's ability to appreciate the criminality of his conduct at the time of his crime was severely impaired.  To the contrary, Dr. Dee testified that Petitioner suffered from cognitive impairment which primarily affected his memory and linguistic functions, as well as hampered his impulse control to some extent.  Exh. H-11 at 1535-36, 1539. More importantly, Dr. Dee specifically stated that while Petitioner showed difficulties over his life in conforming his conduct to the dictates of the law, "I don't see any evidence that he wouldn't have been able to appreciate the wrongfulness of his conduct."  Exh. H-11 at 1541. Thus, given Dr. Dee's less than convincing testimony, coupled with the substantial, compelling aggravating factors found by the trial court, there is no reasonable probability that had Dr. Dee testified (or some other neuropsychologist with a similar diagnosis), the outcome would have been different.

Court, it would fail because the Petitioner has failed to demonstrate any deficient performance by his trial counsel as required by <u>Strickland</u>.  Claim XV is Denied.

CLAIM XVI

> MR. COLE WAS DENIED HIS RIGHT TO EFFECTIVE MENTAL HEALTH ASSISTANCE BECAUSE THE NEUROPSYCHOLOGIST WHO EVALUATED MR. COLE DID NOT RENDER ADEQUATE MENTAL HEALTH ASSISTANCE AS REQUIRED BY <u>AKE V. OKLAHOMA</u>, IN VIOLATION OF MR. COLE'S RIGHTS UNDER THE FOURTH, FIFTH, SIXTH, EIGHTH, AND FOURTEENTH AMENDMENTS. TRIAL COUNSEL'S FAILURE TO ENSURE THAT MR. COLE RECEIVED A COMPETENT MENTAL HEALTH EVALUATION VIOLATED MR. COLE'S FIFTH, SIXTH, EIGHTH, AND FOURTEENTH AMENDMENT RIGHTS

Petitioner's next claim closely mirrors Claim XV because it also focuses on his neuropsychological examination prior to the penalty phase of his trial.  Specifically, Petitioner claims he was denied effective mental health assistance, as required under <u>Ake v. Oklahoma</u>, 470 U.S. 68 (1985), because Dr. Bortnick only met with him for approximately one hour, and spent little time reviewing Petitioner's medical records.  If Dr. Bortnick had spent a longer period of time evaluating Petitioner, he arguably would have changed his diagnosis and trial counsel could have called him to testify that Petitioner was extremely mentally disturbed and unable to conform his conduct to the requirements of the law.

This claim in its current form was not properly presented to the trial court, but the Florida Supreme Court nevertheless denied it on its merits:

> Cole next argues that he did not receive effective mental health assistance as required by <u>Ake v. Oklahoma</u>, 470 U.S. 68, 105

> S.Ct. 1087, 84 L.Ed.2d 53 (1985).  This claim was not presented in this form to the trial judge; however, on the basis of the record, we conclude that there is no basis for relief under Ake.

Cole v. State, 841 So.2d at 423.

The Florida Supreme Court's decision was neither contrary to or an unreasonable application of federal law.  Pursuant to Ake, "when a defendant demonstrates to the trial judge that his sanity at the time of the offense is to be a significant factor at trial, the State must, at a minimum, assure the defendant access to a competent psychiatrist who will conduct an appropriate examination and assist in evaluation, preparation, and presentation of the defense."  Ake v. Oklahoma, 470 U.S. 68, 83 (1985).  The Eleventh Circuit has further explained Ake to simply require that the trial court provide mental health expert assistance upon request by a defendant.  Provenzano v. Singletary, 148 F.3d 1327 (11th Cir. 1998); Clisby v. Jones, 960 F.2d 925 (11th Cir. 1992).  That is exactly what happened in this case: trial counsel and the trial court ensured that Petitioner received an appropriate examination from a competent forensic clinical psychiatrist - Dr. Berland - who assisted in the evaluation, preparation, and presentation of Petitioner's defense.  Trial counsel went one step further and had Petitioner evaluated by Dr. Bortnick as well.  Thus, it is clear that the requirements of Ake were satisfied.

Petitioner's attempts to rely on Dr. Dee's testimony at the evidentiary hearing as proof that Dr. Bortnick's evaluation was insufficient under Ake is misplaced.  As discussed in Claim XV above, conflicting opinions of experts such as Dr. Dee, who come onto the scene

almost five years after the fact, cannot be given much weight.  See Card, 911 F.2d at 1513;

Daugherty, 839 F.2d at 1432.  For, as the United States Supreme Court itself stated in Ake:

> Psychiatry is not, however, an exact science, and psychiatrists disagree widely and frequently on what constitutes mental illness, on the appropriate diagnosis to be attached to given behavior and symptoms, on cure and treatment, and on likelihood of future dangerousness. Perhaps because there often is no single, accurate psychiatric conclusion on legal insanity in a given case, juries remain the primary factfinders on this issue, and they must resolve differences in opinion within the psychiatric profession on the basis of the evidence offered by each party.... In so saying, we neither approve nor disapprove the widespread reliance on psychiatrists but instead recognize the unfairness of a contrary holding in light of the evolving practice.

Id. at 81, 82 (emphasis supplied).

Thus, just as reasonable lawyers may disagree on a strategy for any given case, so may reasonable psychiatrists similarly disagree; and subsequent diagnoses more favorable to the Petitioner do not render unreliable those opinions available at the time of trial. Petitioner's rights under Ake were not violated, and Claim XVI is Denied.

### CLAIM XVII

COUNSEL WAS INEFFECTIVE DURING THE GUILT PORTION OF MR.  COLE'S TRIAL, VIOLATING HIS FIFTH, SIXTH, EIGHTH AND FOURTEENTH AMENDMENT RIGHTS UNDER THE UNITED STATES CONSTITUTION

Petitioner's last ineffective assistance of counsel claim focuses on the guilt phase of his trial.  He lists five instances where his trial counsel was allegedly deficient: (1) counsel's failure to conduct individual voir dire on five of the 11 eligible jurors; (2) counsel's failure to use a peremptory challenge to remove Juror Cutts; (3) counsel's failure to call co-Defendant

William Paul to testify; (4) counsel's failure to contemporaneously object to the prosecutory's opening argument; and (5) counsel's decision to call John Thompson as the only defense witness.  According to Petitioner, these alleged deficiencies, when viewed individually and/or cumulatively, prejudiced him and resulted in his conviction for first-degree murder.

Petitioner first raised these claims in his Rule 3.850 motion for post-conviction relief, and the trial court held an extensive evidentiary hearing.  Exhs.  H-11 and H-12. The trial court and the Florida Supreme Court found none of these alleged deficiencies to have any merit and, as discussed below, the Court agrees.

## A.    Failure to Conduct Individual Voir Dire.

The trial court conducted an extensive voir dire, which began at 9:41 a.m. on September 18, 1995, and concluded at 6:46 p.m. that same day.  During the voir dire process, the trial court allowed both sides time to question each prospective juror, and entertained challenges for cause as well as peremptory challenges.  Exh.  A-7 through A-9. The trial court chose to complete jury selection in one day, in the hope of lowering any chance that jurors might be influenced by outside sources prior to their empaneling.  Exh. A-8 at 294-95.  During the afternoon session, which began at 4:30 p.m., 11 potential jurors were subject to examination, but trial counsel did not question five of them.  Exh.  A-9 at 318-402.  Of these five, two became jurors and one became an alternate.  Petitioner contends that his counsel failed to ask any questions of these five individuals not due to any strategic or tactical plan, but because he had "other things" to do and wanted to conclude jury selection as quickly as possible.

At the conclusion of the evidentiary hearing on this claim, and after a review of the trial

record, the trial court determined that counsel actively participated in voir dire, and that any

decision not to question a particular juror was a tactical decision.  As such, the trial  court

found that counsel was not deficient or ineffective, and denied this claim.  Exh.  G-5 at 1-2.

On appeal, the Florida Supreme Court agreed:

> The trial court found that every prospective juror was
> questioned individually by the trial court, by the State,
> or by trial counsel, and that trial counsel was an
> active participant throughout voir dire, even though
> trial counsel did not question each juror individually.
> There is competent, substantial evidence to support
> the trial court's findings.  We find no error with the
> trial court's determination that, on the basis of this
> record, Cole has failed to demonstrate his trial
> counsel's ineffectiveness under <u>Strickland</u> for trial
> counsel's not questioning each prospective juror
> himself.  Therefore, this subclaim is without merit.

<u>Cole v.  State</u>, 841 So.2d at 415.

The Florida Supreme Court's decision is not  contrary  to  or  an  unreasonable

application of federal law.  As previously discussed in reference to Petitioner's Claim VI, the

trial court conducted an extensive and thorough voir dire of all prospective jurors, in which

trial counsel actively participated.  The fact that counsel did not specifically question five of

the prospective jurors does not mean that he was deficient - rather it appears from counsel's

testimony at the evidentiary hearing that he was able to discern necessary information from

the State's and trial court's questioning. Exh.  H-11 at 1414, 1450-53.  It also appears from

the Court's own review of the record that trial counsel moved for additional peremptory

challenges during the voir dire process, and consulted with Petitioner before each and every

jury member was selected.  Exh. H-11 at 1454.  This clearly does not demonstrate deficient performance.

Petitioner also has not presented any legal authority that trial counsel must personally question each and every prospective juror, or that his counsel performed deficiently by failing to question these five jurors.  Additionally, even if Petitioner had somehow demonstrated that his counsel did not act appropriately, his claim of prejudice is entirely speculative.  He has not presented a shred of evidence that he suffered any prejudice.  Accordingly, this portion of Claim XVII is Denied.

## B.      Failure to Use Peremptory Challenge on Juror Cutts.

Juror Cutts, an employee of the Florida Department of Corrections, worked in the recreation department of the Florida State Penitentiary.  Trial counsel questioned Cutts and sought to have him removed for cause based on his employment status, but the trial court denied the request.  Exh. A-8 at 231.  Petitioner now claims that his counsel should have exercised a peremptory challenge and had Cutts removed, even though Petitioner himself strongly urged trial counsel to keep Cutts on the jury.  Exh. H-11 at 1454-55.

Both the trial court and the Florida Supreme Court rejected this claim:

> The record reflects that trial counsel unsuccessfully attempted to remove Cutts for cause.  During voir dire, trial counsel concluded and advised Cole that a peremptory challenge should be exercised to remove Cutts; however, Cole stated to counsel that he wanted to retain Cutts.  Trial counsel's conclusion as to juror Cutts was not sufficiently strong that counsel interfered with what Cole wanted to be done.  We find no error in the trial court's determination that, under these circumstances, trial counsel's decision not to

> peremptorily challenge juror Cutts did not constitute deficient performance within the boundaries of Strickland.

Cole v. State, 841 So.2d at 415.

Petitioner has not provided any evidence to refute the state court's findings of fact, and based on the Court's own review of the record in this matter, there is no indication that counsel performed deficiently.  It is apparent that trial counsel's desire to strike Cutts was to avoid any possibility of Cutts working at the same prison where the Petitioner would serve his sentence.  Exh.  A-8 at 230-32.  The trial court relieved this concern by assuring trial counsel that if Petitioner was convicted, the trial court would ensure that he did not reside at the same institution where Cutts worked.  Id.  at 231.  Thus, any reasons to override Petitioner's emphatic desire to keep Cutts on the jury were not sufficiently strong.  Trial counsel made a tactical decision to follow his client's stated desire.  See Stano v.  Dugger, 921 F.2d at 1154; Mitchell v.  Kemp, 762 F.2d at 889.  See also Strickland, 466 U.S. at 691 ("The reasonableness of counsel's actions may be determined or substantially influenced by the defendant's own statements or actions.").

There is also no evidence that Petitioner suffered any prejudice, i.e., that Cutts had any predisposition against Petitioner or in favor of the death penalty, or that Petitioner's conviction would have been any different without Cutts on the jury.  Moreover, the Court finds no merit in Petitioner's apparent eleventh hour attempt to claim that he suffered from such severe brain damage that he was incompetent to assist in his defense or to make decisions concerning jurors, particularly since no such claim was ever made at trial.  The

Florida Supreme Court's decision was not contrary to or an unreasonable application of federal law, and this portion of Claim XVII is Denied.

## C.   Failure to Present Co-Defendant's Testimony.

Petitioner next alleges that his trial counsel was ineffective for not presenting William Paul's testimony at trial.   Petitioner claims that because Paul was in possession of the murder weapon at the time of his arrest, and because the case against Petitioner was allegedly largely circumstantial, trial counsel should have called Paul to testify in the hope that he would confess to John Edwards' murder.   This claim mirrors closely Petitioner's argument in sub-claim five of Claim XIII above challenging trial counsel's decision not to introduce evidence of Paul's life sentence in order to thwart the state prosecutor from introducing potentially damaging rebuttal evidence from Paul and others further establishing that Petitioner committed the crimes.   The claim here is equally without merit.

The trial court rejected this claim, finding that:  (1) trial counsel extensively questioned Paul during his pre-trial deposition; (2) Paul testified at his deposition that Petitioner killed John Edwards and raped Pam Edwards; (3) Paul's deposition testimony was consistent with his statement to the police immediately following his arrest; (4) Pam Edwards' trial testimony - that she was raped by Petitioner and that he killed her brother - was consistent with Paul's prior statements and deposition testimony; and (5) Paul wrote a letter to trial counsel and to the state prosecutor informing them that he did not wish to testify for either side.  Exh.  G-5 at 3.  Based on these findings, the trial court determined that Petitioner's trial counsel made a reasonable tactical decision not to call Paul to the stand because his testimony would not

help his client in any way.  Further, Petitioner had an opportunity to review Paul's deposition

and agreed with counsel's decision not to call Paul as a witness.  Id.  See also Exh.  H-11

at 1455-61.

On appeal, the Florida Supreme Court affirmed:

> We find that there is competent, substantial evidence supporting the trial court's finding that trial counsel's decision was tactical.  Trial counsel testified at the evidentiary hearing that he had taken Paul's deposition, that he was aware of the substance of Paul's statement to Marion County deputies, and that he was familiar with the physical evidence in the case.  Prior to trial, trial counsel and Cole extensively discussed whether Paul should testify.  Trial counsel testified that Cole reviewed Paul's statement and letter.  Trial counsel concluded that having Paul testify would not help Cole, and counsel discussed with Cole the advantages and disadvantages of having Paul testify.  At that time, Cole agreed with counsel not to have Paul testify.  Thus, we find no error in the trial court's conclusion that Cole failed to demonstrate that trial counsel performed deficiently.

Cole v.  State, 841 So.2d at 416.

The Florida Supreme Court's decision is not contrary to or an unreasonable

application of federal law.  Trial counsel's decision not to call Paul as a witness is a classic

example of a strategic decision not to be second-guessed by this Court.  See Conklin v.

Schofield, 366 F.3d 1191, 1204 (11th Cir.  2004) ("Which witnesses, if any, to call, and when

to call them, is the epitome of a strategic decision, and it is one that we will seldom, if ever,

second guess.") (quoting Waters v.  Thomas, 46 F.3d 1506, 1512 (11th Cir.  1995) (en

banc)); United States v. Guerra, 628 F.2d 410, 413 (5th Cir.1980) ( "Complaints concerning

uncalled witnesses impose a heavy showing since the presentation of testimonial evidence is a matter of trial strategy and often allegations of what a witness would have testified to are largely speculative").  Petitioner's argument that his trial counsel should have called to the stand a hostile witness who, by all indications, would have pointed the finger squarely at Petitioner himself, (and whom Petitioner previously agreed should not testify), defies logic.[44] This part of Claim XVII is Denied.

**D.      Failure to Contemporaneously Object to Prosecutor's Improper Opening Statement.**

Petitioner's fourth sub-claim asserts that his trial counsel failed to contemporaneously object to the state prosecutor's statement during his opening argument that Pam and John Edwards found at the Ocala National Forest "not nature at its best, but mankind at its worst." Exh. A-11 at 547.  Trial counsel also refused the trial court's suggested curative instruction as to this statement.  Id. at 552-53; Exh. H-11 at 1461-63.

Petitioner's argument is quite limited however, because trial counsel did in fact object to this comment and moved for a mistrial - Petitioner's only complaint is that trial counsel waited until the conclusion of the prosecutor's opening argument to make his objections. Thus, in order to prevail on this claim, Petitioner must demonstrate that his counsel was deficient and that he was prejudiced by trial counsel's decision to wait.  Petitioner must also

---

[44] The Petitioner's claim that Paul could have testified that his left hand was not broken would not have changed the outcome of the trial.  As discussed in sub-claim three of Claim XIII above, whether or not Paul's hand was broken or otherwise injured is not particularly relevant.  Moreover, while the Petitioner correctly notes that trial counsel could have elicited some testimony from Paul via leading questions, the Petitioner ignores the fact that Paul would then have been subject to extensive cross examination from the state, which would have surely produced very damaging testimony.

show how his counsel was deficient and how he was prejudiced by counsel's refusal of the trial court's curative instruction.

Both the trial court and the Florida Supreme Court rejected this very narrow claim on the basis that the Petitioner could not demonstrate deficient performance:

> Trial counsel testified at the evidentiary hearing that he decided to wait until after the opening statement so that the comment would not be emphasized and also testified that the curative instruction in this case would have had the effect of repeating the offensive comment. We find that competent, substantial evidence supports the trial court's conclusions that trial counsel's decision to wait until the conclusion of the prosecutor's opening statement before moving for mistrial was tactical as well as counsel's decision to decline the curative instruction. We find no error in the trial court's ruling that Cole was not entitled to Strickland relief because Cole failed to demonstrate that his counsel performed deficiently. We also conclude that Cole has failed to demonstrate that he was prejudiced.

Cole v. State, 841 So.2d at 417. See also Exh. G-5 at 4.

The Court agrees completely with the state courts' analysis. Petitioner has utterly failed to demonstrate how this minor delay in making an objection, as well as the rejection of a curative instruction, was either deficient performance or prejudiced Petitioner. This was simply a tactical decision on the part of trial counsel, which the Court will not second guess. This portion of Claim XVII is Denied.

## E.   John Thompson.

Petitioner's last subclaim attacks his trial counsel's decision to call John Thompson as the only defense witness during the guilt phase of trial. Under Florida law, by calling

witnesses, the defense loses its right to make the first closing argument, as well as its right to a rebuttal closing argument.[45]  Petitioner claims that trial counsel could have elicited the same testimony from John Thompson through cross examination during the state's case-in-chief, and that counsel was deficient both for failing to conduct such a cross examination and for losing the defense's right to a rebuttal closing argument.

After conducting an evidentiary hearing on this issue, and carefully examining the relevant testimony of both John Thompson and another related state witness, Mary Gamble, the trial court and the Florida Supreme Court rejected this argument:

> Both Thompson and Gamble, who did not previously know each other, met each other and Cole months prior to the murder and rape while they and others jointly lived at the Salvation Army in Marion County. Gamble and Cole formed a friendship and engaged in sexual relations, and after Cole's arrest, Gamble visited Cole at the jail.  Gamble testified during the State's case-in-chief that while she visited Cole in jail, he confessed to her that he raped Pam Edwards and slit John Edwards' throat.  Thompson had driven Gamble to the jail to visit Cole.  Counsel called Thompson during Cole's case-in-chief to have Thompson testify that Gamble never told him that Cole confessed to the murder, even though he drove Gamble to the jail.
>
> The record establishes that Thompson was the State's fifteenth trial witness, and Gamble was the State's eighteenth witness.  Thompson testified, when called by the State, that he drove Gamble to the jail to see Cole while Cole was awating trial. When Thompson testified for the State, the State did not elicit any testimony concerning any conversation Gamble had with Cole at the jail.  When Gamble later

---

[45] See Fla.R.Crim.P. 3.250.

testified, she testified that Cole confessed to comitting these crimes.  Thus, trial counsel called Thompson as a witness for the defense so that Thompson could tesifiy that Gamble never told him that Cole confessed.  Cole contends that trial counsel should have elicited the testimony impeaching Gamble during Thompson's cross-examination, when Thompson was a State's witnes and prior to Gamble's testimony.  We do not agree because the record shows that at the time Thompson testified there was no predicate in the record upon which Gamble could be impeached.

At the evidentiary hearing, trial counsel testified that he knew that by calling Thompson trial counsel was losing the right to a rebuttal closing but thought that the benefit of having Thompson refute Gamble, the only person who testified that Cole confessed, outweighed the benefits of giving the rebuttal argument.  We find there to be competent, substantial evidence supporting the trial court's finding that counsel's decision to call Thompson was tactical.  We find no error in the trial court's conclusion that Cole failed to demonstrate how his trial counsel performed deficiently under <u>Strickland</u> and therefore is not entitled to relief on this claim.

<u>Cole v. State</u>, 841 So.2d at 417-18.  <u>See also</u> Exh. H-11 at 1463-66.

The Court has conducted its own review of the record in this case, and agrees with the state courts' findings of fact and analysis.  Petitioner has not been able to refute these findings of fact, or provide any support for its claim of ineffective assistance of counsel.   He has failed to demonstrate how counsel's well thought out tactical decision was deficient, as well as how he was prejudiced by this decision.[46]   <u>See, e.g.</u>, <u>Davis v. Singletary</u>, 853

---

[46] Petitioner's contention that trial counsel would have been able to rebut the prosecutor's comments about co-Defendant Paul's broken hand are without merit.  As discussed in sub-claim three of
(continued...)

F.Supp. 1492, 1527-28 (M.D. Fla.  1994) (whether to preserve the right to the "opening" closing argument and rebuttal argument or challenge the state's case-in-chief testimony is a "legitimate, tactical choice."). See also Conklin, 366 F.3d at 1204.  As such, the Florida Supreme Court's decision was not contrary to or an unreasonable application of federal law, and this portion of Claim XVII is Denied.

**F.    Cumulative Effect.**

Because Petitioner has failed to demonstrate either deficient performance or prejudice with respect to any of the five situations specified in this claim, he cannot demonstrate that he suffered any harm from the cumulative effect of his counsel's performance.  Accordingly, Claim XVII is Denied.

CLAIM XVIII

> LORAN COLE WAS DENIED A FAIR PENALTY PHASE IN VIOLATION OF THE FIFTH, SIXTH, EIGHTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION AND FLORIDA LAW BECAUSE THE COURT PERMITTED NONSTATUTORY AGGRAVATORS TO BE PRESENTED.

Petitioner next claims that the trial court relied upon unspecified nonstatutory aggravating factors when sentencing him, thereby violating his constitutional rights and Florida's death penalty scheme.  See Fla. Stat. § 921.141(5)(a) - (o).  Petitioner bases this claim on a single sentence contained in the trial court's final order denying his motion for

---

[46] (...continued)
Claim XIII above, the issue of whether Paul's hand was broken or otherwise severely injured is irrelevant and would not have changed the outcome of the Petitioner's conviction or sentence.

post-conviction relief under  Florida Rule of Criminal Procedure 3.850, during which the trial

court noted that "[e]xtensive statutory and non-statutory aggravating circumstances were

prevented [sic]."  Exh.  H-9 at 1197.[47]

The Florida Supreme Court rejected this claim as procedurally barred:

> . . . Cole asserts that the trial court impermissibly relied upon nonstatutory aggravating factors when sentencing Cole and that Cole is therefore entitled to a new sentencing proceeding.  Cole points to the trial court's final order denying the rule 3.850 motion in which the trial court stated:

>> 10.  The jury's advisory verdict of death was unanimous – despite the fact that it was instructed upon and given evidence of non-statutory mitigating circumstances.  Extensive statutory and *non-statutory circumstances* were prevented [sic].

> . . . .   On direct appeal, Cole raised numerous challenges to aggravating and mitigating circumstances, which we rejected.  See Cole, 701 So.2d at 851-53.  Cole did not contend on direct appeal that the trial court considered nonstatutory aggravating circumstances in its imposition of the death penalty, and we clearly identified that the trial court only considered four statutory aggravating circumstances in its evaluation of the imposition of the death penalty.  See id. at 849 n.  1.  We agree with the State that Cole's current argument is procedurally barred as the issue could have and

---

[47] The trial judge made this statement in the course of analyzing one of Petitioner's ineffective assistance of counsel claims, which related to trial counsel's failure to request a jury instruction on various statutory mitigating circumstances. Exh. H-9 at 1195.  During his analysis of this claim, the trial judge set out in detail the statutory and non-statutory mitigating circumstances that were presented to the jury, and found that given the extensive mitigation presented, the trial counsel's failure to ask for these specific instructions was not so prejudicial as to change the outcome at sentencing.  Id. at 1195-97.

should have been raised on direct appeal.  See, e.g., Hall v. State, 541 So.2d 1125, 1126 n. 1 (Fla. 1989).

Cole v. State, 841 So.2d at 428-29 (emphasis in original).

The Florida Supreme Court also rejected this claim on its merits:

In context of the trial court's entire discussion in the order, it is clear that the reference to nonstatutory aggravating circumstances was merely a scrivener's error, and in context, the reference was to nonstatutory mitigating circumstances. Moreover, there is no indication in the record that Cole attempted to bring this scrivener's error to the trial court's attention.

Id. at 429, n. 8.

The Court agrees with the Florida Supreme Court's analysis that this claim is procedurally barred; therefore it cannot be raised in a habeas petition before this Court.  See Smith v. Dugger, 840 F.2d 787, 791 (11th Cir. 1988); LeCroy v. Fla. Dept. of Corrections, 421 F.3d 1237, 1260 (11th Cir. 2005).  A review of the state court record shows that Petitioner did not raise this issue in the state trial court or on direct appeal.  Rather, he first raised this nonstatutory aggravators claim in his Rule 3.850 motion.  Because Petitioner's claim was not raised at trial or on direct appeal, the Florida Supreme Court's procedural-bar determination under Florida law rests on an independent and adequate state ground that precludes federal habeas consideration of this issue.  See LeCroy, 421 F.3d at 1260.[48]

_____

[48] This procedural bar doctrine which precludes federal habeas review has two narrow exceptions: (1) a petitioner must show both "cause" for his failure to properly raise the claim on direct appeal and actual "prejudice" resulting from this default; or (2) review of the barred claim is necessary to correct a fundamental miscarriage of justice.  See Grossman v. Crosby, 359 F. Supp.2d 1233, 1249 (M.D. Fla. (continued...)

The Court also agrees with the Florida Supreme Court's analysis of the trial court's order.  It is clear that Petitioner has taken this lone sentence from the trial court's order out of context.  The two pages preceding this sentence discuss in detail the aggravating and mitigating factors presented to the jury.  In particular, the trial court listed the four statutory aggravating factors that were submitted; there was no discussion of any nonstatutory aggravators.  Notably, the trial judge then discussed the evidence of statutory mitigating factors, and the two nonstatutory mitigating circumstances that were also presented to the jury.  When read together with the sentence cited by Petitioner, it is clear that the trial court meant to say nonstatutory <u>mitigating</u> circumstances.  There is simply no proof that the jury or the trial court considered any nonstatutory aggravating factors.  Moreover, Petitioner has not provided any evidence or any legal support for this claim, or demonstrated how the Florida Supreme Court's rejection of this claim - both on its merits and as procedurally barred - is contrary to or an unreasonable application of federal law.  Claim XVIII is therefore Denied.

CLAIM XIX

THE STATE WITHHELD EXCULPATORY EVIDENCE IN VIOLATION OF MR. COLE'S FIFTH, SIXTH, EIGHTH, AND FOURTEENTH AMENDMENT RIGHTS UNDER THE UNITED STATES CONSTITUTION

---

[48] (...continued)
2005).  Petitioner has not asserted either cause or prejudice from his default, and because the Court agrees that the trial court's mention of nonstatutory aggravators was merely a scrivener's error, the Court finds that Petitioner has also failed to demonstrate a fundamental miscarriage of justice.

Petitioner next alleges that the state attorney who prosecuted the Petitioner, Mr. Brad King, withheld exculpatory evidence in derogation of the rule laid down in Brady v. Maryland, 373 U.S. 83 (1963). This claim centers on a conversation between Mr. King and Mrs. Eleanor Simpson, which took place in a public area of the Florida Supreme Court Building following the conclusion of the oral argument in the Petitioner's direct appeal of his conviction and sentence. Mrs. Eleanor Simpson allegedly approached Mr. King and asked him why he did not call the co-defendant, William Paul, to testify. Mr. King responded that he was afraid that Paul would claim responsibility for the entire incident. According to Petitioner, this alleged statement by Mr. King proved that he had withheld some sort of evidence establishing that Paul in fact killed John Edwards.

Petitioner first raised this claim in his Rule 3.850 motion before the trial court, and an evidentiary hearing was held. Exhs. H-11, H-12. Mrs. Simpson testified at the hearing, and maintained that Mr. King indeed admitted that he was worried that Paul would attempt to take blame for the murder of John Edwards and the other related crimes. Exh. H-11 at 1545, 1554-57. However, Mrs. Simpson also admitted that several facts set forth in her affidavit - other than her recollection of Mr. King's statement - were false. She also admitted that she attended the oral argument with Petitioner's mother, and that Petitioner's mother helped her prepare the affidavit. Id. H-11 at 1547-56.

Mr. King also testified at the evidentiary hearing. He remembered talking briefly with Mrs. Simpson, and her question about Paul, but refuted Mrs. Simpson's recollection of his response. Instead, Mr. King testified that he said, "I didn't need to [call Paul as a witness],

that we had a good case without him; he was there and could have been called, but I chose not to call him; and, in part, I chose not to call him because I could never tell for a certainty what he would say if he testified." Exh. H-12 at 1576. Mr. King further testified that he never had any indication that Paul killed John Edwards, and that Mr. King was always convinced that Petitioner murdered John Edwards. Exh. H-12 at 1578.

In addition to this testimony, the trial court found that the State had provided Petitioner's trial counsel with all statements made by Paul, that trial counsel deposed Paul and chose not to call him during the trial, knew that Paul would not willingly testify for either the State or the Petitioner, and knew that Paul pled guilty to murder in exchange for a life sentence. Based on this evidence, the trial court determined that "[t]he State did not have any information on Mr. Paul - favorable to the Defendant or otherwise - which it did not provide to the defense," and denied Petitioner's <u>Brady</u> claim. Exh. H-9 at 1197-98.

On appeal, the Florida Supreme Court agreed with the trial court and held that "[c]ompetent, substantial evidence exists in the record supporting the trial court's findings. Thus, we find no error in the trial court's denial of this claim." <u>Cole v. State</u>, 841 So.2d at 419. The Florida Supreme Court got it right.

To establish a <u>Brady</u> violation, Petitioner must prove that: (1) the government possessed evidence favorable to him; (2) the defendant did not possess the evidence and could not have obtained it with reasonable diligence; (3) the government suppressed the favorable evidence; and (4) the evidence was material. <u>LeCroy</u>, 421 F.3d at 1268; <u>United States v. Meros</u>, 866 F.2d 1304, 1308 (11th Cir. 1989). <u>See also</u> <u>Strickler v. Greene</u>, 527

U.S. 263, 281-82 (1999).  Petitioner has not met any of these requirements.  A separate review of the record by the Court demonstrates that the State did not possess any evidence favorable to Petitioner which it did not turn over to him.  As the trial court found following a full and fair evidentiary hearing, and the Florida Supreme Court affirmed, the State provided all of Paul's statements to Petitioner's trial counsel, and the State had no indication that Paul was the murderer.  The Florida Supreme Court affirmed these findings and its rejection of this claim is not contrary to or an unreasonable application of federal law.  Claim XIX is Denied.

## CLAIM XX

THE RULES PROHIBITING MR. COLE'S LAWYERS FROM INTERVIEWING JURORS TO DETERMINE IF CONSTITUTIONAL ERROR WAS PRESENT VIOLATES EQUAL PROTECTION PRINCIPLES, THE FIRST, SIXTH, EIGHTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION AND DENIES MR. COLE ADEQUATE ASSISTANCE OF COUNSEL IN PURSUING HIS POSTCONVICTION REMEDIES.

In his twentieth claim, Petitioner challenges the constitutionality of Rule 4-3.5(d)(4) of the Rules Regulating the Florida Bar, which expressly prohibits counsel from directly or indirectly communicating with jurors except in very limited circumstances.[49]  According to

---

[49] Rule 4-3.5(d)(4) states, in relevant part that:

A lawyer shall not . . . after dismissal of the jury in a case with which the lawyer is connected, initiate communication with or cause another to initiate communication with any juror regarding the trial except to determine whether the verdict is subject to legal challenge; provided, a lawyer may not interview jurors for this purpose unless the lawyer has reason

(continued...)

Petitioner, this rule prevented his trial counsel from fully investigating whether any juror bias or misconduct took place during either phase of the trial, and in particular, whether the jurors were persuaded by the publicity surrounding the trial.   Petitioner raised this claim in his amended motion to vacate his sentence under Rule 3.850, and the trial court denied the claim.  Exh.  H-6 at 934-35.

On appeal, the Florida Supreme Court denied this motion as procedurally barred, because Petitioner could have and should have raised it on direct appeal.  Cole v.  State, 841 So.2d at 419.  For this reason, Petitioner cannot seek habeas relief in this Court on this claim.[50]  See Sims v.  Singletary, 155 F.3d 1297, (11th Cir.  1998); LeCroy, 421 F.3d at 1260. In addition, rules which prevent attorney interviews or other contact with jurors, or preclude juror testimony where the subject  inheres in the verdict itself have repeatedly been applied in criminal cases and held constitutional.  See, e.g., Tanner v.  United States, 483 U.S. 107 (1987) (applying Federal Rule of Evidence 606(b) to exclude testimony of juror misconduct, including drug and alcohol use); Sims, 155 F.3d at 1312-13 (applying Florida rule that juror testimony is not relevant unless it concerns matters that do not essentially inhere in the verdict itself).

---

[49] (...continued)
to believe that grounds for such challenge may exist.

[50] Petitioner also has not demonstrated "cause and prejudice" for his procedural default, or that he is "actually innocent," such that the Court could consider this procedurally barred claim.  Sims, 155 F.3d at 1311 (quoting Johnson v.  Singletary, 938 F.2d 1166, 1174-75 (11th Cir.  1991)).

Petitioner has presented no evidence or made any legal argument demonstrating that the Florida Supreme Court's and the trial court's rejection of this claim is contrary to or an unreasonable application of federal law.  Accordingly, this claim is Denied.

CLAIM XXI

FLORIDA STATUTE 921.141(5) IS FACIALLY VAGUE AND OVERBROAD IN VIOLATION OF THE FIFTH, EIGHTH, AND FOURTEENTH AMENDMENTS, AND THE UNCONSTITUTIONALITY WAS NOT CURED BECAUSE THE JURY DID NOT RECEIVE ADEQUATE GUIDANCE IN VIOLATION FO THE EIGHTH AND FOURTEENTH AMENDMENTS. MR. COLE'S DEATH SENTENCE IS PREMISED ON FUNDAMENTAL ERROR WHICH MUST BE CORRECTED. TO THE EXTENT TRIAL COUNSEL FAILED TO LITIGATE THESE ISSUES, TRIAL COUNSEL WAS INEFFECTIVE.

Petitioner's next claim attacks the trial court's instruction to the jury during the penalty phase concerning the weighing of aggravating and mitigating circumstances.  The trial court instructed the jury that "[t]o define [sic] sufficient aggravating circumstances do exist, it will then be your duty to determine whether mitigating circumstances exist that out-weigh the aggravating circumstances."  Exh.  A-17 at 1570-71.  Petitioner argues that this instruction, which is an almost verbatim recitation of Florida Statute § 921.141,[51] unconstitutionally shifted to Petitioner the burden of proving that the death penalty was not appropriate, *i.e.* created a presumption in favor of the death penalty.  Petitioner supports this argument by

---

[51] That statute provides, in relevant part, that the jury shall deliberate and render an advisory sentence to the court, based on "whether sufficient mitigating circumstances exist which outweigh the aggravating circumstances found to exist."  Fla.  Stat. § 921.141(2)(b).

citing to the Florida Supreme Court's 1973 decision <u>State v. Dixon</u>, which provides that a death sentence "could be given if the state showed the aggravating circumstance outweighed the mitigating circumstances," making it clear that the burden of proof is upon the state.  <u>State v. Dixon</u>, 283 So.2d 1 (Fla. 1973).

Petitioner first raised this claim in his Rule 3.850 motion, and the trial court rejected it as procedurally barred.  Exh. H-6 at 933.  On appeal, the Florida Supreme Court also held that this claim was procedurally barred as Petitioner could have and should have raised it on direct appeal.  <u>Cole v. State</u>, 841 So.2d at 429.  Petitioner does not argue that the Florida Supreme Court's rejection of this claim as barred is contrary to or an unreasonable application of federal law, and has not alleged cause or actual prejudice such that the Court should ignore this procedural bar.  As such, the Court cannot consider this claim at the habeas stage.

In addition, both arguments advanced in this claim were raised in Claim Ten and in sub-parts two and 15 of Claim Twelve and were denied.  As discussed at length in the Court's analysis of those Claims, the United States Supreme Court has repeatedly upheld Florida's death penalty scheme, including the method of weighing aggravating and mitigating factors against each other, and the use of the felony murder aggravator. <u>See</u> <u>Hildwin</u>, 490 U.S. 638; <u>Proffitt</u>, 428 U.S. 242.  <u>See also</u> <u>Bertolotti</u>, 883 F.2d at 1524-25 (affirming trial judge's instructions to the jury that it must determine whether sufficient mitigating circumstances exist to outweigh any aggravating circumstances found to exist).  Petitioner

has not cited any authority in support of this claim, and his attempt to revive it at this stage is of no avail.

In an attempt to avoid the procedural bar, Petitioner also raises an ineffective assistance of counsel claim focusing on his counsel's failure to raise these challenges to Florida's death penalty scheme on direct appeal.  It is the law of this Circuit that counsel is not ineffective for failing to advance a tenuous or meritless claim on appeal.  United States v. Nyhuis, 211 F.3d 1340, 1344 (11th Cir.  2000); Bertolotti, 883 F.2d at 1523; Alvord v. Wainwright, 725 F.2d 1282, 1291 (11th Cir. 1984).  Claim XXI is Denied.

CLAIM XXII

> THE PROSECUTOR'S IMPROPER PENALTY PHASE CLOSING ARGUMENT RENDERED LORAN COLE'S DEATH SENTENCE UNRELIABLE IN VIOLATION OF THE FIFTH, SIXTH, EIGHT, AND FOURTEENTH AMENDMENTS TO THE UNITED STATE CONSTITUTION AND THE CORRESPONDING PROVISIONS OF THE FLORIDA CONSTITUTION. APPELLATE COUNSEL WAS INEFFECTIVE FOR FAILING TO RAISE THIS CLAIM ON DIRECT APPEAL.

In Claim Twenty-Two, Petitioner challenges the prosecutor's closing argument during the penalty phase of his trial.  In particular, Petitioner takes issue with two aspects of the prosecutor's closing argument: (1) his statements that the co-defendant, William Paul, could not possibly have killed John Edwards because Paul had a broken hand; and (2) that the jurors should show Petitioner the same level of mercy that he showed to his victims.  The Court will address each aspect separately.

**A.     The "Broken Hand" Argument**

Petitioner raised this "broken hand" argument twice during his Rule 3.850 state court proceedings: first as part of his ineffective assistance of counsel claim (which is discussed above in Claim Thirteen), and second as part of his habeas corpus claim. The trial court rejected the ineffective assistance of counsel argument on its merits, and rejected the habeas claim as procedurally barred. Exh. H-6 at 927-28, 930-31.

On appeal, the Florida Supreme Court did not address whether the habeas claim was procedurally barred, but rather focused on the merits of the claim, and in particular, the fact that it was identical to his prior ineffective assistance of counsel claim:

> We addressed the merits of the "broken hand" argument in that portion of the opinion rejecting Cole's 3.850 motion in which we agreed with the trial court's conclusion that no prejudice was demonstrated as to that unobjected-to comment. For the same reasons, we conclude that the habeas claim based on this same argument lacks merit.

Cole v. State, 841 So.2d at 430.

As in the state courts, Petitioner's argument here concerning the "broken hand" argument mirrors his ineffective assistance of counsel argument discussed by the Court in detail in sub-part three of Claim Thirteen above, and will therefore be denied for the same reasons.

## B.   The "Same Mercy" Argument

Petitioner raised the "same mercy" argument for the first time during his state habeas corpus proceedings. Specifically, Petitioner challenged the following portion of the state prosecutor's argument:

Each and every one of us for the most part have this innate thing in us that is called "mercy." We want to be nice. Most of us do. Probably the only thing that holds this world together is us, at some point, wanting to be nice to each other.

There is every bit of room in this world for mercy. No question. But I submit to you that, in these facts, the time for mercy was as Loran Cole and William Paul planned to rob these two young people. That was the time for mercy.

When they sat by the campfire and talked them into going into the woods at night, to rob them. That was the time for mercy. As they walked down the trail and talked about "the third in line always getting it," that was the time for mercy.

Even as the plan went into action and they were both subdued and they were both willing to give up everything they had - - "Take whatever you want from me. I've got a thousand dollars in my checkbook. I will tell you where the keys to my car are. Have my gold, have my car, have everything I have. Have my Dorito coupon, if it means something to you. But leave us with our lives."

That was the time for mercy. When he picked up the camera to hit him in the head, he could have chosen mercy. When he pulled the knife out of his pocket to cut his throat, he could have chosen mercy. He never chose mercy. Never.

The time for mercy has passed. It's time now for justice. When mercy is taken to an extreme, it ends in indulgence. Justice is a fair and measured response to the wrong done.

Pam and John didn't have a jury. They didn't have a lawyer. They didn't have a judge. Except for one. That man right there was their judge. He didn't chose mercy.

132

It is not fair. It is not just for him to seek mercy where he showed no mercy.

The only just sentence is not just for him to seek mercy where he showed no mercy.

The only just sentence in this case is the most difficult sentence that you could ever be asked to consider and that you could ever bring yourself to pronounce. But, you see, you didn't do it. You did not choose.

Loran Cole chose. And Loran Cole should receive the just consequence for what he chose to do. The only just and appropriate consequence is the sentence of death.

Exh. A-17 at 1559-60.

Petitioner raised this challenge for the first time in his petition for writ of habeas corpus to the Florida Supreme Court. Exh. L. Because he had not raised this argument during his direct appeal, the state contended that it should be procedurally barred. The Florida Supreme Court rejected Petitioner's argument, but not on procedural grounds:

Regarding the "same mercy" argument, we disagree with the State that this argument is procedurally barred, as Cole maintains that the prosecutor's arguments constituted fundamental error and we have not previously addressed the merits of the claim. We find, however, that the "same mercy" argument in this case does not rise to the level of fundamental error. . . .

Cole v. State, 841 So.2d at 430.

According to Petitioner, these statements by the prosecutor were "an unecessary appeal to the jury's sympathies" which the Florida Supreme Court has repeatedly

condemned.  Petitioner's Mem.  of Law at 82.  However, Petitioner has not explained how the prosecutor's statements violate his <u>federal</u> constitutional rights, and does not provide any support for his habeas petition in <u>this</u> Court.  Rather, Petitioner has relied entirely on state law decisions and doctrines, and therefore has not preserved this portion of his claim for federal habeas review.  <u>See</u> <u>Anderson v.  Harless</u>, 459 U.S. 4, 6-8 (1982); <u>Kelley</u>, 377 F.3d at 1344-45.  Nevertheless, because Petitioner contends that the prosecutor's comments constitute fundamental error, the Court will address the merits of this claim.

An improper closing argument by a state prosecutor in a capital sentencing hearing justifies federal habeas relief only if the argument rendered the hearing fundamentally unfair.  <u>Nelson v.  Nagle</u>, 995 F.2d 1549, 1555 (11th Cir.  1993) (The relevant question is whether the prosecutor's closing argument "rendered the sentencing phase of the trial 'so fundamentally unfair as to deny him due process.'").  The Eleventh Circuit Court of Appeals applies the prejudice test from <u>Strickland v.  Washington</u> to establish fundamental unfairness, which requires a showing that, absent the improper argument, there is a reasonable probability that the sentencing outcome would have been different.  <u>Presnell v.  Zant</u>, 959 F.2d 1524, 1528 (11th Cir.  1992).  <u>See also</u>, <u>Nelson</u> 995 F.2d at 1555; <u>Johnson v.  Wainwright</u>, 778 F.2d 623, 630-31 (11th Cir.  1985); <u>Tucker v.  Kemp</u>, 762 F.2d 1496, 1503-09 (11th Cir.  1985) (en banc); <u>Drake v.  Kemp</u>, 762 F.2d 1449, 1458-61 (11th Cir.  1985).

The Florida Supreme Court found the prosecutor's closing argument concerning mercy to be improper, and the state did not dispute this issue under state law.  <u>See</u> <u>Cole v.  State</u>,

841 So.2d at 430; Exh. M at 20-21. Whether the summation was improper under federal constitutional standards is another matter entirely. Of course, a jury argument which is not directly connected to the facts of the particular case and which blatantly appeals to hoped for passion or prejudice on the part of the jury, is universally condemned as improper. But submitting argument about the tension that exists between mercy and justice, as in this case, is not of that stripe. There are cases - and this one may be in that category - where the dispassionate application of the law to the facts in an effort to achieve justice effectively forecloses the indulgence of mercy. Or, stated another way, the nature of the case may be such that granting mercy to the accused would work an insulting injustice not only to the victim of the crime, but to the criminal justice system itself.[52]

Still, the state courts found the prosecutor's argument to be improper and the Court will accept that judgment for the purposes of deciding this claim.

Turning, then, to the probable effect of the prosecutor's closing argument, the Court agrees with the state and with the Florida Supreme Court that the absence of this argument from the penalty phase would not have changed the jury's advisory verdict. The record before the jury clearly demonstrated that Petitioner kidnapped and robbed John Edwards and slit his throat. The prosecutor's comments also do not change the fact that four separate aggravating factors existed in this case, with minimal mitigating evidence. Thus, the record established to a moral certainty that Petitioner killed John Edwards and there is no reasonable possibility that the jury's advisory opinion would have been different in the

---

[52] Judges must steel themselves every day against letting hard cases make bad law. This aging axiom is yet another way of stating the principle that mercy and justice are not the same thing.

absence of the prosecutor's closing argument about eschewing mercy. Petitioner has not demonstrated prejudice under the Strickland test such that habeas relief would be appropriate.

Because Petitioner has not demonstrated that the prosecutor committed fundamental error, or that the Florida Supreme Court's rejection of this claim was contrary to or an unreasonable application of federal law, this portion of Claim XXII is denied.

## C. Ineffective Assistance of Appellate Counsel

Petitioner also argues that his appellate counsel was ineffective for failing to raise the prosecutor's penalty phase closing argument on direct appeal. Because there was no constitutional violation and because this claim has no merit, Petitioner's appellate counsel cannot be found ineffective for failing to raise this claim on direct appeal. Nyhuis, 211 F.3d at 1344; Bertolotti, 883 F.2d at 1523; Alvord, 725 F.2d at 1291. This portion of Claim XXII is also denied.

CLAIM XXIII

FLORIDA'S CAPITAL SENTENCING SCHEME WAS UNCONSTITUTIONAL AS APPLIED, DENYING MR. COLE HIS RIGHTS UNDER THE FIFTH SIXTH, EIGHTH, AND FOURTEENTH AMENDMENTS TO THE UNITED SATES CONSTITUTION.

Petitioner raises four challenges to his sentence based on the United States Supreme Court's decision in Apprendi v. New Jersey, 530 U.S. 466 (2000). Applying Apprendi to this case, Petitioner first argues that Florida's statutory aggravating factors are in actuality elements of the underlying offense, which must be charged in the indictment, proven beyond

a reasonable doubt, and submitted to the jury for a unanimous verdict.  Petitioner claims that

because the four statutory aggravating factors found in the penalty phase of his trial were

not handled in accordance with Apprendi, his constitutional rights were violated.

Together with this constitutional challenge, Petitioner raises three ineffective

assistance of appellate counsel arguments: (1) that his appellate counsel was ineffective for

failing to raise on appeal the trial court's denial of Petitioner's motion for a statement of

particulars, which requested that the state list in the indictment each aggravating factor it

intended to prove at trial; (2) that his appellate counsel was ineffective for failing to raise on

appeal the trial court's denial of his constitutional challenge to Florida's death penalty

scheme that only a bare majority of jurors is sufficient to recommend a death sentence; and

(3) that his appellate counsel was ineffective for failing to raise on appeal the trial court's

rejection of Petitioner's requested jury instruction that an aggravating circumstance must be

found unanimously and established beyond a reasonable doubt.

None of these claims have any merit.  First, both the United States Supreme Court

and the Eleventh Circuit Court of Appeals have held that Apprendi, as well as the Supreme

Court's later decision in Ring v. Arizona, 536 U.S. 584 (2002) do not apply retroactively in

habeas actions.  See Schriro v. Summerlin, 542 U.S. 348, 124 S.Ct. 2519, 2526 (2004)

Harris v. United States, 536 U.S. 545, 581 (2002); Turner v. Crosby, 339 F.3d 1247, 1285

(11th Cir. 2003); McCoy v. United States, 266 F.3d 1245, 1258 (11th Cir. 2001).  In

addition, as Petitioner himself acknowledges, the United States Supreme Court has

repeatedly reviewed and upheld Florida's capital sentencing scheme, and Apprendi does not

overrule that precedent.  See Apprendi, 530 U.S. at 496-97.  Finally, Petitioner's assertion that aggravating factors are elements of the underlying offense has been raised at least twice before in this Petition, without success.  See sub-claims four and 13 of Claim XII, supra.  See also Hildwin v. Florida, 490 U.S. at 640-41 (rejecting this same argument).  As such, his claim that Florida's death penalty scheme is unconstitutional as applied based on Apprendi is Denied.

Turning to his ineffective assistance of counsel claims, this Court has previously found that the Florida Supreme Court's rejection of Petitioner's motion for a statement of particulars was valid and constitutional - aggravating factors are clearly not elements of the underlying offense.  See Hildwin, 490 U.S. at 640-41.  And this Court has also agreed with the Florida Supreme Court's rejection of Petitioner's request for a jury instruction requiring unanimous verdicts on each aggravating factor.  See sub-claim 4 of Claim XII; Claim X, supra.  Finally, Petitioner's argument that a jury's advisory opinion recommending a sentence of death must be by more than a bare majority, has also been rejected in sub-claim 3 of Claim XII, above. Petitioner's attempt to disguise these arguments  as ineffective assistance of counsel claims does not overcome their fatal deficiencies.  Thus, as the Florida Supreme Court correctly determined, the failure of Petitioner's appellate counsel to raise meritless claims on appeal is not ineffective assistance of counsel.  Claim XXIII is denied.

CLAIM XXIV

THE CIRCUIT COURT ERRED IN DENYING MR. COLE'S 3.853 MOTION FOR POSTCONVICTION RELIEF

Petitioner's next claim challenges the trial court's denial of his motion for post-conviction DNA testing of the semen and other bodily fluids and hair found on Pam Edwards person and clothing.  According to Petitioner, DNA testing may have demonstrated that Petitioner and his co-defendant both raped Pam, thereby casting doubt on the remainder of her recollection and testimony, especially with respect to who murdered John Edwards.

Petitioner first sought DNA testing following his conviction, pursuant to Rule 3.853 of the Florida Rules of Criminal Procedure.  The trial court heard argument on this issue on October 30, 2003 and denied the Petitioner's request. Exh. P-4. In particular, the trial court concluded that DNA testing would not have changed the outcome of either the guilt or penalty phase of the trial - there was no reasonable probability that the testing would exonerate Petitioner or mitigate his sentence.

On appeal, Petitioner realleged this same argument, and also argued that the denial of such testing violated his state and federal constitutional habeas corpus rights.  Applying state law precedents, the Florida Supreme Court rejected Petitioner's argument for the same reasons as the trial court - namely, that "the allegations of the [Petitioner's] motion do not give rise to a reasonable probability of Cole being acquitted or receiving a lesser sentence." Cole v. State, 895 So.2d 395, 403 (2004).  The Florida Supreme Court also rejected Petitioner's habeas argument as inapplicable to the case:

> Because we agree with the circuit court that Cole would not have been acquitted or received a lesser sentence if he had offered the DNA test results at trial, any constitutional right to access evidence that "could prove a man innocent in fact or of the death penalty" is not implicated in this case.

139

Id.

This claim is due to be denied both on procedural and substantive grounds. As an initial matter, Petitioner has not raised this claim in terms of a deprivation of a federal constitutional right. Rather, this claim involves state law issues only - an alleged violation of Florida's post-conviction DNA testing process. A mere error of state law does not constitute a denial of due process. Estelle v. McGuire, 502 U.S. 62, 67-69 (1991). Moreover, this Court expresses no opinion on the state trial court's and Florida Supreme Court's interpretations of Florida law. A state's interpretation of its own laws or rules provides no basis for federal habeas corpus relief, since no question of a constitutional nature is involved. See Carrizales v. Wainwright, 699 F.2d 1053, 1055 (11th Cir.1983); Llamas-Almaguer v. Wainwright, 666 F.2d 191 (5th Cir.1982). Since Petitioner's claim for DNA testing is based exclusively on state law issues that is merely "couched in terms of equal protection and due process," it must be denied. Willeford v. Estelle, 538 F.2d 1194, 1198 (5th Cir.1976).[53]

The Court also agrees with the Florida Supreme Court that DNA testing was not warranted in this case. Upon an independent review of the record, it is clear that Petitioner in fact committed the crime for which he was convicted and sentenced, and whether or not

---

[53] The Court agrees with the Florida Supreme Court that Petitioner's last-ditch effort to couch this claim as a denial of his habeas corpus rights is to no avail. Where there is no reasonable probability that a DNA test will either exonerate Petitioner or mitigate his sentence, there is also no reasonable probability that any juror would have changed his or her vote, or that the test would prove Petitioner innocent of the crime or the death penalty such that any federal constitutional rights would be implicated. In fact, the allegations set forth in Petitioner's original motion for DNA testing do not come close to demonstrating factual innocence. See e.g., Bertolotti v. Dugger, 883 F.2d 1503, 1519, n. 12 (11th Cir. 1989) (discussing reasonable probability standard); 18 U.S.C. § 3600 (requiring allegations of "factual innocence" under federal DNA testing procedures).

his co-defendant also raped Pam Edwards would have no bearing on that outcome. Specifically, three of the four aggravating factors found during the penalty phase of Petitioner's trial - (1) conviction of a prior felony; (2) murder occurring in the course of a kidnaping; and (3) murder for pecuniary gain - have absolutely nothing to do with the identity of the person(s) who sexually assaulted Pam Edwards. The trial court's findings concerning the fourth aggravating factor - that the murder was heinous, atrocious or cruel - also does not relate to Ms. Edwards' sexual assault. The trial court nowhere mentions her rape in his sentencing order, nor should he, because Ms. Edwards was not the murder victim. There simply was no showing by Petitioner that a DNA test would have exonerated him or mitigated his sentence. Under these circumstances, the trial court and the Florida Supreme Court properly denied the Rule 3.853 motion for post-conviction DNA testing. This claim is therefore Denied.

## CLAIM XXV

CUMULATIVELY, THE COMBINATION OF PROCEDURAL AND SUBSTANTIVE ERRORS DEPRIVED MR. COLE OF A FUNDAMENTALLY FAIR TRIAL GUARANTEED UNDER THE SIXTH, EIGHTH, AND FOURTEENTH AMENDMENTS, AND THE TRIAL COURT ERRED IN DENYING AN EVIDENTIARY HEARING

Petitioner's final claim is a combination of his 24 previous claims, none of which have any merit. Petitioner previously raised this claim in his Rule 3.850 motion with respect to his numerous allegations of ineffective assistance of counsel, as well as the various alleged trial court errors. The Florida Supreme Court rejected this claim on appeal on the basis that all

of the underlying claims were found to be without merit.  <u>Cole v.  State</u>, 841 So.2d at 418,

429.  The same analysis applies here.  Because the Court has found that there is no merit

to any of the prior 24 claims, including each sub-part, as alleged in Petitioner's habeas

petition, this final cumulative claim is similarly deficient and shall be Denied.

## <u>CONCLUSION</u>

Because the Court has found that the Petition for Habeas Corpus was not timely filed

and that none of the claims contained within the  Petition have any merit, the Petition (Doc.

1) is DENIED WITH PREJUDICE.  The State's Motion to Dismiss (Doc. 13) is GRANTED.

The Clerk is directed to enter judgment accordingly, terminate any pending motions, and

close the file.

IT IS SO ORDERED.

DONE and ORDERED at Ocala, Florida this 3rd day of May, 2006.


_____

UNITED STATES DISTRICT JUDGE


Copies to:   Counsel of Record